Dean R. Broyles, Esq., CA Bar No. 179535
dbroyles@nclplaw.org
NATIONAL CENTER FOR LAW & POLICY
539 West Grand Ave.
Escondido, CA 92025
Telephone:   (760) 747-4529
Facsimile:    (760) 747-4505

Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
Julianne Fleischer, Esq. CA Bar No. 337006
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:   (951) 600-2733
Facsimile:    (951) 600-4996

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHURCH OF COMPASSION**, a California Non-Profit Corporation, **DAYSPRING CHRISTIAN LEARNING CENTER**, a subsidiary of the CHURCH OF COMPASSION;<br><br>            Plaintiffs,<br><br>       vs.<br><br>**ROB BONTA**, in his official capacity as Attorney General of the State of California; **KIM JOHNSON**, in her official capacity as the Director of the California Department of Social Services; **JESSIE ROSALES**, in his official capacity as the Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services; **SEAN HARDIN**, in his official capacity as the Acting Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services,<br><br>            Defendants. | Case No.:  **'23 CV 0470 AGS WVG**<br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF:**<br><br>**1) DEPRIVATION OF THE FREE EXERCISE OF RELIGION**<br><br>**2) DEPRIVATION OF THE FREEDOM OF SPEECH**<br><br>**3) STATE ESTABLISHMENT OF RELIGION/HOSTILITY TOWARDS RELIGION** |

## INTRODUCTION

1.      This Action brings facial and as applied constitutional challenges to new government mandates recently issued by the State of California Department of Social Services

("CDSS") which completely bar houses of worship and religious organizations that maintain traditional religious beliefs regarding human sexuality from continued participation in the Child and Adult Food Care Program ("CACFP" or "Food Program"). These religious beliefs were uncontroversial for more than 2,000 years of human history and continue to be held by most major world religions. These new CDSS directives, on their face and as applied to Plaintiffs, violate the Free Exercise Clause, the Free Speech Clause and the Establishment Clause which are civil rights guarantees embodied in the U.S. Bill of Rights, specifically the First Amendment to the U.S. Constitution.

2.    The Church of Compassion ("Church") and its Dayspring Learning Center ("Dayspring" or "Preschool") have been consistently, humbly and compassionately loving their neighbors by identifying and meeting the needs of their community for more than two decades. El Cajon, California, where the church and preschool are located, has a large immigrant population and many of the families served by the Church and Preschool live below the poverty level.  Dayspring serves all families and children, including several LGBTQ+ families who understand and appreciate the religious instruction their children receive at the Preschool and have no desire to force the Church to change its religious beliefs.  However, while the Church and Preschool serve all families, they will not teach or promote all messages.

3.    By implementing the CDSS' new inflexible mandates, the State of California brazenly attempts to coercively force the Church and Preschool to completely surrender and waive their sincerely held orthodox Christian religious beliefs and practices regarding human sexuality. This is achieved by the government's unconditional demand that the Church and Preschool agree to fully comply with the new "sexual orientation" and "gender identity" mandates (including in their religious employment practices) ("SOGI Rules" or "Statist Sexual Orthodoxy Mandates") or forfeit their right to continue to receive generally available public funds used to feed needy children, including immigrants, in their community. This is a Faustian bargain that no church or religious institution should ever be forced to make in a free nation. Where is the promise of diversity, equality, tolerance and inclusion for our religious citizens and organizations?

4.      Because the Church and Preschool had the temerity to refuse to unconditionally surrender and waive their deeply held religious beliefs and practices by agreeing to comply with the new Statist Sexual Orthodoxy Mandates, CDSS unlawfully suspended the Church and Dayspring from the Food Program, effective December 29, 2022.  Ironically, California has, purportedly in the name of ending LGBTQ+ discrimination, aggressively targeted all religious organizations who dare to hold divergent viewpoints from the new Statist Sexual Orthodoxy Mandates for negative treatment, including moral derision and financial exclusion. This is antithetical to the First Amendment promise of religious freedom. This also contradicts the federal governments' decision (USDA) to accommodate religion by granting automatic exemptions under Title IX to religious schools that maintain beliefs and practices in conflict with its SOGI provisions.

5.      California must be reminded that the U.S. Constitution remains the highest law in the land.  Therefore, California and its state agencies have no jurisdiction to interfere in the autonomy of houses of worship, except under very rare and extreme circumstances. Simply put, the government does not have the authority to force religious institutions to compromise their deeply and sincerely held religious beliefs and practices about human sexuality, capitulate to the new Statist Sexual Orthodoxy Mandates, or pressure religious groups and people to assimilate to conflicting sexual philosophies. Furthermore, a government's antidiscrimination interest does not justify "enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson as next friend of O. C. v. Makin*, 142 S.Ct. 1987, 1996–98 (2022).  Yet this is precisely what California has done here.

6.      This Action alleges causes of action against the CDSS for violating the Church's free exercise and free speech rights under the United States Constitution by denying the Church's CACFP application and disqualifying the Church from participation in CACFP. This Action also alleges a cause of action against CDSS for violating the Establishment Clause because it demonstrates impermissible hostility towards religion by forcing its Statist Sexual Orthodoxy on houses of worship and other religious organizations.

**PARTIES – PLAINTIFF**

7.     Plaintiff Church of Compassion, Inc. ("Church") is a California Non-Profit Corporation and is a Christian church organized exclusively for religious purposes. The Church is located in the city of El Cajon, California.  The Church owns and operates the Dayspring Christian Learning Center, a Christian preschool and daycare program ("Dayspring").

**PARTIES – DEFENDANTS**

8.     Rob Bonta is the Attorney General of the State of California. He is sued in his official capacity only.

9.     Kim Johnson is the Director of the California Department of Social Services. She is sued in her official capacity only.

10.     Jessie Rosales is the Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services. He is sued in his official capacity only.

11.     Sean Hardin is the Acting Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services. He is sued in his official capacity.

**JURISDICTION AND VENUE**

12.     This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983.

13.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

16.     The Church of Compassion is a non-denominational Christian church which maintains biblically orthodox religious beliefs and practices regarding human sexuality, as most Christian churches have faithfully maintained for the past two thousand years.

17.     The Church operates Dayspring, a religious preschool and daycare program, which is licensed to serve up to 112 children in the community.

18.     Dayspring teachers are required to subscribe to a statement of faith in the employee handbook and have religious and theological teaching responsibilities, including reading and explaining Bible stories to students. During chapel services, teachers lead the students in Christian songs worshipping God and also pray with the students.  A true and correct copy of Dayspring's employee handbook is attached hereto as **Exhibit A**.

19.     Parents who choose to send their children to Dayspring are on notice and understand that the preschool and daycare program is affiliated with the Church of Compassion and is operated as a Christian program.  They are provided with a parent handbook which explicitly includes Dayspring's articles of faith and mission statement. A true and correct copy of Dayspring's parent handbook is attached hereto as **Exhibit B**. Specifically, parents are informed that children will be taught:

> The Bible is the Sovereign Word of God. Jesus Christ is the Son of God, born of the virgin Mary. Jesus died to atone for our sins. Jesus rose on the third day, lives today, and is coming again to receive those that believe and wait for His return. Salvation is obtained by grace alone through faith. The Holy Trinity includes the Father, the Son, and the Holy Spirit.

20.     The CDSS is on notice and is aware that the Church and Dayspring are faith-based organizations. For instance, the Church provides a public Statement of Faith on its website and describes itself on its "About" tab as a "church that is Spirit Filled, centered upon the Word of God and is family oriented." On its website, Dayspring describes itself as the "Child Development Center of Church of Compassion" and links to the Church's website. Furthermore, the CDSS acknowledges that it has reviewed Dayspring's employee handbook

(See Exhibit A), which also includes a statement of faith and clearly lays out the Christian religious beliefs and practices inculcated at Dayspring.

21.     El Cajon, California, where the Church and Preschool are located, is home to a large immigrant community.  Many people living in the area are originally from Syria, Iraq and Mexico, among other nations. Approximately 28% of its residents were not born in the United States. The median income is comparatively lower than other areas of the State with approximately 19% of the population living below the poverty level.

22.     The Church and Dayspring have been consistently, humbly and compassionately loving their neighbors by identifying and meeting the needs of their community for more than two decades. Approximately 40% of the students attending the Preschool are in families living below the poverty level and may be receiving some form of tuition assistance.  The Preschool's participation in the Food Program is especially important for these needy families and children.

23.     The Preschool welcomes all families who understand and agree to participate in its faith-based program where Christian beliefs and values, including love, are inculcated and experienced. The Preschool does not discriminate against children based on the gender identity or the sexual orientation of student family members.  In fact, there are several LGBTQ+ families whose children attend the Preschool.  These families understand and appreciate the Christian education their children are receiving at Dayspring and are upset that the CDSS would try to force the Church and Preschool to change their religious beliefs and employment practices in order to continue to receive Food Program monies.

24.     The Church and Dayspring successfully participated in the CACFP Food Program, with no legal issues to speak of, through the California Department of Education ("DOE") for nearly twenty years, through early 2022.

25.     As a result of its participation in the Food Program, in 2022 for example, Dayspring received state taxpayer funds of approximately $3,500 to $4,500 a month, to help cover food-related costs for indigent students in its daycare and preschool program.

26.     To participate in the Food Program and receive state funds, the DOE required the Church to submit an annual application which includes signing Civil Rights Compliance

paperwork each year.  However, prior to 2022, the non-discrimination statement Dayspring was required to sign did not include sexual orientation or gender identity ("SOGI").

27.     After assuming responsibility from the DOE for CACFP sometime in 2022, the CDSS issued new and different compliance language in the "Assurance of Civil Rights Compliance," Permanent Single Agreement ("PSA") form dated April 2022. A true and correct copy of this new form is attached hereto as **Exhibit C**.

28.     The new 2022 CDSS PSA required the Church and Dayspring to certify that their management of the CACFP Food Program will be "operated in compliance with all applicable civil rights laws and will implement all applicable non-discrimination regulations.  Unless otherwise made inapplicable by law, the program operator agrees to comply with…Title VII…USDA non-discrimination regulations…to the effect that no person shall be discriminated against on the basis of…sex [including sexual orientation and gender identity] …." ("SOGI Rules" or "Statist Sexual Orthodoxy Mandates").

29.     Because of the Church's orthodox religious beliefs regarding human sexuality, it was unable to comply with the PSA when it submitted its application for the 2022-2023 year. Specifically, Dayspring signed the PSA statement, but deleted the words "sexual orientation" and "gender identity."  A true and correct copy of Dayspring's 2022 Food Program application form is attached hereto as **Exhibit D**.

30.     In response, Defendant Jessie Rosales, Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services, submitted an ominous and threatening letter to the Church dated October 20, 2022 with the subject:  NOTICE OF DENIAL OF APPLICATION AND DETERMINATION OF SERIOUS DEFICIENCY ("CDSS Notice"). A true and correct copy of this CDSS Notice is attached hereto as **Exhibit E**.

31.     The CDSS Notice explained that the Church and Dayspring's application for participation in the CACFP Food Program was denied because Plaintiffs had refused to agree to sign and comply with the PSA's SOGI Rules.

32.     Defendant Rosales' letter states, "While the Legislature strongly supports religious freedom, it has also explicitly stated that religious freedom should not be a justification

for discrimination. To that end, the Legislature enacted California Government Code sections 11135 and 11139.8, which prohibit discrimination based on gender identity and sexual orientation in any program or activity that is operated or administered by the State, is funded by the State, or receives State financial assistance."

33. The CDSS Notice proceeds to note two specific "violations."

34. The first alleged "violation" was that the Church's application requested a modification of the PSA's new non-discrimination clause, specifically excluding "gender identity" and "sexual orientation" from being included in the definition of "sex."

35. The second alleged "violation" was that the Church and Dayspring "requires all employees to read and abide by a staff handbook that specifically disallows "lesbians, gay, bisexual, and transgender lifestyles."

36. Completely ignoring the reality that the U.S. Constitution is the supreme law of the land, trumps contrary state and federal laws, and specifically guarantees Plaintiffs' religious free exercise and free speech, Defendant Rosales improperly concluded the Church violated state law—namely—California Government Code sections 11135 and 11139.8 and federal law— namely—Title 7 of the Code of Federal Regulations (CFR) section 226.6(c)(2)(ii). As a Church, with explicit First Amendment protections and applicable federal exemptions, Plaintiffs' religious beliefs and practices regarding human sexuality were neither in violation of the California Government Code sections 11135 and 11139.8 nor Title 7 of the Code of Federal Regulations (CFR) section 226.6(c)(2)(ii).

37. The CDSS Notice demanded that the Church and Dayspring, in order to continue receiving state funding, could take corrective action within 15 days of receipt of the CDSS notice only by: (1) signing the PSA agreeing to comply with the new SOGI Rules / Statist Sexual Orthodoxy Mandates without modification; (2) attesting to compliance with all state and federal laws, including Title VII, which according to CDSS' misguided interpretation, purportedly mandate the Church's compliance the new SOGI Rules (3) stopping requiring Church employees to sign or abide by its handbook or any other policy not in compliance with the

Gender Identity and Sexual Orientation Rules; and (4) providing the CDSS with an updated copy of the Church employee handbook, presumably to receive the government's blessing.

38.     If the Church and Dayspring refused to comply with all of these onerous demands, Defendant Rosales threatened that failure to comply would result in the termination of the Church's operation of the CACFP Food Program, disqualification of the Church from future program participation, and placement of the Church and Dayspring on the National Disqualification List.

39.     The CDSS Defendants' flagrant disregard for Plaintiffs' religious beliefs and practices regarding human sexuality and its strict enforcement of the PSA and/or the federal government's (USDA) non-discrimination statement stands in glaring contrast to the USDA's own guidance concerning SOGI rules and religious educational institutions. On August 12, 2022, the USDA issued a memorandum stating that Title IX of the Education Amendments of 1972, which "prohibits sex discrimination by educational institutions receiving financial assistance from the federal government," "includes some exceptions, including one permitting an institution to be exempt on religious grounds if there is a conflict between Title IX and a school's governing religious tenets." A true and correct copy of the USDA memorandum is attached hereto as **Exhibit F**.

40.     This federal USDA SOGI exemption for religious schools is automatic. An educational institution may, but is not required to, submit a written request to the USDA in order to claim a Title IX Religious Exemption (See Exhibit F).  Nevertheless, despite this clear federal guidance which respects religious freedom, the CDSS defendants continued to coercively force its Statist Sexual Orthodoxy Mandate on the Church and Preschool, without making any attempt whatsoever to accommodate or exempt the Preschool from its draconian requirements, but rather seeking to forcing the Church to abandon its religious tenants in order to continue serving the community.

41.     On November 4, 2022, the Church timely appealed CDSS's denial of its CACFP application to the Office of Administrative Hearings ("OAH"), requesting a written review of the denial, pursuant to 7 C.F.R., part 226.6(k).  The appeal also served as a legal demand letter

to CDSS, requesting that it immediately stop violating Plaintiffs' constitutional rights and immediately approve their application for Food Program Funding. A true and correct copy of Plaintiffs' Appeal and Demand Letter is attached hereto as **Exhibit G**.[1]

42.    In spite of the fact that the applicable Food Program regulations require that the CDSS must continue to fund organizations during the pendency of an administrative appeal, CDSS inexplicably locked Dayspring out of access to its Child Nutrition Information and Payment System (CNIPS) website sometime in October 2022, prematurely cutting off Dayspring's Food Program funding. This unannounced lockout was before Plaintiffs 15-day response/appeal period elapsed (November 4th) and well before the appeal was decided (December 28th). Furthermore, CDSS waited to notify Dayspring that its CNIPS access was reinstated until November 30, 2022, more than three weeks after the matter was officially brought to CDSS's attention.

43.    On December 28, 2022, Administrative Law Judge Sean Gavin dismissed the Church's appeal, holding that he and the OAH do not have the jurisdiction to decide the Church and Dayspring's constitutional challenges to the SOGI Rules. A true and correct of the OAH ruling is attached hereto as **Exhibit H**.

44.    On January 30, 2023, Defendant Sean Hardin, Acting Chief of the Child and Adult Care Food Program at CDSS submitted a letter to the Church and Dayspring with the subject: 2022–23 APPLICATION DENIAL APPEAL DECISION LETTER FOR CNIPS ("CDSS Decision"). A true and correct copy of the CDSS letter is attached hereto as **Exhibit I**.

45.    In the CDSS Decision letter, it affirmed its decision to deny the Church's CACFP 2022-2023 application, terminated the Church's agreement with CDSS to operate CACFP effective December 29, 2023, and disqualified the Church from participation in CACFP.

46.    Defendant Hardin falsely alleged in the Decision Letter that the OAH's administrative ruling somehow affirmed or approved the CDSS's decision to unilaterally

---

[1] The actual date Plaintiffs' appeal and demand letter was finalized and submitted to the OAH and CDSS is November 4, 2022, however it was mistakenly dated October 4, 2022.

terminate its longstanding agreement with the Church permitting CDSS to withhold neutrally available taxpayer funds used to feed indigent children based solely on the Church's sincerely held religious beliefs and practices regarding human sexuality.

47.     However, the OAH's ruling merely held that it did not have jurisdiction to decide the serious constitutional issues involved nor the power to decide CDSS's allegations against the Church of substantial non-compliance.

48.     The CDSS Decision Letter included, but did not explain or address, as its last attachment, a USDA "Non-discrimination Statement," which asked for counsel's signature.

49.     The attached USDA statement confusingly did not list "gender identity" and "sexual orientation" as protected categories, but only "sex."

50.     The CDSS Decision Letter did not explain why, post-termination of the Church from CACFP regarding SOGI issues, it attached a different USDA statement and requested the Church's counsel to sign the statement on behalf of the Church.

51.     On February 21, 2023, the CDSS' Jessie Rosales, emailed the Church and Dayspring confirming yet again their Food Program application denial and that Plaintiffs are no longer eligible to participate in the Food Program.  He apologized for any confusion and clarified that the USDA non-discrimination sent with the January 30, 2023 correspondence (missing SOGI) was attached pro forma and that the CDSS is in the process of updating its non-discrimination language to include "sexual orientation" and "gender identity."  A true and correct of this CDSS email is attached hereto as **Exhibit J.**

52.     Consistent with the CDSS's repeated threats to the Church, on or about February 7, 2023, "C2Hardin" who is believed to be, on information and belief, Defendant Sean Hardin, terminated the Church's access to the CNIPS web portal with the message "The sponsor's enrollment was closed/terminated by: CDE terminated for the year as of: 12/30/22."

# FIRST CAUSE OF ACTION

## Deprivation of Civil Rights—Free Exercise of Religion (First Amendment)

## (By all Plaintiffs against all Defendants)

53.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 51 of this Complaint as though set forth fully herein.

54.     This cause of action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United State Constitution.

55.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to the free exercise of religion.

56.     Plaintiffs have sincerely held religious beliefs that the Bible is the infallible, inerrant word of God and that they are obligated to believe and obey its teachings. Plaintiffs believe they are commanded by God to love their neighbors as themselves.  They also believe that God created and designed men and women in His image, male and female, and that human sexuality is defined and determined by the Creator, not by human feelings or desires.  They also believe that God loves everyone and that God wants everyone to know Him and have a personal relationship with God through Jesus Christ. They also believe that God has commanded and called Christians to love all people, even those who disagree with their religious beliefs—including their beliefs about human sexuality.

57.     The CDSS Food Program's new SOGI Rules, on their face and as applied, treat religious churches and private religious schools that maintain traditional religious beliefs about human sexuality, including Plaintiffs, differently and more harshly compared to how the SOGI Rules treat comparable public schools, secular private schools and even secularized religious private schools that agree with the new State Sexual Orthodoxy.

58.     The SOGI Rules, on their face and as applied, allow all other secular public or secular private schools and even secularized religious schools who may agree with the new State Sexual Orthodoxy to continue to freely participate in the Food Program and continue to receive public funding.  The CDSS policy and practice of barring the participation in the Food Program and blocking generally available public funding only for certain religious organizations that

maintain traditional religious views regarding human sexuality, constitutes an infringement of a deprivation of Plaintiffs' constitutionally protected right to the free exercise of religion.

59.    The Defendants' SOGI Rules, on their face and as applied, do not allow any religious exemptions for places of worship or other religious organizations, including Plaintiffs, despite the USDA's clear guidance exempting institutions from SOGI Rules based upon their religious tenants.

60.    The SOGI Rules, on their face and as applied, ignore and fail to make any attempt to accommodate the sincerely held religious beliefs and practices of places of worship and other religious organizations, including Plaintiffs.

61.    The CDSS's SOGI Rules, on their face and as applied, impose a substantial burden on Plaintiffs' free exercise of religion. *See Sherbert v. Verner*, 374 U.S. 398 (1963). The requirements to comply with the Statist Sexual Orthodoxy Mandates places substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings and tenets of the Holy Bible including, but not limited to, those tenets regarding God's design of men and women in exchange for continuing to be able to feed indigent children in their community.

62.    The SOGI Rules, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs or Defendants' imposed new State Sexual Orthodoxy value system.

63.    A state violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

64.    A state's antidiscrimination interest does not justify "enactments that exclude some members of the community from an otherwise generally available public benefit because

of their religious exercise." *Carson as next friend of O. C. v. Makin*, 142 S.Ct. 1987, 1996–98 (2022).

65.     Defendants do not have a compelling interest that justified their discrimination against and/or imposition of substantial burden upon houses of worship and other religious institutions, including Plaintiffs' religious beliefs and activities.

66.     Even if Defendants did have a compelling state interest in eradicating discrimination, the Defendants' SOGI Rules, on their face and as applied, do not employ the least restrictive means available to fulfill ending discrimination because the new State Sexual Orthodoxy policies blatantly discriminate against houses of worship and other religious organizations that maintain traditional views of human sexuality, including Plaintiffs, while providing no religious exemptions nor any reasonable attempt to accommodate religion—but rather defaming Plaintiffs' religious beliefs as bigoted and discriminatory and not worthy of recognition or respect.

67.     The SOGI Rules, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.  The SOGI Rules, rather impose the *most* restrictive means on religiously orthodox houses of worship and schools, including Plaintiffs, specifically, a total ban on participation in the Food Program and a complete bar of public funds.

68.     The SOGI Rules, on their face and as applied, constitute a religious gerrymander.

69.     Additionally, the unconstitutional condition's doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *San Diego County Water Authority v. Metropolitan Water Dist. of Southern California*, 12 Cal.App.5th 1124, 1159 (2017) (citing *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604 (2013)).

70.     Under the unconstitutional condition's doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz*, 133 S.Ct. at 2594 (internal quotation and citation omitted). The doctrine "limits the government's ability to exact

waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *See, e.g.*, *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006)

71.     The CDSS's policy requiring compliance with its SOGI Rules constitutes an unconstitutional condition because it requires the Church and Preschool to waive their rights to the free exercise of its religion and freedom of speech (see below) in order to continue to receive the public benefits.

72.     In engaging in the actions alleged above, Defendants acted under color of law and within the course and scope of their employment at the State.

73.     The SOGI Rules, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs' immediate and irreparable harm, and actual and undue hardship.

74.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

75.     WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## SECOND CAUSE OF ACTION

### Deprivation of Civil Rights—Freedom of Speech (First Amendment)

### (By all Plaintiffs against all Defendants)

76.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 75 of this Complaint as though set forth fully herein.

77.     The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from abridging the right to free speech.

78.      It is a basic First Amendment principle that "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61, (2006). Content-based regulations "target speech based on its communicative content." *National Institute of Family Life v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). "Viewpoint

discrimination is …. an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

79.   As a general matter, such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

80.   The Government "'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Forum for Academic and Institutional Rights*, 547 U.S. at 59 (quoting *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 210 (2003)).

81.   A funding condition can result in an unconstitutional burden on free speech rights. *See Forum for Academic and Institutional Rights*, 547 U.S. at 59 (the First Amendment supplies a limit on the "ability to place conditions on the receipt of funds"); *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 547 (2001) (A state "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.").

82.   The SOGI Rules, on their face and as applied, seek to coerce the Church and Dayspring to bring all of their policies and procedures, including the written employment handbook, in alignment with the new Statist Sexual Orthodoxy Mandate. This represents a transparent attempt by state Defendants to tell Plaintiffs what they must say (and what they must believe) about sexual orientation and gender identity.

83.   The SOGI Rules aggressively seek to regulate the Church and Dayspring's speech, including its religious speech, based on its communicative content (i.e. Plaintiffs must by policy and practice only affirm gender identity and sexual orientation in all employment communications and decisions), which is a content-based restriction and is presumptively unconstitutional.

84.   The SOGI Rules, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' speech.

85.     The SOGI Rules, on their face and as applied, unconstitutionally discriminate on the basis of the content of Plaintiffs' speech, specifically its religious content regarding human sexuality.

86.     The SOGI Rules, on their face and as applied, unconstitutionally discriminate against Plaintiffs' speech on the basis of viewpoint, specifically Plaintiffs' religious viewpoints regarding SOGI which conflict with Statist Sexual Orthodoxy.

87.     Defendants' Food Program explicitly and only concerns itself with feeding students and the elderly.  Yet, the Defendants attempts to force recipients of funding in the Food Program explicitly to agree and comply the SOGI Rules, which directly affirm gender identity and sexual orientation—which has nothing to do with feeding children.

88.     Making its SOGI Rules, on their face and as applied, a condition of Food Program funding of Church and Dayspring results in an unconstitutional burden on Plaintiffs' free speech rights.

89.     Defendants lack a compelling, legitimate, or rational interest in the SOGI Rules, on their face and as applied, particularly in the light of the differential standards for traditional and orthodox churches and faith-based institutions (banning Food Program participation and funding) compared to other secular schools or institutions (allowing Food Program participation and funding).  The state has no compelling interest whatsoever in mandating what houses of worship or religious institutions must say, whether expressed verbally or in writing.

90.     Even if the SOGI Rules were supported by a compelling interest, they are not narrowly tailored to accomplish the government's purported interest because they operate as a blanket ban on all churches, religious schools and other religious institutions with traditional historically orthodox biblical viewpoints on human sexuality.

91.     The SOGI Rules, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.  The SOGI Rules rather impose the *most* restrictive means on certain houses of worship, including Plaintiffs', here, a complete and total ban on all Food Program participation and funding.

92.     On their face and as applied, the SOGI Rules' violation of Plaintiffs' right to free speech has caused, is causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

93.     Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their constitutional rights.

94.     WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

<div align="center">

**THIRD CAUSE OF ACTION**

**Violation of the Establishment Clause of the First Amendment to the**

**U.S. Constitution**

**(By all Plaintiffs against all Defendants)**

</div>

95.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 of this Complaint as though set forth fully herein.

96.     The Establishment Clause of the First Amendment to the U.S. Constitution, mandates, among other things, that "Congress shall make no law respecting an establishment of religion…."  U.S. Const. amend. I, §1. The Establishment Clause is incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution.

97.      "The establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church….[n]either can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." *Everson v. Board of Educ. of the Township of Ewing, et al.*, 330 U.S. 1 (1947) (internal quotes omitted).

98.     Defendants' SOGI Rules, on their face and as applied, violate the Establishment Clause of the First Amendment because they punish Plaintiffs traditional orthodox religious beliefs about human sexuality, coercing Plaintiffs to permanently surrender, abandon and waive these religious beliefs *and* concurrently profess belief in state's new religious beliefs about

VERIFIED COMPLAINT

human sexuality (Statist Sexual Orthodoxy Mandate) in order for Plaintiffs to continue to continue to receive public funds to feed needy children in their community.

99.   The Establishment Clause also prohibits excessive government entanglement with religion. The SOGI Rules, on their face and as applied, excessively entangle the government with religion because it provides the Defendants with the overweening authority to monitor and control the religious beliefs and practices of houses of worship and religious organizations including, but not limited to, reviewing Plaintiffs' personnel handbook, monitoring their employment practices, and even interfering with who the Church and Preschool must hire or fire as its lead pastor, youth pastor, preschool teachers, or choir director.

100.   "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943).

101.   Defendants' SOGI Rules, on their face and applied, violate this fundamental constitutional principal because, by the CDSS aggressively enforcing them against houses of worship and religious schools, Government Defendants are attempting to coercively prescribe what is orthodox (correct and acceptable to believe) in religion by forcing Plaintiffs, who maintain contradictory religious beliefs, to confess by word and actions their faith in the new Statist Sexual Orthodoxy.  This must not stand.

102.   The Establishment Clause also prohibits the government from showing hostility toward religion and prohibits the government from showing favoritism towards one religious sect over another or towards non-religion and religion.

103.   The SOGI Rules, on their face and as applied, facilitate the Defendants' open and rampant display of impermissible government hostility toward religious speech and religious free exercise.

104.   Defendants' policy and practice of excluding the Church and Dayspring from its Food Program solely because the church refuses to capitulate to the new State Sexual Orthodoxy Mandate embodies government hostility toward religious beliefs and religious expression and

represents the state's unlawful coercive attempt to impose its substitute (religious) beliefs about human sexuality on places of worship and religious institutions, both which are forbidden under the First Amendment's Establishment Clause.

105.    Defendants' SOGI Rules, on their face and as applied to Plaintiffs, evinces both discriminatory coercion of religious beliefs and speech (i.e., forcing Plaintiffs to parrot and implement the new Statist Sexual Orthodoxy Mandate) and discriminatory suppression of religious beliefs and speech (i.e., forcing Plaintiffs to conceal and suppress their sincerely held religious beliefs about human sexuality). These SOGI Rules are not neutral, but rather evidence impermissible government hostility toward religion.

106.    Defendants' SOGI rules, on their face and as applied, send the message to houses of worship and other religious entities, that organizations that maintain traditional historically orthodox biblical beliefs about human sexuality are second-class institutions, outsiders, and not full members of the community.

107.    Defendants' imposed new Statist Sexual Orthodoxy Mandate, on its face and as applied, by excluding houses of worship and schools that maintain traditional religious beliefs about human sexuality while concurrently permitting secular institutions with points of view that align with the state's SOGI Rules to continue to participate in the Food Program, communicates to Plaintiffs and others that traditional religious institutions are unwelcome outsiders and shamed pariahs.

108.    Defendants' decision to, in violation of applicable regulations, prematurely cut off the Church and Dayspring's Food Program funding several months before the administrative appeal was resolved, demonstrates Defendants' impermissible government hostility towards religion, which is forbidden by the Establishment Clause.

109.    Defendants' comparison of Plaintiffs' sincerely held religious beliefs about human sexuality to racial or sexist bigotry and discrimination evidences impermissible government hostility towards religion. Defendant Jessie Rosales' October 20, 2022 correspondence, which states that "religious freedom should not be a justification for

discrimination" simultaneously demonstrates both a profound government ignorance of and unvarnished targeted hostility towards religion and religious people.

110.    This government statement falsely implies that all houses of worship or religious institutions with divergent viewpoints about human sexuality from the state's sexual orthodoxy, such as Plaintiffs, must always necessarily harbor feelings of hatred or discrimination against LGBTQ+ persons. In other words, if you disagree with any of the government's new ideas about human sex, you are automatically a bigot. This implication is untrue as applied to Plaintiffs and is defamatory.  Christians are commanded by Jesus to love individuals and simultaneously disagree with some life choices—and Plaintiffs are entirely capable of so doing.  The specious charge that if you disagree with others on this issue, you must necessarily be hateful, is a tired, divisive, uncivil and toxic accusation.  Reasonable loving people can disagree.

111.    Defendants' determination of the Church and Dayspring's sincerely held religious objections to its SOGI Rules and their decision to categorize these reasonable religious objections as a "Serious Deficiency" evidences impermissible government hostility towards religion.

112.    Defendants' threat of placing the Church and Dayspring on the "National Disqualified List" evidences impermissible government hostility towards religion.

113.    Defendants' SOGI Rules and CDSS' correspondences with Plaintiff are a transparent and religiously hostile attempt by the state to forcibly eradicate traditional religious beliefs and practices concerning human sexuality, including Plaintiffs' and coercively replace them with the new State Sexual Orthodoxy.

114.    Defendants' SOGI Rules, on their face and as applied, require government actors, who are not theological experts, to review, scrutinize and judge the written and spoken statements of places of worship and other religious institutions (here Plaintiffs' Employee Handbook, and other Plaintiffs' documents), to determine whether the statements made by religious institutions regarding human sexuality align with the new State Sexual Orthodoxy.

115.    "The First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith

and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). The Defendants' SOGI Rules, on their face and as applied, coercively deny places of worship and religious institutions, including Plaintiffs, the freedom to maintain their religious autonomy, including their inherent right to maintain their distinct, deeply and sincerely held religious beliefs regarding human sexuality, engage in the public expression of those same religious beliefs, or act in conformity with their religious beliefs.

116. On the contrary, Defendants' SOGI Rules, on their face and as applied, seek to coercively force places of worship and religious institutions, including Plaintiffs, to surrender and waive under duress their rights of religious autonomy and allow the CDSS' defendants to force upon places of worship and other religious institutions its new State Sexual Orthodoxy.

117. No compelling state interest exists to justify Defendants' coercive attempt to, by the means of its SOGI Rules and funding threats, to obliterate and replace Plaintiffs constitutionally protected religious beliefs and practices regarding human sexuality.

118. The state Defendants' alleged power, by imposing their SOGI Rules, on their face and as applied, to determine which individuals will or will not be employed to minister at Plaintiff's Church and Preschool also violates the Establishment Clause, which prohibits government involvement in such purely ecclesiastical decisions. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012).

119. The ministerial exception to allegations that churches or religious schools have violated government non-discrimination provisions is not limited to those who have the title of "minister." This exception is clearly applicable to teachers at a religious school who are not in the traditional lead pastor role at a church. *Id.* at 190–91; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063-64 (2020).

120. *Hosanna-Tabor's* ministerial exception protects churches and religious schools from both federal and state anti-discrimination claims. *Id.* at 194, n.3.

121. Defendants' policies and practices therefore violate the Establishment Clause of the First Amendment to the United States Constitution, as incorporated and applied to Defendants.

122.    The SOGI Rules, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

123.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their cherished constitutional liberties.

124.    WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

A.    Nominal damages for violations of Plaintiffs civil rights;

B.    For other damages in an amount to be proven at trial;

C.    For declaratory relief that Defendants SOGI Rules, on their face and as applied, violate Plaintiffs rights to the freedom of speech; the free exercise of religion and Establishment Clause;

D.    For injunctive relief ordering Defendants to reinstate Plaintiffs' Food Program Agreement effective December 29, 2022 and prohibiting the Defendants from enforcing or implementing the SOGI Rules against Plaintiffs in the future;

E.    For costs, attorneys' fees and interest, as allowed by law; and

F.    For such other and further relief the Court determines is proper.


                                    Respectfully submitted,
                                    NATIONAL CENTER FOR LAW & POLICY

Dated: March 10, 2023              /s/ Dean R. Broyles, Esq.
                                    Dean R. Broyles
                                    Attorneys for Plaintiffs

                                    ADVOCATES FOR FAITH & FREEDOM

Dated: March 10, 2023              /s/ Mariah R. Gondeiro, Esq.
                                    Mariah R. Gondeiro
                                    Attorney for Plaintiffs

**23**
VERIFIED COMPLAINT

## __VERIFICATION__

I, Ronald Wade, Senior Pastor and Chief Executive Officer of Church of Compassion, Inc., declare as follows:

1.     Church of Compassion, Inc, a California Domestic Nonprofit Corporation, is a party to this action.  I am the Senior Pastor and Chief Executive Officer and am duly authorized to act on behalf of Church of Compassion, Inc. and its subsidiary organization, Dayspring Christian Learning Center.

2.     I have read the foregoing Verified Complaint and know of the contents thereof.

3.     The same is true of my own knowledge, except as those matters which therein are stated on information as to information and belief.  As to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  <u>March 13, 2023</u> , at <u>El Cajon</u>, California.


**CHURCH OF COMPASSION, INC**.


By <u>*Ronald Wade*</u>
   Ronald Wade

Its: Pastor and Chief Executive Officer

**EXHIBIT "A"**

## PURPOSE

This handbook is established and outlines Dayspring Christian Learning Center's personnel policies, employee benefits, privileges, and responsibilities and to serve as a guide to employees and supervisors in their relationships with each other and with the Center. This handbook will be given to each new employee as part of their initial job orientation for retention as a reference throughout their period of employment.

We are committed to maintaining a positive and pleasant working environment. Our goal is to promote a working atmosphere, which will provide a positive emotional climate for students, staff, parents, and visitors. Such an environment cannot be created without commitment and cooperation. You are the most important part of the program. You will create the environment, which develops the attitudes and behaviors of the children. Each staff member must maintain an attitude that is responsive, cooperative, and concerned in his or her interaction with children, parents, co-workers and vendors.

These policies are not an employment contract. Dayspring does not in any way waive its right to change, modify or withdraw the policies and procedures in this handbook. This may be done with or without notice to the employees. Employees are encouraged to make recommendations for the revision and improvement of these policies and procedures.

## MISSION STATEMENT

Since 1994, Dayspring Christian Learning Center has been providing top quality education to Elementary, Primary, Toddler and Infant-aged children in East County. We believe that all students deserve the best care in a safe environment that provide a pleasant place of respite for children and the families they represent. Every day, and with every child, we commit ourselves to providing academic success through an appropriate Child Development curriculum. Our dedication to Christ makes us more than just a "church related daycare or child care provider". Our ultimate goal is to introduce each child to a lasting relationship with Jesus Christ, thus ensuring the best possible foundation from which they can grow and develop into tomorrow's leaders.

## PHILOSOPHY

Dayspring Christian Learning Center philosophy is based upon these core values for children:

1. Children learn best where Godly, spiritual attitudes are encouraged. Our primary goal is to introduce each child to a loving and caring savior.

2. Children learn best in a positive atmosphere designed to foster a sense of self-esteem and confidence, and to provide a varied social environment.

3. Children learn best in a positive environment planned to develop and integrate the seven selves: Social, Emotional, Cognitive, Creative, Spiritual, Physical and Communicational.

1

A well-designed curriculum is carefully planned to achieve a balance of teacher coordinated and child centered activities.  Since play is a child's work, our activities are designed to capitalize on the following:
-Child centered
-Action oriented
-Hands on, concrete experiences
-Promote understanding and respect for the child's cultural heritage
-Provide opportunity to promote autonomy and initiative
-Develop self-help competence by allowing each child to grow in this environment at their own unique pace and style, and we will equip them to meet life's challenges with competence.

We believe a moderate amount of academics for preschoolers is beneficial for their growth and development.  Elementary students will be exposed to greater amounts of academics; however, an Early Childhood Development teaching approach is essential.

During the holidays, we prefer to focus on the religious aspect.  Therefore, we do not incorporate secular ideas into our curriculum (i.e. Easter Bunny, Santa, Halloween, Leprechauns, etc.).

## BY-LAWS

There are various religious backgrounds represented through this facility.  We are not to teach any beliefs unique to any one doctrine except for the by-laws written below.  We are not here to argue or confuse the children, but to enhance and give them a foundation for a spiritual commitment.

We believe and teach the following:

1. "The Holy Bible, both Old and New Testaments, to be the inspired and only infallible  word of God." (1 Peter 1:21)

2. "The One true God revealed in the scriptures as Father, Son, and Holy Ghost." (Luke 3:22)

3. "The creation of man as good, the fall of man from his original state into sin from which he has no power to redeem himself."  (Romans 5: 12-21)

4. "The deity of our Lord Jesus Christ, His virgin birth, His bodily resurrection, His ascension to the right hand of the Father, in the all-sufficient atonement by His blood to cleanse from sin anyone who believes on Him and responds through repentance and faith in Jesus Christ." (Matt. 1:18-25, 1Cor. 15: 1-8, Acts 7:55, Eph. 1:7, Col. 1:14)

5. "Water baptism as taught in the Holy Bible, it identifies the believer with the death, burial, and resurrection of the Lord Jesus Christ."  (Matt. 28:19)

6. "A life of holiness and separation from the world of sin, serving the Lord with a pure heart and living in obedience to God's word."  (Heb. 12:14)

7.  "The church as the body of Christ, chosen by God to reveal God's plan and purpose in the earth, and the local expression of this church functioning according to New Testament order and organization." (1 Cor. 12:8-12)

8.  "The promise of eternal life for all those who believe on the Lord Jesus Christ and accept Him as their savior; and eternal damnation for those who reject Him and die in  their sins." (John 3:16, Rom. 6:23)

9.  "The return of the Lord Jesus Christ to resurrect those who have died in Christ and their translation together with those who are alive." (The Rapture - 1 Thess. 4:16 - 17)


## STAFF QUALIFICATIONS AND REQUIREMENTS

1.  Must be in good physical and mental health.

2.  This is a Christ centered facility.  As a born again believer, you must be an example to the Center itself and the community at large.  Behaviors such as listed below do not model Christ like behavior:

Living with someone with whom you are not married, homosexuality, lesbianism, pregnancy out of wedlock, being charged or arrested for a crime, irresponsible handling of just debts, abortion, alcohol consumption, illegal drug use, prescription drug abuse, use of profanity, adultery, pornography, extra marital affairs, frequenting bars or night clubs,  gambling or any behavior that is deemed not to conform to the Bible.

3.  Must have a signed physician's report, updated T.B. test, cleared and active fingerprints on file with the Department of Social Services, employment application, W-4, employee rights form, handbook verification form, employee verification, illness and prevention, application, transcripts, criminal record statement, signed report of suspected child abuse form, and any other forms necessary.

4.  Must be at least 18 years old.

5.  Must have completed (or be in the process of completing) 12 units of Early Childhood Education at an accredited college.  Copies of transcripts for verification must be on file and current in your employee file.  Staff may be required to complete additional units to insure professional growth depending on the position for which you are applying.

6.  Must attend and maintain a membership in a fundamentally based Christian Church whose beliefs and by-laws mirror the Church and School.  At the beginning of each quarter you will be required to provide the information regarding the Church you are currently attending.  This information may be subject to verification by your supervisor. (Attendance is defined as attending services at the church at least twice a month).
7.  Must be an example of Christ to the Center itself and the community at large. To teach the truth, one must first know the truth, and live accordingly to the truth as stated in the scriptures.

8.  Must be a U.S. or Naturalized Citizen or Legal Immigrant.

Failure to meet any of the above requirements may be grounds for corrective action up to and including termination from employment.

You are the most important part of our Center.  Your personality, attitudes, and behavior create the atmosphere and environment that make our work place successfully.  It is imperative that each staff member be committed to the team effort and to the co-workers with whom they work. Each staff member must work cooperatively, considerately, and in a manner with which she/he would like to be dealt.  In addition, our staff is an example of Christ to parents and the community.

## MANAGEMENT AND SUPERVISORY CLASSIFICATIONS

In order to determine responsibilities and eligibility for various benefits, the following categories have been established in order of authority.

Administration:  This position pertains to the Administrator or Chief Executive Officer.  These are salaried or volunteered positions.  They are exempt from additional compensation for extra hours of work or time off in lieu of additional compensation.  Overtime or compensatory time off will, under no circumstances, be owed or payable to a salaried employee upon separation from Dayspring's employ.  Work schedules may vary with these positions depending on the need of the center.  Administrative positions must be a member of the church and attend a monthly board meeting regarding the center.  Administration is responsible for coordination of church, school, and overseeing developments from both ministries.

Director and Assistant Director:  These are salaried full-time employees and are exempt from additional compensation for extra hours of work in lieu of additional compensation.  Over-time or compensatory time off will, under no circumstances, be owed or payable to a salaried employee upon separation from Dayspring's employ.  The Director is responsible for the complete operation of the facility.  The Assistant Director is responsible in the absence of the Director.

Lead Teacher: Lead Teachers are hourly paid employees and are covered by the overtime provisions of the Federal Fair Labor Standard Act.  Employees in this category are entitled to overtime pay for work in excess of 8 hours a day or 40 hours in a workweek.  One Lead Teacher must be on duty at all times and must either open or close the facility.  Lead Teachers are responsible for the facility in the absence of the Director or Assistant Director.

## OTHER EMPLOYEES

Task Coordinator:  Task coordinators are hourly paid employees and are covered by the overtime provisions of the Federal Fair Labor Standards Act.  Task Coordinators are assigned specific departments in which they are directly responsible.  All information in regards to specific

4

departments should be brought to the attention of the appropriate Task Coordinator before the immediate Supervisor.  Task Coordinators are responsible for their assigned task(s).

Full-Time Employee:  A full time employee is an employee who is regularly scheduled to work forty (40) hours per week.

Part-Time Employees:  A part time employee is an employee who is regularly scheduled to work less than forty (40) hours per week.

Temporary Employee:  A temporary employee is an employee who works full or part-time for a specified period of time or a short-term assignment.  Temporary employees are not eligible for any benefits.  Temporary employees must be fully qualified for the position in which they are substituting.

Substitute:  A substitute is an employee that is on call for instances of a permanent employee illness, emergency or vacation.  Substitutes must be fully qualified for the position in which they are substituting.  All employee qualifications apply to regular substitutes.  All regular employees must equip a substitute with appropriate supplies or curriculum.  Job planning should be done no less than a week in advance.  This will enable substitutes to successfully maintain regular routines and schedules for your job description.

Volunteer:  A volunteer is a non-paid employee who has met the employee qualifications for paid employees.  Volunteers must clear schedules of work with the director in advance.  A fully qualified employee must oversee any volunteer who does not meet the Early Childhood Education requirements.


## **PAID HOLIDAYS**

All regular full-time employees and part-time employees regularly scheduled to work thirty (30) hours a week or more will receive the holidays listed below as paid.  Part-time employees will be paid the equivalent of their average daily hours.  If a holiday occurs on a weekend, it shall be observed on the day the State recognizes it as the legal holiday.  Paid holidays are listed below:

| | |
|---|---|
| January | New Year's Day, Martin Luther King Jr. Day |
| February | President's Day |
| May | Memorial Day |
| July | Independence Day |
| September | Labor Day |
| November | Thanksgiving Day and the day after, Veterans Day |
| December | Christmas Week (As of 1/1/16 each employee working for Church of Compassion for one continuous year will be paid for Christmas week.  Any employee working less than one year, will be pro-rated for this week based upon how long you have worked for Church of Compassion.) |

## PAID SICK LEAVE

Effective July 1, 2015, each employee will earn one hour for every 30 hours worked.  In accordance with the State law, sick leave is not payable when leaving Church of Compassion/Dayspring Center.  However, accrued paid sick leave will carry over to the following year of employment and will be capped at 48 hours or 6 days.

## VACATION DAYS

Vacation benefits listed below.  However, no vacations, or time-off without pay will be approved during Christmas Vacation, Easter Vacation, Special functions i.e., school pictures, programs, etc.

Director/Assistant Director/Lead Teachers.  After three years continuous employment - one hour paid vacation time for every forty hours worked.

Staff Members:  After three years continuous employment- one hour paid vacation time for every forty hours worked.

## TIME OFF WITHOUT PAY

Time off without pay is an approved absence in a non-pay status, which you may request.  The approval of Time Off without pay is at the discretion of the Administrator, Director or designee.  Time off without pay is typically used and approved in the following circumstances:

- A disabled veteran who is undergoing medical treatment.

- A military reservist or a member of the National Guard who is entitled if necessary to perform military training duties.

- An injured employed on or currently collecting workman's compensation benefits.

- Employee incapacitated due to illness or injury and no other time off is available.

## EMPLOYEE CHILDCARE

Tuition rates for employee children age's birth through two years is $2.50 while on duty.  Preschool and School-Age tuition rates is $1.00 per hour.  When the employee is off duty, tuition rates for all employee children will be $4.00 per hour.

Tuition will be deducted from the employee's paycheck and must be paid directly by the employee.  Employee's children are not to attend school without the employee on duty unless that child is in our elementary department or special arrangements have been made.  Although childcare is intended as a benefit to our employees, some guidelines must be observed:

6

1.  Employee's children must stay in their appropriate classrooms

2.  Employee's children are subject to school schedules, rules, grading systems, lunches, discipline procedures, and routines.

3.  Employee's children must be at least 100 feet from our school if being administered corporal punishment.

4.  Employee's children given special attention exclusively by the parent may not be given on company time.

5.  Employee's children must never be left unattended.

6.  When clocking in and out daily, staff will have a 5 minute window to drop off or pick up their child/ren.  Regular tuition rates will be applied for any childcare before or after five minute window unless special circumstances are granted by your immediate supervisor.

Co-workers are expected to understand the special needs of employee's children.  Knowing that their parent is nearby, and not being able to see them, is a difficult concept for young children. Employees can expect equal treatment given to them as parents and to their children as students. Teachers of employee's children must maintain the same high standards of care given employee children as to other children.

## PAYDAYS

Paydays are on the 5th (for dates 16th –30th /31st) and the 20th (for dates 1st –15th) of each month. Checks will be available at the close of business on paydays.  If the payday falls on a Saturday, payday will be on the previous Friday at the close of business.  If the payday falls on a Sunday, payday will be on the following Monday at the close of business.  If your regular designated payday falls on a holiday and we observe that holiday by closing, you will be paid on the next business day.  Completed time cards are due on the 15th and the 30th /31st of each month. Employees are responsible to total time cards and annotate all departments, vacation, reimbursements, childcare or holidays.  Failure to do so could result in non-payment.  All overtime must be approved and initialed by the Director.  Falsification of a time card may be cause for dismissal.

## PAY INCREASES

Pay increases are set by the School Board are dependent upon the financial stability of our student enrollment and are contingent upon job performance.

## BREAKS AND LUNCHES

10 minute breaks may not be attached to lunch periods.

| Hours Worked | Entitled Break or Lunch |
|---|---|
| 4 | 1 10 minute break |
| 5 | 30 minute lunch |
| 6-7 | 30 minute lunch & 1 10 minute break |
| 8 | 60 minute lunch & 2 10 minute breaks |

An unpaid lunch period of at least 30 minutes must be taken after six hours of work.

## OVERTIME

Dayspring does not permit employees to take compensatory time off in lieu of receiving overtime pay. Employees will be allowed to work overtime if there is a legitimate need for the facility and approved by the supervisor. (Employees cannot work on the premises before or after his/her work shift.)

## ATTENDANCE

Flexibility is necessary for an efficient working environment. Various factors, such as workloads, operational efficiency, ratios, and staffing needs, may require variations in an employee's work shifts and total hours worked each day or week. Dayspring reserves the right to assign employees to jobs other than their usual assignments when necessary, and to adjust the total work hours as needed, on a temporary or permanent basis for the overall well-being or operational needs of the facility. In addition, employees may be required to work overtime or less hours than originally scheduled than those normally scheduled in order to maintain safe ratios for the children. Employees must be flexible when asked to change their regular work schedule or job duties. Dayspring employees are cautioned about scheduling appointments directly after work that would not allow time for flexibility should a difficulty arise. Employees are expected to remain on duty when needed for emergencies. Each staff member is expected to be on the premises for the duration of her/his scheduled hours. The immediate supervisor will amend the original schedule if ratios make alteration of work shifts necessary. It is strongly recommended that appointments be made outside of your regular shift. However, if necessary, requests for scheduled time off should be submitted to the Scheduling Supervisor and Director eight days in advance. Requests for time off during scheduled work hours for part-time employees will be denied unless it is an emergency. Employees may be instrumental in obtaining a substitute for requested time off or vacation. The Scheduling Supervisor will assist in organizing coverage. All employees are required to notify the Director, Assistant Director or Scheduling Supervisor prior to the beginning of their work shift regarding schedule changes even if a suitable replacement has been secured.

## SCHOOL ATTENDANCE

It is the policy of this facility to allow employees to attend a place of higher learning to facilitate their education.  To that end, the School will accommodate those employees if possible; and the accommodation does not place an undue hardship on the facility.   It is important to discuss the classes with your supervisor in advance to assist in schedule accommodation if you are considering attending classes.  Once enrolled, you must notify your supervisor immediately if you have withdrawn from class(s) or school.  Also, in order to fulfill Child Development educational requirements at this facility, you must receive a C grade or higher.  It is possible that your supervisor may require additional educational experiences to enhance job performance.  Employees needing additional instruction will be expected to further their education when instructed to do so by a supervisor.

## MANDATORY MEETINGS:

Programs, workshops, staff meetings and classes meant for employee enrichment, paid for through Dayspring are mandatory and may not be missed by reason of vacations or other commitments.  The Director will make every effort to give prior notice and choose times as convenient as possible for all people involved.  Hourly paid employees are paid regular hourly wage or overtime wages (if they apply) when attending a mandatory activity.

## NON-MANDATORY MEETINGS:

This ministry integrates purposeful, social activities between Church and School to strengthen relationships. These events foster a cohesive atmosphere that encourages growth and strengthens involvement within the community and the ministry at large.  Employees are strongly encouraged to attend at least three of these functions each year to support a cohesive atmosphere.

## ILLNESS:

Please do not come to work when you are truly ill.  You cannot give your best when you are not at your best.  However, you are sorely missed when you are not here.  Make sure that your illness truly incapacitates you for duty.  Absences in excess of three consecutive workdays will require medical certification.

Please give the Director or the Assistant Director as much notice as possible when you are sick and cannot come to work.  Employees must call the Director, Assistant Director or the Scheduling Supervisor at least two (2) hours before the beginning of their shift.  All employees scheduled to be at work before 9:00 am must call the director at home two hours in advance of his/her shift.  All employees are required to notify the Director or Assistant Director prior to the beginning of their work shift regarding schedule changes even if they have a suitable replacement.

## JOB RELATED INJURIES OF ILLNESS:

It is the policy of Dayspring to provide full assistance to all employees who sustain injuries or illness as a result of their employment with Dayspring.

Illness.  An illness is any abnormal condition of disorder, other than one resulting from a work-related injury, caused by exposure to environmental factors associated with employment.  It includes acute and chronic illnesses or disease which may caused by inhalation, absorption, ingestion, repeated trauma, stress, or direct contact.

Injury.  An injury is any cut, fracture, sprain, amputation, etc., which results from a work accident or from exposure involving a single incident in the work environment.  Conditions resulting from animal bites, such as insect or snakebites or from one-time exposure to chemicals, are considered to be injuries.

Reporting.  When an injury occurs, the employee must notify the Director immediately. All injuries must be reported even if the employee does not desire treatment.

Treatment.  The employee must give official written notice within forty-eight (48) hours to the Director of the injury.  After successful treatment, the employee will return to duty providing that the initial physician has granted a medical release accompanying a written report.  If the physician certifies the employee is unfit for regular duty, the physician will provide a written report to the Director.  If the physician provides a report that releases an employee to perform light duty, it will be at the discretion of the Director to determine if light duty is available or needed which the injured employee can perform.

Emergency Treatment.  In cases of traumatic injury where emergency treatment is necessary, the employee may contact the nearest qualified physician or hospital for treatment.  It is the employee's responsibility to immediately notifying the Director of the medical determination pertaining to the injury.

## DISABILITY:

Dayspring is a non-profit organization, and is therefore exempt from disability insurance taxes.

## TARDINESS:

Employees must report to their work station on time.  Many people depend on you being in a certain place at a certain time.  For example, if you are due at work at 8:30 a.m., you must be at your designated place at 8:30, not just arriving.  Break times depend on the schedule being maintained.  If you are late for work, your time card should reflect the correct time of your arrival.  Unexcused tardiness may be grounds for non pay and cause for termination.

## EVALUATIONS:

Staff evaluations will be conducted annually by the Administrator, Director or Assistant Director.  Time will be provided for discussion of strengths and areas where improvements can be made as well as future goals.  The Director may conduct mid-year performance reviews as necessary.  Employees are encouraged to actively participate in these performance discussions.

## DRESS CODE:

As an employee of Dayspring Christian Learning Center, you display a symbol of outstanding service on behalf of our agency.  Consequently, we are required to meet a high standard of personal grooming expected within a professional and religious agency. Each staff member will be dressed appropriately whenever on school grounds.  Please be aware of the dress code and your responsibility to set an example.

1.  Slacks, dresses, skirts, blouses, jeans, capris and T-shirts are all acceptable.

2.  No faded, tight, torn or stained clothing.

3.  No midriffs, halter tops, razor backs, spaghetti straps or tank tops.

4.  No athletic clothing or casual sweat pants/ shirts.

5.  Dresses are to be knee length and modest.

6.  No tops revealing ANY cleavage or suggestive attire is allowed.

7.  Leggings are permitted providing blouses/dresses cover the buttocks in all positions including bending over and are not form fitting.

8.  At no time are undergarments to be exposed.

9.  No T-shirts with any advertisement or slogans are permitted unless child-oriented.

10.  No offensive slogans or advertisements on employee clothing, belongings or vehicles are permitted on school property.

11.  Visible body piercing are not permitted other than earlobes with no more than two piercing in each ear.  In addition, earlobes may not be stretched.  If other body parts are pierced, a neutral colored retainer must be worn and no other visible piercing are permitted after employment has begun.

12.  Hair should be clean, combed, and no extreme colors or styles are permitted.

13.  Although tattoos are strongly discouraged, one visible tattoo may be permitted on the waist down if it is smaller than 3 inches.  If tattoos are above the waist or larger than 3 inches, they must be covered.

14.  No visible intentional scarring, intentional mutilation, objects under the skin,  or split/ forked tongue will be permitted at any time.

15.  Dental ornamentation is not permitted by the use of gold, platinum, silver, or  other ornamentation.  Teeth, whether natural, capped, or veneered, shall not be ornamented with designs, jewels, initials, etc.

The summer dress code and designated "Hot Days" attire varies slightly by allowing sleeveless tops (two inches across), walking shorts no more than two inches above the knee and modest, one- piece bathing suits during swimming activities.  If wearing a two-piece bathing suit during swim activities, a shirt must be worn as well.

Employees are expected to dress appropriately with formal attire during school programs  and performances as well.


## DISCIPLINE:

In the workplace discipline can be thought of in two parts.  The first part establishes clear and fair rules by which you can accomplish your assigned duties.  The second part requires that all employees adhere to the rules that are established.  Action may be taken against any employee who violates the rules up to and including removal from employment.  Make sure you know the rules.  If you are unsure about any rule or policy, contact the Administrator or Director for guidance.

## PERFORMANCE DEFICIENCIES:

If an employee performs at a poor or unsatisfactory level, the director will formally meet with the employee and establish in writing a Performance Improvement Plan.  The employee will have the opportunity to improve performance within a specific period of time.  During that time, the Director may be called upon for support of strategy's and management skills unique to the employee's job description.  At the end of the designated time, the Director will again meet formally with the employee to establish a rating of performance.  If the performance is still unsatisfactory, demotion or termination will occur.

## PROFESSIONAL RELATIONSHIPS:

Parent Relationships:  Parents are to be regarded with great respect at all times.  You are a professional and are to portray that in communicating with parents.  You are expected to perform in a manner consistent to the teaching profession.  Treat parents with the utmost courtesy and patience, even in difficult situations.  We have great opportunity to inspire and educate families.

12

Be tactful.  When we discuss child related information, we are discussing the dearest thing to a parent, and they will react negatively or positively when receiving suggestions from us.

Any written or verbal communication going to parents (other than trivial details) must be brought to the attention of the Director, Assistant Director, or immediate supervisor.  Topics which should be discussed with a Supervisor prior to parent involvement are:  discipline problems, learning disabilities, physical disorders, emotional stability, home environment, parent cooperation, divorce matters, tuition payments, etc.  Problems concerning children need to be discussed with the guardian ONLY.  (Do not discuss private matters with friends or other family members even if asked.)  Discussing concerns with your supervisor can give you valuable input and also come to your aid in the event of a misunderstanding with a parent.  When in doubt, talk it over with your supervisor first.  All conversations with parents or guardians should be kept relative to the parent's child, always in private, and without the child present.  Do not discuss your personal life with parents, difficulties with other children, parents, or other staff members.  Always give family members opportunity to greet one another before relaying information regarding the child's day.  Your loyalty to the school and each person represented at this facility is essential in conversation in order to retain a reputation of high standing in the community.

Consideration to our staff members is also a requirement on the part of our clients.  Report any incident in which you feel threatened, or were treated disrespectfully.  Do not press any matter in which you feel the parent is not responding rationally.  Your supervisor will deal with that parent at a later time.

Student Relationships:  Children learn what they hear and see.  Respond respectfully when dealing with each student. Employees are expected to have substantial knowledge in child development.  Behaviors that are developmentally appropriate should be expected and dealt with in a positive manner.  The knowledge of developmental stages can help eliminate frustration when trying to minimize undesirable behavior that is age appropriate.  If an undesirable behavior needs correcting, first remember that it is your duty to change that behavior in a loving way, rather than be irritated by the behavior itself.  Galatians 5:22 tells us "But the fruit of the Spirit is love, joy, peace, patience, kindness, goodness, faithfulness, gentleness, self-control; against such things there is no law".  Jesus told us of the importance of guiding the little ones.  Such as the children placed in our school.  It is Daysprings' belief that Christian love is at the heart of all discipline.  Correction and chastening are as much a part of that love as is encouraging and guiding.  Firmness must be balanced with fairness, the child's abilities, and consistency.  Dayspring has an open door policy for parents or visitors.  Someone is always within hearing, if not an actual person, then certainly our Heavenly Father.  If you are disciplining a child when a parent arrives, make certain the parent understands the situation by repeating the course of events to the child.  This reinforces good discipline techniques and maintains confidence in you from the parent.

**BELOW ARE BEHAVIOR MANAGEMENT STEPS**

1. Preventative measures (i.e., have more than one specific toy).  Set up the environment of the room to minimize discipline.

2. Clearly set the ground rules.

3. Warn the child of consequences.

4. Redirect the child to another area.

5. Remove the child from the situation.

6. Discipline using natural consequences rather than "time out".

7. Discipline must be followed by prayer and consistency for true effectiveness.

We are forming lifelong feelings and habits in each child.  Discipline must be planned thoughtfully and always in the best interest of the child.  Help each child retain their self-esteem during disciplining by treating them with respect and confronting them in private.  Get to know the students.  You are here to make a difference in his/her life.  You can be a positive influence by guiding behavior patterns now.  This can have a great effect on his/her life later.

**BABYSITTING POLICY:**

Employees are not allowed to take a child off campus without written parental consent and the Director's knowledge and consent.  Should this occur, Dayspring does not endorse the care, and the liability will then be solely upon the employee.  Arrangements for babysitting must be made outside of work hours.

**STAFF RELATIONSHIPS**:

Dayspring Christian Learning Center strives to maintain a pleasant, agreeable work place for all. Our job responsibilities require cooperation from each staff member.  Schedules, classroom networking and planning can only be implemented effectively when we work together.  A "Manager Log" is kept in the staff lounge for general communication between staff members. Check it daily for needed information.

If staff members have disagreements, they are to be handled in the Biblical context according to Matthew 18:15-17.  If a private meeting has not brought a favorable result, the immediate Supervisor may be contacted to help resolve the problem within five calendar days.  If an acceptable resolution is not reached with the help of the immediate Supervisor, the staff member may communicate with the Assistant Director within five days in an effort to solve the problem. If there still remain difficulties after this point, the staff member may appeal any decision to the Director within five days for a final decision.  If a lapse of time of more than five days occurs between appeal procedures, the employee forfeits appeal rights.

Our facility maintains confidential relationships with present and former employees.  Employees may not give out any information on past or present employees without the consent of the Director.  Dayspring's administration reserves the right to communicate regarding school business with the employee only.

## SOCIAL MEDIA

All employees or volunteers of the Church and School are expected to exhibit a committed Christian lifestyle in all areas of their daily life.  This obligation includes your use of social media on a work-related or personal basis.  "Social media" refers to any situation that allows you to interact with, communicate with, and express opinions with other individuals or networking sites including, but not limited to Facebook, Myspace, Twitter, blogging as well a personal electronic forms of communication such as e-mail or text messages.  It also includes such technology, applications or branding as may be developed in the future that allows for social networking opportunities.  Even if your use of social media is strictly for personal use, many viewers may assume you are speaking on behalf of Church of Compassion or Dayspring Christian Learning Center.  Accordingly, the Church and School have adopted the following guidelines for social media use.

Uphold Christian Standards:  The content of your social media page and any images on other pages must be a reflection of Christian values and the religious beliefs of the Church and School.

Maintain Respect:  Respect toward others and this ministry is paramount.  Any content reflecting the following will not be tolerated.  Negative postings, disparage speaking, ridiculing, gossiping, defaming this or other ministries, obscenities, sexually suggestive  material, profane, libelous, slanderous, harassing or hateful messages.

Use of Church Intellectual Property:  Do not use the Church or School's logos, materials, trademarks, copyrights, or other creative works on personal media pages unless written permission is first obtained from your supervisor.

Maintain Confidentiality:  As a representative of the Church or School, you will be privy  to confidential information.  You must use caution not to intentionally or inadvertently discuss or divulge any information obtained at this facility.

Use of Church or School Computers and Internet:  Internet and computer use is intended  for Church and School business only.  Personal information should not be kept on these computers nor should personal sites be accessed.  Under no circumstances should pornographic or harassing material be sent or received using Church or School facilities and or equipment.  In addition, do not use the Church or School equipment for personal e-mails or downloading personal sites.  All material that appears on computers, e-mail, voice mails, facsimiles and the like are presumed to be for business purposes; the product belongs to the Church or School and all materials are subject to review by the Church or School at any time without notice to the employee.
Do not create any links between the Church or School's website or other media addresses and any third-party without written permission.

Professional Relationships:  The Church and School strongly suggest that you do not mix professional and personal relationships.  However, if you do, you have a responsibility to maintain a high standard of professionalism with clients and parishioners on all social medial networks.   Does your message or graphic reflect a healthy, positive individual?  Can our clients rest assured that their child is being cared for by a capable, responsible caregiver?  Be aware that all material posted in a public forum and brought to the attention of a representative of the Church or School will be viewed and dealt with considering the above.  Use common sense and exercise self-control.

Violations of these Policies may result in corrective action up to and including the removal from your position, or termination of employment.

## PARKING

Please park in the staff designated parking lot only.  If staff parking lot is full, please park on the street.   Be aware that you are parking at your own risk.  Dayspring is not responsible for loss, theft or damages.  Also, vehicles with offensive bumper stickers or logos must park on the street, as Dayspring does not wish to endorse such advertisement by association.

## PUBLIC NOTICES

Notices or communication meant for parents must be professionally written and typed.  Any information sent home must be reviewed by the Director or Assistant Director before it is dispersed to students or put up for public notice.

Bulletin boards must be kept current, neat and changed not less than once a month.  Child oriented bulletin boards are preferred.

## PHONE CALLS, CELL PHONES AND VISITORS

Family members and friends must confine their visits to lunch periods or break times.  Employees may not have visitors while on duty unless the visitor is assisting as a volunteer (see volunteer qualifications) or for special events.  Visitors are not privy to know or discuss corporate information and must stay with the employee in a vacant room while visiting on breaks.  Visitors are not allowed to interact with students on a formal basis for insurance purposes and for the protection of the children.  No additional break time will be given to employees with visitors.  Children who are visiting our school through a relationship of an employee must have prior approval with the Director. Visiting children will be subject to employee day care rates.

Phone calls will not be permitted while on duty unless it is an emergency.  If a personal call is taken for an on duty employee, a message will be taken and given to the employee during a break time.

Cell phones can be used on breaks and lunch periods only.  They must be turned off while on duty.

## OUTSIDE EMPLOYMENT

Dayspring has no objections to an employee holding another job as long as the employee's supervisor is informed and he/she can effectively meet the performance standards for his/her position with Dayspring.  Dayspring asks that the employee think seriously about the effects that such extra work may have on the limits of their endurance, overall personal health, and their effectiveness at Dayspring.  Employees with outside employment will be required to perform by the same standards as other employees.  Dayspring will make no exceptions for employees holding outside jobs that interfere with their job duties at Dayspring.  Employees are still expected to attend staff meetings or evening school events when necessary to accommodate our Center.

## DRUG FREE WORKPLACE

Dayspring is committed to a philosophy of good health and a safe work place.  1 Cor. 3:16-17 tells us that we are the temple of the Holy Ghost.  At no time will any illegal drugs or alcohol be allowed or consumed on the premises.  Dayspring's staff requirements prohibit any behavior unlike our Savior.  Therefore, any employee using alcohol, cigarettes or illegal drugs cannot effectively represent our facility in a Christ-like manner to the community.

Any prescription used under the care of a doctor is permitted as long as it does not have any mind-altering effect while on duty.  Unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited.  Employees violating such prohibition may undergo drug counseling, rehabilitation, employee assistance, loss of pay and up to termination of position.  This is a drug free facility.  As a result, random drug testing may be done at anytime.

## STUDENT ALLERGIES, ACCIDENTS, ILLNESS AND MEDICINES

Allergy:  Students having an allergy will inform Dayspring through the Teacher Information Sheet.  Allergies and special needs must be posted in a central place in each classroom by the primary care giver to alert all staff members.

Accidents:  If a child has an accident, render necessary first aide.  Ouch reports must be filled out in duplicate.  One copy goes to the parent, the other goes to the office to be filed in the child's student records.  Ouch reports are meant to be written documentation of the events and first aid given.  The immediate supervisor must be informed of any accident in question and will then decide and give further instructions.  Do not move or pick up an injured child.  If it is a serious accident, call 911.  Any involvement of an ambulance or fire department will be handled by the immediate Supervisor only.  The Director, if not on campus, must then be notified before the legal parent and will give further instructions at that time.  At no time is an employee to transport an injured student to emergency services.

Illness and Medicine:  Medicines can be given at school providing there is an Authorization to Dispense Medicine form completed by the parent with dispensing instructions.  Medication must be in the original container with the doctor's signature on the prescription.  All requests must

have a prescription accompanying the medication.  All medicines must be stored in the designated area located in each classroom or in a refrigerator where children have no access.  Medication may only be administered by staff members and documentation shall annotate times, dosages and initials of staff member.  Medications will be a direct responsibility of the primary care giver while at school.

The immediate supervisor must be notified before any student is sent home because of illness or injury.

## EMERGENCIES

Fires:  Fires drills will be held once a month and are alerted by a solid alarm.  See the evacuation route posted in each room.  All employees must perform their designated task timely during a fire drill to ensure the prompt evacuation of each student.  All students must be guided to the parking lots during the event of a fire or fire drill.

Earthquake:  Earthquake drills are held directly after a fire drill in each individual classroom.  A duck and cover method under the tables is to be followed.  If the students are outside during an earthquake, they are to be taken to the parking lot, away form trees and power lines.  Please see the disaster plan of events of gas and water shut off posted in the school office.

## RELEASING A CHILD

**DO NOT** allow a child to leave with someone who is not authorized.  The student's emergency form must verify any individual wishing to take the student off campus.  If the person is not on the authorization list and special instructions have not been left by the parent, contact the immediate supervisor.  In case of an emergency, call 911 immediately if the supervisor is not available.  Document the description of the person taking the child, license plate numbers and other pertinent information pertaining to the event.

## FOOD AND DRINKS

Please confine refreshments to breaks and lunch periods.  Food or drink items are not allowed in the classrooms or outside while on duty.  Employees may eat snacks or lunch with the children to encourage proper table manners and conversation.  Please be aware that this is for modeling purposes only.

## REPORTING TO STATE AGENCIES

Each employee has a legal obligation to report suspected child abuse.  The employee is given the right by the State of California to report any incident without the prior knowledge of the Director.  However, we would appreciate notification of any circumstances requiring State involvement.  Reporting an incident is confidential on the part of the agency and the reporter, and therefore employees reporting may not contact or give information to parents or other employees regarding the incident.

## FIELD TRIPS

Dayspring occasionally uses field trips to enrich our learning experiences.  Below is a list of rules for taking children off campus during a field trip.

1.  Notify the Director in advance of any fieldtrip

2.  Notices to parents must be distributed no less than seven (7) calendar days in advance.

3.  All children under 8 or under 4'9" tall must be in a car seat.

4.  All children must be seated in seatbelts singularly.

5.  A first aid kit must accompany each field trip.

6.  A field trip consent form must be signed by a parent must accompany each child on the fieldtrip.

7.  Each driver must fill out the Driver's Form verifying a valid driver's license and current insurance.

8.  Children must wear name tags (first name only) and the school's phone number must be written clearly in case of separation.

9.  Each adult driving must have explicit written instruction on schedules, destination and list of children for whom they are in charge.

**In case of an accident requiring medical attention occurs while on a field trip:**

1.  Log all injuries and accidents.

2.  Find out what hospital or care center each child is taken.

3.  Notify the school of details before notifying the parents (the director will notify parents).

4.  Record the seating arrangements of all people in each car or bus.

**USDA NON-DISCRIMATION STATEMENT:**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, disability, age, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American sign Language, etc.), should contact the Agency (State or local) where they applied for benefits.  Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339.  Additionally, program information may be made available in languages other than English.

To file a complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at http://www.ascr.usda.gov/complaint_filing_cust.html, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form.  To request a copy of the complaint form, call (866) 632-9992.  Submit your completed form or letter to USDA by:

(1) Mail:  U.S. Department of Agriculture Office of the Assistant Secretary for Civil Rights 1400   Independence Avenue, S.W., Washington, D.C.  20250-9410,
(2) fax (202) 690-7442 or
(3) email at program.intake@usda.gov.

This institution is an equal opportunity provider.


## HEALTHY SCHOOLS ACT REQUIREMENT

**Pesticide Use Notification**

Dayspring Christian Learning Center complies with the state law requiring use of effective and least toxic pest management practices.  Parents & Staff will be notified at least 72 hours before pesticides are applied.  Signs will be posted.  If you have any questions, please contact the office.

**EMPLOYEE HANDBOOK AND AT-WILL EMPLOYEE STATUS ACKNOWLEDGMENT**

I, the undersigned employee, hereby acknowledge that I have received and read a copy of Dayspring Christian Learning Center's Employee Handbook.

I further understand and agree that:

1. Additional information and policies may be implemented from time to time by Dayspring and I will also be required to read and understand them.

2. The employee handbook is not an employment agreement or guarantee of employment of any length or duration.

3. I am an "at-will" employee, which means either me or Dayspring Christian Learning Center may terminate the employment relationship, for any reason or for no reason, at any time.

4. My status as an at-will employee can only be changed through a written agreement duly authorized and executed by the Administrator of Dayspring Christian Learning Center and the employee.

5. There have been no statements, agreements, promises, representations, or understandings made by any officer, employee, or agent of Dayspring Christian Learning Center inconsistent with this acknowledgment form.

_____
Signature of Employee

_____
Printed Name of Employee

_____
Date

21

**EXHIBIT "B"**

**Articles of Faith**

Below are the fundamental truths that Dayspring Christian Learning Center teaches:

- The Bible is the Sovereign Word of God.

- Jesus Christ is the Son of God, born of the virgin Mary.

- Jesus died to atone for our sins.

- Jesus rose on the third day, lives today, and is coming again to receive those that believe and wait for His return.

- Salvation is obtained by grace alone through faith.

- The Holy Trinity includes the Father, the Son, and the Holy Spirit.


**Mission Statement**

Since 1994, Dayspring Christian Learning Center has been providing top-quality education to Elementary, Primary, Toddler and Infant-aged children in East County.   We believe that all students deserve the best care in a safe environment that provides a pleasant place of respite for children and the families they represent.   Every day, and with every child, we commit ourselves to providing academic success through an appropriate Child Development curriculum.   Our dedication to Christ makes us more than just a "church related daycare or child care provider".   Our ultimate goal is to introduce each child to a lasting relationship with Jesus Christ, thus ensuring the best possible foundation from which they can grow and develop into tomorrow's leaders.

Hello!

I bring you a warm welcome to Dayspring Christian Learning Center (DCLC), the child development center of Church of Compassion.   I pray that you find DCLC to be a place where children and parents are accepted and loved… a place where laughter and play are cherished… a place where children's needs are met in warm response.

I am honored to work with a staff that is committed to teaching young children. They have been selected for their knowledge of child development as well as their interpersonal skills.   They are truly the strength of the program.   When visiting DCLC, please take a moment to listen, watch and learn from this unique group.   You will be enriched.

It is my and the staff's role to facilitate not only the learning of the children, parents, and one another, but to also inspire Spiritual growth and instill basic Christian principles.   Our sponsoring church offers further enrichment through worship services and counseling.   It is my desire that your family have a positive experience at our facility, and that we can be a stepping stone to further your child's development. Sincerely,


Kelly Wade
Administrator

2

**Our Philosophy for Infants and Toddlers**

We strive to provide a safe stimulating environment to help the toddler to learn and explore. The child to teacher ratio is 4 to 1 infants.   The areas we stress daily are listed below:

1.   **Basic Needs** - There is a vast difference in needs within this age group.   However, physical and emotional needs are our first concerns.   Food, diapering, cleanliness, comfort, safety and health are conditions which we not compromise.   Each child is assured quality care in a personal, well organized program.

2.   **Spiritual** - Biblical and spiritual ideas are best taught when reflected by the attitudes of the staff.   Not only will short Bible stories be presented but our goal is to portray the true spirit of Christ by the daily demonstration of His love to the children.

3.   **Social** - By the time a child is two years of age, they have established their sexual identity, their general disposition, and a positive or negative view about their self-worth.   These ideas will follow them into their adulthood.   It is important for us to provide a sound social environment of interaction between caregiver and child.   Our goal in the nursery is to provide more individual attention through auditory, visual, and physical communication.   Avenues for these to occur are facial expression, quiet voices, and physical stimulation.   Our goal in the toddler program is to provide social interaction through small group experiences.   Structured circle and play times will give opportunities for learning and building relationships with other children.

4.   **Physical and Cognitive** - Infants learn by using their senses, mainly tactile.   Learning is based upon use of small and large motor skills.   Infants will strengthen head control and limbs, begin reaching for objects, and explore their world through availability of age appropriate toys (using their most sensitive area, the mouth).
Toddlers will be encouraged to develop coordination and muscle tone through physical activity. Small motor skills will be emphasized through age appropriate activities throughout the day. They will also begin to grasp simple learning concepts.   Your child will be taught Language Arts by providing hands-on experiments, puzzles and blocks.   Colors, shapes, animals, body parts, language development, increased attention span and their community awareness will be addressed through fun group activities.

**Sample Schedule:**

| | | | |
|---|---|---|---|
| 7:00 | Manipulative / Self-selective / Outside Time | 12:00 | Nap Time |
| 8:00 | Breakfast | 2:30 | Art |
| 9:00 | Diapering | 3:00 | Snack / Diapering |
| 9:15 | Morning Group Time | 3:30 | Outside |
| 9:30 | Outside / Sensory Project | 4:30 | Individual Attention / |
| 11: 00 | Diapering / Hygiene | | Afternoon Group Time |
| 11:30 | Lunch | 6:00 | School Close |

**Our Philosophy for Preschoolers**

It is our purpose to provide an atmosphere for children where their development will be under the direction of capable Christian teachers.   We strive to provide an environment where parents can leave their children with the confidence that their child will be assisted in his/her natural development, as well as receive opportunity to accelerate learning skills in group situations. Our student/teacher ratio is 12 to 1.   Your child will be taught in the areas listed below in order of priority:

1.  **Spiritual** - Each child will be taught basic Biblical truths through a strong Christian based curriculum.   The children will become aware of the love of God as it is demonstrated through the lives of their teachers, and as God's goodness is recognized in the prayers said before mealtimes and throughout the day.   Each child has highly personalized feelings and ideas and must be respected as a unique individual.   Your child will learn that Jesus loves him/her, and will be encouraged and guided to live his/her life according to God's delightful pattern.

2.  **Emotional/Social** - We offer group and individual experiences which provide opportunities to strengthen autonomy, social habits and attitudes that will help the child enjoy relationships with others and prepare him/her for later life.

3.  **Physical Development** - Our program as a whole is intended to encourage the natural development of small and large motor skills.   We provide this through play, table work, and the environment as a whole.    Many of these skills must be attained before academics can be pursued.

4.  **Academics** - Our daily curriculum is devoted to both the needs and the interests of the individual child and the group.   It is our objective to provide a learning environment for each individual age group thus encouraging maximum growth for the whole child.   We offer a planned educational program using a monthly/weekly thematic approach.   Each child will, however, be encouraged to learn at their own level and pace.

**Curriculum Areas Include:**

- Art Experiences
- Language and Literature
- Science and Math Concepts
- Cooking Experiences
- Writing Experiences
- Music and Movement
- Dramatic Play / Family Life
- Block Area
- Self-Selected Indoor Activities
- Small Motor Development
- Social Studies
- Bible Stories
- Scripture Memorization
- Manipulatives
- Large Motor Development
- Self-Selected Outdoor Activities
- Sensory Experiences
- Chapel Service
- Field Trips

**Sample Schedule:**

| | |
|---|---|
| 7:00 - 8:00 | Self Selective Activities / Outside Times |
| 8:00 - 9:30 | Breakfast / Bible Circle Time / Manipulatives |
| 9:30 - 9:45 | Art |
| 9:45 - 10:15 | Outside Time |
| 10:15 - 11:30 | Academic Group Time, Music, Self-Selective and Clean Up |
| 11:30 - 12:00 | Lunch |
| 12:00 - 3:00 | Naptime / Outside Play |

4

| 3:00 - 3:30 | Snack |
| 3:30 - 4:30 | Group Time, Art and Cooking |
| 4:30 - 5:00 | Outside Playtime, Group Time, waiting for Mom and Dad to arrive |

**Our Philosophy for Elementary Day Care**

We strive to provide a safe, fun alternative for children ages, 5-12.   We offer before and after school care from 7:00 a.m. to 5:00 p.m. in a stimulating environment.   We also provide day care during summer months and Holidays.

**Transportation for School Age Students**

Dayspring offers transportation from local schools in East County.   Currently, we offer transportation from Pepper Drive Elementary School and Magnolia Elementary School. Dayspring also conducts fieldtrips during vacation times for elementary students.   Van rules are as follows.

- All children under 8 year of age or under 4'9" tall must be in a car seat/ children over 8 years of age or 4'9" tall must be in a seat belt
- All students will be dropped off and picked up at your child's elementary school's front gate
- Field trip consent forms must be signed by a parent in advance of any fieldtrip conducted by Dayspring
- Students are expected to be picked up promptly at the pickup location
- Parents must call the school in advance of any changes to normal pick up/ drop off schedules
- Students are expected to follow school van rules regarding safety and the comfort of others
- Students must arrive no less than 15 minutes before the scheduled leaving time

**Activities**

- Snack (included in our program)
- Group Time - Stories, Contests, Games and Music
- Study Hall - Each day the children will do homework with the aid of their teacher.
- Physical - a variety of large motor activities and organized games (soccer, basketball, 4-square etc.)
- Social Interaction - Attitudes and respect for peers will be expected of each student.
- Art - Specialized Crafts
- Music - Group Singing and Music Appreciation
- Fieldtrips

**Sample Schedule:**

| 3:00 | Snack |
| 3:30 | Homework/Tutoring |
| 4:00 | Outside Time |
| 4:45 | Self Selected Inside Activities / Art |

**GENERAL GUIDELINES**

**Parent/Teacher Conferences**
Formal conferences are offered in the fall for Kindergarten students and in the Spring for Preschoolers.   However, you may request a conference at any time if you feel the need. Children are tested in the Fall and in the Spring, and results are given to you regarding your child's progress during conferencing.

**Appearance and Dress**
The following is a list of dress requirements for all students:
1.  Clothing that wears and cleans easily is encouraged.
2.  No gang related colors or symbols are permissible at school.
3.  Clothing should be clean and in good repair at all times.
4.  Shoes need to be safe and comfortable for your child.
5.  While not wanting to infringe on an individual's personal rights, we are a center that adheres to conservative Christian standards.   Therefore, we reserve the right to monitor both students and adults in the way of hairstyles, jewelry, clothing and general appearance.

**Nutrition**
We provide nutritionally balanced snacks, meals, and cooking activities.   Menus are given in the enrollment packet.   Each meal meets Federal guidelines to meet daily nutritional standards for your child.   If your child has a special need or food allergy, we will provide alternate choices with a valid doctor note.   We encourage children to have a "hello" bite - that is, to try a taste of everything.   We limit sugars and prefer a more natural menu.   Please check your child's classroom meal schedules.   Children arriving ten minutes after meals have started are assumed to have eaten before they arrived.

**Photography/Social Media**
Your child's photo may be taken during classroom activities.   These photos may be posted on our website at **www.dayspringlearning.com** or used on our Social Media website when displaying activities/crafts/special events. Names will not be used when displaying these pictures. If you have concerns regarding this please see the director.

**Vision Testing for children 3-5 years**
Once a year the children will participate in a vision screening provided free through donations by The Elks.   There is no cost to the school or child for participation in this vision screening. Results will be provided to the Legal Guardian.

**Health**
Children with contagious conditions or fevers should not be brought to school.   The Director or Teachers reserve the right to refuse admission to a child considered contagious or too ill to participate in the program.   The school office should be notified as soon as possible of any contagious conditions so that we can give timely and appropriate notice to parent regarding any such contagious disease within the school.
Below are conditions not allowed in school:

1.  Any child with a temperature over 100 degrees will be sent home.   The child may return to school when the fever has been normal for 48 hours.
2.  Children with a colored runny nose will be sent home.
3.  Any type of colored discharge from the eyes must be seen by a doctor. Once on medication for 24 hours, the child may return to school.

6

4. If your child has excessive diarrhea, he/she will be sent home.
5. Any child who is vomiting will be sent home. He/she will need to stay home until 48 hours after the vomiting has stopped.
6. If your child has a rash, he/she may come to school only if they are comfortable and it is not contagious. (You may need a written notice from the doctor stating such).
7. Any child who is lethargic, excessively cranky, or irritable may be sent home at the Director's discretion.
8. Persistent, excessive coughs will need to be seen by a doctor.
9. We require a written prescription from your child's doctor when asking Dayspring to administer any medication. Also, you must complete a "Parent Consent for Administration of Medications Chart". Please know that this is for prescription, non-prescription, topical and oral medications/ointments.   If you need us to administer any of the above to your child, please submit a physician's prescription and stop by the office for the required consent form. Please give the medicine directly to the office.
10. If your child is on an antibiotic, they may attend school 48 hours after their first dosage, provided they are feeling well.
11. Children with severe sore throats that make swallowing difficult need to be seen by a doctor.
11. Any child with signs of yellowish skin or eyes will need to be seen by a doctor and must provide a doctor's note to return to the center.
12. Any child with head lice or any other parasite will be sent home.   Return can occur only after treatment and removal of all signs have been completed.   The child will need to be inspected with the parent present upon return.

The Director and Staff have training in recognizing symptoms of communicable diseases.   They rely on their training to determine the indicated illnesses.   We follow strict hand washing and disinfecting procedures to help assist in preventing the communicable diseases from continuing.

**Toilet Training**
Toilet training should not be a frustrating time for you or your preschooler.   This is a normal step and if your child is ready, he/she will be excited to acquire this independent life skill.   To make the toilet training process a positive experience for your child, we want to ensure he or she displays signs of readiness before we begin a training program.   Please discuss signs of readiness with our staff so we can partner with you to make this a smooth process. Your child is considered toilet trained when the following skills are mastered: when wearing underwear (we do not use pull ups due to having to completely undress and dress your child and often prolongs potty training) when using the bathroom independently and when accidents are no more than two wet accidents per week at school.
Your child will need ten pairs of underwear and five pairs of complete changes of clothes each day until he/she is using the bathroom successfully.   Please remember to check your child's cubby daily during this process for clothes possibly in need of laundering.

**Picking Your Child Up From School**
We ask that parents closely supervise their children in the parking lot and elsewhere in the center.   When departing from the center, please resist allowing children to run to the car while you sign them out.   Much can happen in a moment or two, and we request your cooperation and assistance in keeping our children safe.

**Signing Your Child In and Out**
Children must be signed in and out each day in your child's classroom.   This is extremely important since this list is used to check attendance during emergency drills or events. Children under the age of 18 may not sign another child out, even if they have the parent's

permission to do so.   State program parents must also sign in and out on other required forms.

**Releasing Your Child**
Children are released only to those for whom the staff has written authorization.   Parents should provide us with written permission for any person designated to pick up a child and should update that list regularly.   The person picking up must show proof of identification before the child can be released.   They will not, and cannot be released to an unauthorized individual. Restraining orders can only be honored when processed through proper legal channels.

**Dropping Your Child Off**
Please make sure that you have made contact with the attending teacher before dropping off your child at the facility.   Children may not be left alone or unsupervised.   At arrival, parents may need to help their child settle into play, which may require five minutes or so.   Parents are permitted access to all parts of the center at any time, including nap areas and pre-admission interview records; however, please be courteous and refrain from interrupting normal classroom routines.

**Department of Social Services**
Dayspring Christian Learning Center is a non-profit organization, licensed by the Department of Social Services. The Department has the authority to interview children or staff without prior consent and inspect, audit, and copy child or child care center records upon demand during normal business hours.

**Fire Safety**
Our facility is equipped with a fire alarm system that sounds during a fire emergency, and we routinely practice fire and earthquake drills.   In addition, the local fire department inspects our system annually to insure optimum safety.

**Accidents**
Minor accidents are attended to promptly and are followed by an "Ouch Report" to inform the parent of the event and treatment of the injury.   If a minor accident requiring medical attention occurs, the parent is notified first to allow as much parental control as possible.   911 will be notified in the event of a serious emergency.   The parent will be called following the securing of professional treatment.

**Earthquake Preparedness**
Each child will need to bring a labeled earthquake preparedness kit in a zip-lock bag containing the following items:

| | |
|---|---|
| 3 snack sized canned fruits (pull top lid) | 3 granola bars |
| 3 snack sized canned dinners (pull top lid) | Diapers (3 day supply) |
| 20 soft candies | Formula or baby food if needed |
| 3 fruit snack packages | |

**What To Bring To School**

Infants
- Bottles, labeled and dated if filled
- Pacifiers, labeled
- Disposable diapers (package labeled)

Toddlers
- Pacifiers, labeled
- Labeled sheet and blanket for nap time (This is a licensing requirement.   Failure to have both will lead to an added charge to your account.   See Financial Info page, "Blanket Fee" for details.)
- Disposable Diapers (labeled package)

1 or more change of weather appropriate clothes, labeled

Preschoolers
- Labeled sheet and blanket for nap time (This is licensing requirement.   Failure to have both will lead to an added charge to your account.   See Financial Info page, "Blanket Fee" for details.)
- 1 or 2 changes of weather appropriate clothes
- Security Items
- Sweater or Jacket labeled
- Earthquake Preparedness Kit

**Personal Items from Home**

The school cannot assume the responsibility for personal items or toys from home that have been lost or broken.   Since a toy is a source of conflict, it is better to leave it at home.   If your child's teacher has established a share day, please bring appropriate items on that day ONLY! Guns, combat toys, or any toys which promote aggression are not permitted.

**Absences and Vacation Credit Days**

The school will not refund fees or give credit for days missed due to illness, holidays or any other reason.   Since our monthly expenses remain constant from month to month, your tuition must remain the same to ensure our budget.   Also, by paying for days your child is absent, you are ensuring his/her space is reserved.   However, all students enrolled 5 full days per week are allowed 10 vacation days a year after a 90 day enrollment period is completed.   Part time students are allowed 5 vacation days a year after the 90 day enrollment period. If you do not use your vacation days, they expire on anniversary of enrollment.

Additional vacation credit days are not issued when you withdraw and re-enroll later in the year. At no time will it be permitted for a child to "switch days" in lieu of an absence or credit.

1. The credit may be used in any combination of full week or single day credits.
2. The child must be absent to receive credit.
3. The credit request must be made in advance to the office.
4. When your child/ren will be absent for the day or when making a schedule change, you must contact the office no later than 9:00a.m.   After this time, we will be unable to care for your child/ren on that day.

**The School Is Closed the Following Days:**

If the holiday falls on a weekend, it will be observed on the nearest weekday. Tuition payments are expected for holidays/closure days.

| | |
|---|---|
| New Year's Day | Two Day Before First Day of School |
| Martin Luther King Jr. Day | Labor Day |
| President's Day | Veteran's Day |
| Good Friday | Thanksgiving Day and the Day After |
| Memorial Day | Christmas Week |
| Independence Day | |

9

**Unscheduled Hours**
When you enroll your child for a specific schedule, that space is always reserved for your child. If your child is not enrolled for full time care, you may use extra time at our school if there is space available and if prior permission is obtained from the office.   Please see the office to do so and to pay for the extra time used.   Trading days is not permissible.   Your child's schedule can be adjusted monthly and only as space is available.

**Discipline Policy**
Dayspring Christian Learning Center strives to create a positive, safe and nurturing environment to promote the success of each child.   No child will be humiliated, shamed, frightened or subjected to verbal or corporal punishment by staff, volunteers or parents either on the premises or during fieldtrips.   However, some behaviors adversely affect the program quality such as:
1. Fighting
2. Biting
3. Inappropriate Behaviors
4. Defiance to Authority

Every effort will be made to work with a child to rectify an inappropriate behavior.   These efforts include:

1. Calmly talking to the child about the behavior.
2. Giving the child alternate activity choices.
3. Re-directing the child to another activity or location.
4. Using "time-outs" as needed if a child is emotionally out of control and needs a private time to regain composure.

If all of the above measures are unsuccessful, the Director will contact the parent regarding the behavior.   Notification will include the school discipline efforts already taken, and will then request parental cooperation in resolving the behavior.   This notification will be considered the first of three formal warnings.

If the behavior persists, the Director will again notify the parent in writing and may request a conference.   At the conference, the Director will discuss a behavior modification plan with the parent.   Modification plans may include daily progress notes or reward stickers for a "good day".   Parental cooperation is essential to the success of this technique.   A written summary of the meeting will be submitted to the parent and will be considered the second formal warning.

The staff will continue to work with the child; however, if behavior persists, a third and final warning will be sent to the parent.   If the behavior does not cease, it may be recommended that the child seek professional guidance.   Resources will be provided upon request, and enrollment in our program will or may be terminated.

**Parent Involvement**
We believe that parents are the most important person in the child's life.   We encourage all parents to take part in their child's development here at our school.   Each of the classes are happy to have room parents that would like to help with everyday activities or special projects. Please see your child's teacher if this is of interest to you.   Your attendance at school programs and special days are highly encouraged.   We want to be partners with you to make your child's experience at our school productive.

**FINANCIAL INFORMATION**

**Registration**
All forms in the registration packet must be completed and returned to the school office before the child can attend the center.   The Annual Registration is $100.00 and is due each year at the beginning of the month your enrollment began.

**Returned Checks**
There is a $25.00 fee for checks returned to us due to non-sufficient funds.

**Payments / Late Charges**
Monthly tuition payments are due on the first of each month, and weekly tuition payments are due each week on Monday.   Please make cash payments to office personnel only and always obtain a receipt.   Checks may be left in the locked box on the office wall.   The following rates are charged for late payments: 10% of balance due after the 5th of the month for monthly payments and 10% of balance due after each Wednesday for weekly payments.

**Refund Policy**
Dayspring will not offer refunds due to absences on regularly scheduled days or for early withdrawals with less than two weeks' notice given to office staff.

**Separate Accounts**
Sometimes separate accounts are necessary when two parties are paying tuition.   This can be accommodated and tax receipts will be issued to each party at the end of the year.   If a balance is left on an account, any credit from either account will be used to cover the balance due.

**Overtime Charges**
Half-day students will go onto overtime charges after 12:00 p.m. and full-time students will go onto overtime after 6:00 p.m.   Our fees are computed to discourage tardiness.   The late fee is due immediately, and to be given to the teacher on duty.

Fees are as follows:
After 12:30 p.m.        $10.00
After 5:30 p.m.        $1.00 per minute per child

**Blanket and Laundry Fee**
There is a $5.00 charge for any child who does not bring a sheet and blanket from home for nap time (blankets are a licensing requirement).   A school blanket will be issued to the child and used until other blankets from home are received.   Blankets from home are sent home to be laundered every two weeks and need to be returned on your child's first day back to school.

### *USDA NON-DISCRIMINATION STATEMENT:*

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, disability, age, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American sign Language, etc.), should contact the Agency (State or local) where they applied for benefits.   Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at (800) 877-8339.   Additionally, program information may be made available in languages other than English.

To file a complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at http://www.ascr.usda.gov/complaint_filing_cust.html, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form.   To request a copy of the complaint form, call (866) 632-9992.   Submit your completed form or letter to USDA by:

(1)      Mail:   U.S. Department of Agriculture Office of the Assistant Secretary for Civil Rights 1400   Independence Avenue, S.W., Washington, D.C.   20250-9410,
(2)      fax (202) 690-7442 or
(3)      email at program.intake@usda.gov.

The USDA is an equal opportunity provider.

## HEALTHY SCHOOL ACT REQUIREMENT

Pesticide Use Notification

Dayspring Christian Learning Center complies with the state law requiring use of effective and least toxic pest management practices.   Signs will be posted as notification at least 72 hours in advance of pesticide applications.   Materials are normally applied outside.   However, if inside materials are needed, Temprid SC 0.0750% will be used.   If you have any questions, please contact the office.



# *Dayspring Christian Learning Center*

1150 Greenfield Drive   El Cajon, CA 92021
Phone: (619) 442-2895        Fax: (619) 442-2899
Email: dayspringcenter@sbcglobal.net    Web: www.dayspringlearning.com

## TUITION & FEE'S EFFECTIVE JANUARY 2022

### REGISTRATION

Annual Registration Fee      $ 100.00 1ˢᵗ child        $75.00 each additional child
Daycare Summer Camp Activity Fee    $ 100.00 activity fee

### DAYCARE TUITION (5-12 years)

Weekly - $125.00 for before and after school care up to 5 hours per day
(Any day attended over 5 hours will be prorated at a full-time rate)

#### DAYCARE TUITION
#### DURING VACATION TIMES

| | Full Days Weekly | Half Days (5 hrs. or less per day) Weekly |
|---|---|---|
| 5 | $220.00 | $170.00 |
| 4 | $190.00 | $150.00 |
| 3 | $170.00 | $140.00 |
| 2 | $150.00 | $130.00 |

#### TODDLER TUITION
#### (25 Months - 29 Months (and until potty-trained)

| | Full Days Weekly | Half Days (5 hrs. or less per day) Weekly |
|---|---|---|
| 5 | $255.00 | $195.00 |
| 4 | $220.00 | $180.00 |
| 3 | $195.00 | $170.00 |
| 2 | $180.00 | $150.00 |

#### PRESCHOOL TUITION
#### (30 Months - Before Kindergarten)

| | Full Days Weekly | Half Days (5 hrs. or less per day) Weekly |
|---|---|---|
| 5 | $220.00 | $170.00 |
| 4 | $190.00 | $150.00 |
| 3 | $170.00 | $140.00 |
| 2 | $150.00 | $130.00 |

#### INFANT TUITION
#### (0 - 24 months)

| | Full Days Weekly | Half Days (5 hrs. or less per day) Weekly |
|---|---|---|
| 5 | $305.00 | $215.00 |
| 4 | $250.00 | $200.00 |
| 3 | $215.00 | $190.00 |
| 2 | $200.00 | $185.00 |

#### ADDITIONAL FEES

| | |
|---|---|
| Diaper Fee | $1.00 per diaper |
| Late pick up after 5:30 p.m. | $1.00 per minute |

#### DISCOUNTS

Families with 2 or more children:  10% discount
Military Families:                        10% discount
Advance Payment (1 month in advance)     5% discount
Discount Maximum is 20% per family

13

**PLEASE SIGN AND RETURN THIS PAGE TO THE OFFICE.   (copy in registration)**

Child/ren Name:_____

I/We have read and understood all the policies and information in this handbook and I/We agree to abide by the policies stated.

Parent(s) or Guardian's Signatures:

1.   _____

2.   _____

**EXHIBIT "C"**

State of California
Department of Social Services
Child and Adult Care Food Program

Permanent Single Agreement
CACFP 03 Rev. April 2022

---

### Assurance of Civil Rights Compliance

---

The Program Operator assures that the CACFP will be operated in compliance with all applicable civil rights laws and will implement all applicable nondiscrimination regulations. Unless otherwise made inapplicable by law, the Program Operator hereby agrees that it will comply with Title VI and VII of the Civil Rights Act of 1964 (42 *U.S.C.* 2000d  2000e-16), Title IX of the Education Amendments of 1972 (Title 20, *United States Code* Section 1681 et seq.), Section 504 of the Rehabilitation Act of 1973 (Title 29, *United States Code* Section 794), the Age Discrimination Act of 1975 (42 *U.S.C.* 6101 et seq.), the Americans with Disabilities Act of 1990 (P.L.101-336), all provisions required by USDA nondiscrimination regulations (7 *CFR*, parts 15, 15a, 15b), Department of Justice Enforcement Guidelines for Enforcement of Nondiscrimination in Federally Assisted Programs, and the USDA Food and Nutrition Service (FNS) directives and guidelines, including data collection, public notification, and compliance reviews, to the effect that no person shall be discriminated against on the basis of race, color, national origin, sex (including gender identity and sexual orientation), age, or disability or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by the USDA. The Program Operator hereby assures that it will immediately take necessary measures to effectuate this PSA.

This assurance is given in consideration of and for the purpose of obtaining any and all federal financial assistance, grants and loans of federal funds; reimbursable expenditures; grant or donation of federal property and interest in property; the detail of federal personnel; and the sale and lease of, and the permission to use, federal property or interest in such property or the furnishing of services without consideration or at a nominal consideration, or at a consideration that is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale, lease, or furnishing of services to the recipient, or any improvements made with federal financial assistance extended to the Program Operator by the USDA or CDSS. This includes any federal agreement, arrangement, or other contract that has as one of its purposes the provision of assistance such as food, cash assistance for the purchase of food, or any other financial assistance extended in reliance on the representations and agreements made in this assurance.

By providing this assurance, the Program Operator agrees to compile data, maintain records, and submit reports as required to permit effective enforcement of the nondiscrimination laws, and permit authorized USDA or CDSS personnel during normal working hours to review such records, books, and accounts as needed to ascertain compliance with the nondiscrimination laws. If there are any violations of this assurance, the USDA or CDSS shall have the right to seek judicial enforcement of this assurance.

This assurance is binding on the Program Operator, its successors, transfers, and assignees as long as it receives assistance or retains possession of any assistance from the CDSS. The persons whose signatures appear below are authorized to sign this assurance on behalf of the Program Operator.

**EXHIBIT "D"**



**Application Packet**
**Independent Center**

| 04897-CACFP-37-NP-IC | Packet Submitted Date: | 09/21/2022 |
|---|---|---|
| **CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR** | Packet Approved Date: | |
| 1150 GREENFIELD DR | Packet Original Approval Date: | |
| EL CAJON, CA 92021-3915 | | |
| SAN DIEGO | | |
| CD: | | |
| Vendor #: V6020Z | | |

| Action | Form Name | Latest Version | Status |
|---|---|---|---|
| View | ✔ Agency Application | Original | Submitted |
| View | ✔ Civil Rights Information | | Approved |
| View | ✔ Responsible Principals List | Original | Approved |
| View | ✔ VCA Form | | Approved |
| Details | Vendor/Central Kitchen Information | | No Facilities |
| Details | ✔ Checklist (2) | | |

| | Approved | Pending | Return for Correction | Denied | Withdrawn/ Closed | Error | Total Applications |
|---|---|---|---|---|---|---|---|
| Site Application(s) | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

**Packet History**

| Event | Event Date/Time | User |
|---|---|---|
| The application packet was submitted. | 9/21/2022 8:18:22 AM | KWADE |
| The application packet was changed requiring it to be submitted. | 9/21/2022 8:17:32 AM | KWADE |
| The application packet was returned. | 9/16/2022 11:04:31 AM | JBunge |
| The application packet was submitted. | 8/25/2022 1:56:41 PM | KWADE |
| The application packet was changed requiring it to be submitted. | 8/25/2022 1:56:12 PM | KWADE |
| The application packet was returned. | 8/25/2022 1:49:12 PM | JBunge |
| The application packet was submitted. | 8/4/2022 3:59:16 PM | KWADE |
| CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR was enrolled in 2023. | 8/4/2022 1:24:54 PM | KWADE |

**Child & Adult Care Food Program**
**Agency Application for 2022 - 2023**

---

04897-CACFP-37-NP-IC
**CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR**
1150 GREENFIELD DR
EL CAJON, CA 92021-3915
SAN DIEGO
CD:
Vendor #: V6020Z

---

## Agency Description

| FEIN | Agreement Type | Agency Type |
|---|---|---|
| 33-0316156 | Independent Center | Non-Profit |

1. Private Non-profit and Higher Education Private agencies, select one.

    ◉ This is a faith-based non-profit agency.

    ◯ This is a secular non-profit agency (not faith-based).

2. Are all of your agency's CACFP participating centers located at the same physical address?   ◉ Yes   ◯ No

---

## Addresses

### Street Address

3. Address 1:          1150 GREENFIELD DR

4. Address 2:

5. City:                    EL CAJON

6. State:                  CA        Zip:     92021-3915

7. County:               SAN DIEGO - 37

### Mailing Address

8. Address 1:          1150 GREENFIELD DR

9. Address 2:

10. City:                   EL CAJON

11. State:                 CA        Zip:     92021-3915

### Payment Address (Legal IRS Address) To change your payment information, contact your program specialist

12. Agency Name:   CHURCH OF COMPASSION

13. Address 1:         1150 GREENFIELD DR

14. Address 2:

15. City:                   EL CAJON

16. State:                 CA        Zip:     92021-3314

17. County:

---

## Authorized Representative

|  | Salutation | First Name |  | Last Name |
|---|---|---|---|---|
| 18. Name: | Rev. | KELLY | | WADE |

19. Title:                 Authorized Representative

20. Email Address:   dayspringcenter@sbcglobal.net

21. Phone:              (619) 442-2895      Ext:    (619)         Fax:        (619) 442-2894
    (999-999-9999)                                                          (999-999-9999)

| 22. | Address 1: | 1150 GREENFIELD DR |
|-----|-----------|--------------------|
| 23. | Address 2: | |
| 24. | City: | EL CAJON |
| 25. | State: | CA          Zip:          92021-3915 |
| 26. | County: | SAN DIEGO - 37 |

## Program Contact

| | | Salutation | First Name | | Last Name |
|---|---|---|---|---|---|
| 27. | Name: | Rev. | KELLY | | WADE |
| 28. | Title: | Authorized Representative | | | |
| 29. | Email Address: | dayspringcenter@sbcglobal.net | | | |
| 30. | Phone: (999-999-9999) | (619) 442-2895      Ext:     (619) | | Fax: (999-999-9999) | (619) 442-2894 |

## Publicly Funded Programs

31. Provide the names of the publicly funded programs that your center(s) operate, the names of the principals in your agency responsible for the management of each program, and the years your agency participated in each program.

| Names of Programs | Principals Responsible for Program Management | Calendar Years Your Agency Participated in each Program |
|-------------------|-----------------------------------------------|--------------------------------------------------------|

## Certifications

Federal regulations require agency to certify information regarding past business participation and criminal background. Please answer the following questions:

○ Yes  ◉ No  1. Has the agency or any of the agency's principals participated in any publicly funded programs within the past seven years?

**NOTE: Principal** means any individual who holds a management position within or is an officer of the agency, including all members of the agency's board of directors (if that is applicable).

**Publicly funded** means money that is received from a local, state, or federal governmental agency.

○ Yes  ◉ No  2. Within the past seven years, has the agency or any of the agency's principals been declared ineligible to participate in any other publicly funded programs for violating program requirements?

○ Yes  ◉ No  3. Has the agency or any of the agency's principals been convicted of any activity that occurred within the past seven years that indicated a lack of business integrity? A lack of business integrity includes fraud, antitrust violations, embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, receiving stolen property, making false claims, obstruction of justice, or any other activity indicating a lack of business integrity as defined by the state agency.

## Certification Statement:

☑ The Agency certifies that it will participate in the Child and Adult Care Food Program (CACFP) for the upcoming program year. The Agency further certifies that the submitted information and documents are true and correct. We accept final administrative and financial responsibility for the operation of the CACFP. Reimbursement will be claimed only for meals served to enrolled participants during the hours they are in attendance. All participants in attendance will be offered the same meals at no additional charge with no discriminatory physical segregation or other discrimination because of economic need, race, color, national origin, sex, age, or disability. The Agency assures the CDE that it will adhere to all of the requirements and responsibilities as agreed to in the Agreement to Participate and will follow all CDE and United States Department of Agriculture (USDA) policies and guidance. We understand that the information being given is in connection with the receipt of federal funds and that a deliberate misrepresentation or withholding of information may result in prosecution under applicable state and federal statutes and placement of all responsible Principals and the Agency on the USDA's National Disqualified List.

Created By: KWADE on: 8/4/2022 1:24:54 PM     Modified By: KWADE on: 8/4/2022 1:27:00 PM

### Civil Rights Information

04897-CACFP-37-NP-IC
**CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR**
1150 GREENFIELD DR
EL CAJON, CA 92021-3915
SAN DIEGO
CD:
Vendor #: V6020Z

## Civil Rights Information

CACFP benefits are available to organizations that provide day care services and do not discriminate on the basis of color, race, sex, age, disability or national origin. The following questions are about your organization's nondiscrimination policies.

1.  Indicate the name of your agency's Civil Rights Compliance Officer.

    Kelly Wade

2.  List the towns, neighborhoods or communities served by your organization.

    El Cajon, Santee, Lakeside, La Mesa, San Diego, Alpine

3.  List the ways you let your community know your day care services are open to all. For example, advertisements in newspapers, or posters in community locations.

    Justice for All Poster posted in front of school, ad placed in local newspaper

4.  Have any complaints or lawsuits been filed against your organization, or any facility under your administration, based on discrimination by color, race, sex, age, disability, or national origin within the last three years?   ○ Yes  ◉ No

    If yes, explain:

5.  Has any federal or state agency advised your organization, or any facility under your administration, that they were not in compliance with the Civil Rights Act of 1964 within the last three years?   ○ Yes  ◉ No

    If yes, explain:

6.  Has any federal or state agency denied assistance to your organization, or any facility under your administration, because of noncompliance with the Civil Rights Act of 1964 within the last three years?   ○ Yes  ◉ No

    If yes, explain:

7.  Has a civil rights compliance review been conducted for your organization, or any facility under your administration, within the past two years?   ○ Yes  ◉ No

    If yes, explain:

| | | Count |
|---|---|---|
| 8. | **What number of participants in care at your sites fall into each ethnic category?** | |
| | HISPANIC OR LATINO - A person of Cuban, Mexican, Puerto Rican, South or Central South American, or other Spanish culture or origin, regardless of race. | 29 |
| | NOT HISPANIC OR LATINO | 0 |
| 9. | **How many participants attend the sites from each racial category?** | Count |
| | AMERICAN INDIAN OR ALASKAN NATIVE - A person having origins in any of the original peoples of North or South America, and who maintains tribal affiliations or community attachment (includes Central America). | 0 |
| | ASIAN - A person having origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent. This area includes China, Japan, Korea, India and the Philippine Islands. | 8 |

BLACK OR AFRICAN AMERICAN – A person having origins in any of the black racial groups of Africa.                                                                                    6

NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER - A person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.                               1

WHITE – A person having origins in any of the original peoples of Europe, North Africa or the Middle East.                                                                         46

10. ☑  · The agency understands all written material for public distribution that mentions the USDA food program must contain a nondiscrimination statement.

· The agency is in compliance with civil rights requirements.

☐  Check here if your Emergency / Homeless Shelters do not issue a public release because of client confidentiality.

Created By: KWADE on: 8/4/2022 1:24:54 PM    Modified By: JBunge on: 8/25/2022 1:37:59 PM

## Responsible Principals List for 2022 - 2023

04897-CACFP-37-NP-IC
**CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR**
1150 GREENFIELD DR
EL CAJON, CA 92021-3915
SAN DIEGO
CD:
Vendor #: V6020Z

**Version: Original**

| Action | Name | Position | Phone |
|---|---|---|---|
| View | Ronald Wade<br>636 SOUTH THIRD ST.<br>EL CAJON, CA 92019<br><br>DOB: 08/07/1948 | Executive Director | (619) 442-6846 |
| View | Justin Bennett<br>1920 Cornerstone Court<br>El Cajon, CA 92021<br><br>DOB: 07/11/1970 | Board Chair | (619) 579-3150 |
| View | Ronald Perkins<br>246 Hart Dr. Unit 1314<br>El Cajon, CA 92021<br><br>DOB: 09/14/1959 | Board Treasurer | (760) 535-1764 |

## Certification

☑ By checking here I certify that the above Responsible Principals information is correct for this program year, and the institutions and its principals are not on the National Disqualified List [226.6(b)(1)(xii)].

Created By: KWADE on: 8/4/2022 1:24:55 PM

## Viability, Capability, and Accountability Form

| |
|---|
| 04897-CACFP-37-NP-IC |
| **CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR** |
| 1150 GREENFIELD DR |
| EL CAJON, CA 92021-3915 |
| SAN DIEGO |
| CD: |
| Vendor #: V6020Z |

| **VCA Form Version:** Original |
|---|

## Section I - Financial Viability

An agency participating in the CACFP must be financially viable. Program funds must be expended and accounted for in accordance with Title 7, *Code of Federal Regulations* (7 *CFR*), Part 226, 2 *CFR*, Part 200, and Food and Nutrition Service (FNS) Instruction 796-2, Revision 4.

### A. Fiscal Resources and Financial History

1. The monthly claim must be documented (eligibility, meal counts, etc.), accurate (edit checks of each site's claims), and filed within 60 days after the claim month. Describe how your organization ensures claims are documented, accurate, and timely.

   > Meal Benefit Forms are filled out by parent/guardian and income is verified for participation. Meal counts are taken at point of service and logged on a meal count sheet in each classroom. Meal counts are audited daily for accuracy to ensure that meal counts do not exceed number of participants listed on attendance records.
   > At the month's end, the data is compiled onto the monthly claim form and submitted through the Child Nutrition website.

2. Nonprofit Food Service: Describe your center's procedures for comparing food service costs to CACFP reimbursement to ensure you maintain a nonprofit food service.

   > Annual budgets are set at the beginning of the fiscal year. Monthly budgets are compared to our annual budget each month to ensure a non-profit food service program.

3. Procurement Methods: Check the boxes below to indicate all procurement (purchasing) methods used to obtain items listed on your Annual CACFP Center Budget for Organizations.

   For purchases of meals, food, supplies, equipment, and other goods and services with a cost above your agency's small purchase threshold, you must follow formal bid procedures. Small purchase procedures are allowed if your agency is purchasing below the small purchase threshold. Micro-purchasing is only allowed if your agency's purchases fall below $3,500. For more information on procurement in the CACFP, please see the Procurement in Child Nutrition Programs Web page at http://www.cde.ca.gov/ls/nu/pr/index.asp.

   - [x] Micropurchase
   - [ ] Formal purchase procedure: Sealed bids (Invitations for Bid, IFBs)
   - [ ] Small purchase procedures
   - [ ] Noncompetitive Proposals
   - [ ] Formal purchase procedure: Competitive proposals (Requests for Proposals, RFPs)

   Submit a copy of your most recent audit or financial statement as to the financial viability of your agency.

### B. Annual Program Budget for Independent Centers: October 1, 2022 - September 30, 2023

A center must state its estimated expenses (Expense Category and Expense Amount) and anticipated income from the CACFP (CACFP Funding Amount) and other income sources (Other Income Amount) in a manner that corresponds to each expense category.

Examples of other income sources include parent fees, Head Start funding, Child Development grants, Title XIX grants, Medi-Cal care fees, United Way, and donations.

REMEMBER: A center must operate a nonprofit food service. As a result, total food service expenses must equal total food service income (CACFP + Other Income). Other income is the amount that is put into the food service account from sources other than CACFP funding amount.

| Expense Category | Expense Amount | CACFP Funding Amount | Other Income Amount |
|---|---|---|---|
| Food | 21,000 | 21,000 | 0 |

| | | | |
|---|---|---|---|
| Food Service Supplies | 5,000 | 5,000 | 5,000 |
| Food Service Labor | 39,000 | 14,000 | 20,000 |
| Administrative Labor | 0 | 0 | 0 |
| Benefits | 0 | 0 | 0 |
| Food Service Equipment | 0 | 0 | 0 |
| Rent/Lease | 0 | 0 | 0 |
| Other | 0 | 0 | 0 |
| Other | 0 | 0 | 0 |
| Total | 65,000 | 40,000 | 25,000 |

## Section II - Administrative Capability

An independent center must be administratively capable. Appropriate and effective management practices must be in effect to ensure that the Program operates in accordance with the 7 CFR 226 requirements. The Center may not contract with any consultant for the management of the Program [7 CFR §226.15(c)].

### A. Organizational Structure and Staffing

Submit your center's current organizational chart that shows all of the CACFP staff.

### B. Staffing Plan

1. Complete the following CACFP Organization Staffing Pattern:

**Administrative Labor**

| CACFP Duties | Name | Title | Who Double Checks? |
|---|---|---|---|
| Overall CACFP Management | Kelly Wade | Administrator | N/A |
| Maintenance of Financial Records | Kelly Wade | Administrator | Diana Evangelista |
| Eligibility Determination | Kelly Wade | Administrator | Diana Evangelista |
| Claims Preparation | Kelly Wade | Administrator | Diana Evangelista |
| Monitoring | Kelly Wade | Administrator | Diana Evangelista |
| Training | Kelly Wade | Administrator | Diana Evangelista |
| Payroll | Kelly Wade | Administrator | Diana Evangelista |
| Other | | | |

**Operating Labor**

| CACFP Duties | Name | Title | Who Double Checks? |
|---|---|---|---|
| Menu Production Records | Kelly Wade | Administrator | Diana Evangelista |
| Food Purchasing | Socorro Hernandez | Cook | Kelly Wade |
| Food Preparation | Socorro Hernandez | Cook | Kelly Wade |
| Food Transport | N/A | N/A | N/A |
| Meal Counts | Diana Evangelista | Director | Kelly Wade |
| Other | | | |
| Other | | | |

2. Are CACFP duties included in employee job descriptions?       ◉ Yes    ○ No

## Section III - Program Accountability

An independent center must have internal controls and other management systems in effect to ensure fiscal accountability and program operation in accordance with the 7 CFR 226 requirements.

All private non-profit agencies must complete the Board of Directors/Owners List form for each Executive Director and Board Officer. All private for-profit agencies must complete the Board of Directors/Owners List form for each Owner and principal stockholder.

Note: An agency may not contract out for the management of the CACFP.

### A. Governing Board/Agency Principals (Private, Nonprofit and Proprietary Agencies Only)

1. If you have a Board/Stockholders, how often is a meeting held?    Quarterly

2. If you have a Board or Stockholders, describe their role in approving fiscal actions, policy decisions, and other administrative actions.

> The board sets and annual budget in January for the following year. Any expenditure over $200.00 must be approved by the board.

### B. Fiscal Accountability

Financial Management: Describe your center's financial management system and indicate how:
- Money is received and disbursed;
- Expenses are incurred and accounted for; and
- Improper financial activities by employees are prevented and detected.

> Tuition and payments are made by check or cash. Kelly Wade or Diana Evangelista collect payments. Kelly Wade or Diana Evangelista make deposits at Bank of America. Bills and invoices are paid by a Dayspring check or online by a Dayspring debit card. Kelly Wade is responsible to pay them. Kelly Wade and Diana Evangelista have access to bank accounts or checks/cash/credit card information stored at our administrative office. Our accounting system is Quickbooks. Kelly Wade and Diana Evangelista are responsible for accounting duties. Our accountant reviews and audits our financial books and prepares financial reports as needed.

### C. Operations

1. Training: You must train key CACFP staff on program responsibilities a minimum of one time per year. At a minimum, such training must include instruction, appropriate to the level of staff experience and duties. Training documents must be maintained reflecting the dates, location, names of participants, and CACFP training topic(s). Training topics are to include:
   - Meal patterns
   - Record keeping requirements
   - Meal counts
   - Reimbursement system
   - Claim submission and review procedures
   - Civil Rights compliance

   a) Annual Center Training: Describe your proposed staff training for the upcoming program year. See the training topics listed above.

   > All required training topics listed above will be covered in the upcoming program year. Training will be held at Dayspring Christian Learning Center 1150 Greenfield Drive El Cajon, Ca 92021
   > The training will be held once a year. All topics will be done at one meeting. Attendance at training will be documented by a sign in sheet by all attendees.

   b) Mandatory State Training: Describe how your center will ensure that appropriate staff attends or participates in the mandatory CACFP trainings held by CDE.

   > Staff will be paid at their usual salaries for time spent attending training. Our agency will choose the staff that will attend and Kelly Wade or Diana Evangelista will attend all CDE trainings. We will give the staff advance notice of training and provide directions and all information they may need to attend the training.

   c) Staff Training Needs: Describe how your center will address on-going staff training needs, including the training of new staff.

   > CACFP training is done upon hiring a new employee and quarterly thereafter.

2. Record Keeping

   a) Overall Responsibility: Name the person or persons who have responsibility for maintaining CACFP records.

   > Kelly Wade

   b) All CACFP records must be maintained at the center. All CACFP records must be available for review during normal business hours. Indicate below where in the center you will maintain the CACFP records for the current fiscal year and where you will store the prior three years of CACFP records.

   > All current CACFP records as well as the prior three years are maintained in the office. Our address is 1150 Greenfield Drive El Cajon, CA 92021

   c) Menu Planning and Menu Production Records

1)Describe how your center plans the meals served so that adequate amounts of food items are purchased and prepared. Identify all resources your center uses to ensure that all meals will comply with the regulatory requirements.

> Our center uses the CACFP meal patterns to determine the correct serving sizes for each group we serve. We also use the Food Buying Guide Calculator to determine the amount of food the agency must purchase to provide each participant with the correct serving size.

2) If your center prepares any meals on-site, describe how your center completes the Menu Production Records to document that all meals served are in accordance with the portion requirements of the CACFP. These records must document the types and quantities of food prepared for the meals claimed for reimbursement and the number of participants served these meals.

> Once actual meals counts have been accounted for, we adjust our estimated counts to an actual number of children fed. Our center uses food scales and measuring cups to ensure accuracy.

d) Food Substitutions: If your center claims meals served to participants in need of food substitutions for the required meal components, describe how you identify these participants and how your staff knows which participants must have food substitutions.

> Specific food needs are gathered through the enrollment process. If substitutions are needed, a Medical Statement signed by the participant's physician will be required. This statement will document the food substitution needed. When a substitution is needed, the cook and the teachers are notified verbally and through a communication log. Also, notices are posted in each classroom with the name of the child, room number and substitution needed.

e) Meal Counts: Describe how your center ensures that no more than two meals and one snack or two snacks and one meal per participant per day are claimed for reimbursement. Specify the method used at the point of meal service to count the meals and the method that is used to double-check the accuracy of the claim prior to its submission.

NOTE: Homeless / Emergency Shelters may claim three meals per day. Describe method.

> Kelly Wade has established specific meal times to ensure only 2 meals and 1 snack is provided daily. At the point of service, the participants are counted and logged on a Meal Count Sheet that is in each classroom. Diana Evangelista or Kelly Wade double checks counts through attendance sheets every day.

f) At-Risk Snack Programs only: Describe how your center ensures that no more than one snack per child per day is claimed.

Note: An At Risk Sponsor should describe how the meal count method will ensure that the Sponsor will claim no more than one snack and one meal per child, per day.

3.   Participant Eligibility Status

NOTE: Head Start Centers, Even Start Centers, Migrant Centers, At-Risk Snack Centers, and Homeless/Emergency Shelters may skip this section.

a) Child Care Centers: Describe how your center ensures that the participant's meal benefit forms are properly completed and approved.

> Our agency distributes and collects Meal Benefit Forms to all parents to be filled out and returned to our school once per year. Kelly Wade or Diana Evangelista will certify all participants annually.

Adult Care Centers: Describe how your center uses alternative documentation (if applicable) and how your center ensures that Meal Category/Eligibility Forms are properly completed and approved.

b) Confidentiality: Describe how your center maintains the confidentiality of the participants' meal category determination and ensures the confidentiality of all forms that contain that information.

> Food eligibility sheets are kept in a separate file and Kelly Wade and Diana Evangelista has access to these applications.

## Section IV - Certifications and Signatures

☑  I certify that the center will abide by the VCA and that all applicable State and Federal regulations and policies will be observed. I certify that reimbursement will be claimed only for eligible meals served to enrolled participants who are eligible for the program. We understand that information being given in this VCA is in connection with the receipt of federal funds and that a deliberate misrepresentation or withholding

of information may result in prosecution under applicable state and federal statutes, and placement of all responsible Principals and the Agency on the USDA's National Disqualified List.

**Agency Comments**

### CACFP Checklist

04897-CACFP-37-NP-IC
**CHURCH OF COMPASSION DAYSPRING CHRISTIAN LRNING CTR**
1150 GREENFIELD DR
EL CAJON, CA 92021-3915
SAN DIEGO
CD:
Vendor #: V6020Z

| Required Forms/Documents to send to CDE | Document Submitted to CDE | Date Submitted to CDE | Document on File w/ CDE | Status | Status Date | Last Updated By |
|---|---|---|---|---|---|---|
| Agency-wide 12-month independently audited financial statement **OR** A Profit/Loss Statement for the most recently completed fiscal year **AND** your most recently submitted income tax return | ☑ | 08/25/2022 | ☑ | Approved | 09/16/2022 | KWADE |
| Agency-wide organization chart with titles and names of staff | ☑ | 08/25/2022 | ☑ | Approved | 09/16/2022 | KWADE |

| Action | Checklist Item | Comment | Attachment Date/Time |
|---|---|---|---|
| View | Agency-wide 12-month independently audited financial statement **OR** A Profit/Loss Statement for the most recently completed fiscal year **AND** your most recently submitted income tax return | CACFP 87 FORM IS ATTACHED | 8/4/2022 3:56:35 PM |
| View | Agency-wide 12-month independently audited financial statement **OR** A Profit/Loss Statement for the most recently completed fiscal year **AND** your most recently submitted income tax return | RPL 41 | 9/21/2022 7:55:12 AM |
| View | Agency-wide organization chart with titles and names of staff | CHART IS ATTACHED | 8/4/2022 3:57:10 PM |

# EXHIBIT "E"




CALIFORNIA HEALTH & HUMAN SERVICES AGENCY
# DEPARTMENT OF SOCIAL SERVICES
744 P Street • Sacramento, CA 95814 • *www.cdss.ca.gov*

**KIM JOHNSON**
DIRECTOR

**GAVIN NEWSOM**
GOVERNOR

*Ronald Wade*

**ATTN:** R   d   d   E       D r   r                       rd C   r R   d   r
rd C   r           d  Ad           r   r

***NOTICE O  DENIA  O  A      ICATION AND DETERMINATION O   SERIOUS
DE  ICIENC***

---

1 For the purposes of this letter all references to the Church of Compassion include the Church of Compassion as a program operator and the responsible parties: Ronald Wade, Justin Bennett, and Ronald Perkins.



r R r d r
r r r d rr d d r d
d D D d rr d r
r d d d r r r d d r
d r d rr r
r d r rr r d d r r d r d
d d r r d d rd
d d

r r r rr d
d r d d D r
d r r r d d
r rr d D r d r r r rr d d
d r d d r
r r r r d R

r d r r d r d
d r r r r r
r r r r r
r d d r d r
d d r r r d d r
d D d

D r r r d d r
r r d r r
r d d r d r D
r d d

Sincerely,

Jessie Rosales
d d d r d r r r
r D r r

**Signature:** Ronald Wade

**Email:** r.wade1@cox.net

**Title:** Pastor, Church of Compassion

**Company:** Church of Compassion

# Nondiscrimination Statement

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, sex, disability, age, or reprisal or retaliation for prior civil rights activity in any program or activity conducted or funded by USDA.

Persons with disabilities who require alternative means of communication for program information (e.g. Braille, large print, audiotape, American Sign Language, etc.), should contact the Agency (State or local) where they applied for benefits.  Individuals who are deaf, hard of hearing or have speech disabilities may contact USDA through the Federal Relay Service at 800-877-8339.  Additionally, program information may be made available in languages other than English.

To file a program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, (AD-3027) found online at: How to File a Complaint, and at any USDA office, or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call 866-632-9992. Submit your completed form or letter to USDA by:

1.  mail:  U.S. Department of Agriculture
        Office of the Assistant Secretary for Civil Rights
        1400 Independence Avenue, SW
         Washington, D.C. 20250-9410

2.  fax: 202-690-7442

3.  email: program.intake@usda.gov

This institution is an equal opportunity provider.

**Signature:**

**Email:**  [2] dbroyles@nclplaw.org,mgondeiro@tylerbursch.com

**Title:**

**Company:**

**EXHIBIT "F"**



**United States
Department of
Agriculture**

**Office of the
Assistant Secretary
for Civil Rights**

1400 Independence
Avenue SW

Washington, DC
20250

**RELIGIOUS EXEMPTIONS UNDER
TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**

Title IX of the Education Amendments of 1972 ("Title IX") is a federal law that prohibits sex discrimination by educational institutions receiving financial assistance from the federal government, including USDA. Although this prohibition applies to a wide array of public and private schools at the K-12 and the college/university level, the law includes some exceptions, including one permitting an institution to be exempt on religious grounds if there is a conflict between Title IX and a school's governing religious tenets.

Below are two basic questions and answers about Title IX Religious Exemptions. If your institution decides to seek USDA assurance of an exemption, please be sure to do so consistent with regulations (link below), and contact us at CR-INFO@usda.gov if you have questions:

1. **Are religious educational institutions required to submit a written request to USDA in order to claim a Title IX Religious Exemption?**

   No.  USDA regulations do not require a religious educational institution to submit a written request for a Title IX exemption in order to claim that exemption.

   If, however, a religious educational institution wishes to seek USDA recognition of their religious exemption, it may do so through a written request under USDA regulations (7 CFR 15a.205).  The written request seeks USDA assurance of exemption from applicable sections of USDA's Title IX regulations.  Those that have neither sought nor received prior written assurance from USDA may still invoke their exemption after USDA receives a Title IX discrimination complaint or initiates Title IX compliance efforts.  Any action taken by USDA in a specific case will take account of all relevant facts and legal requirements, including, where applicable, Title IX's Religious Exemption, the Religious Freedom Restoration Act, 42 USC 2000bb et seq., and any other applicable exemptions.

2. **If an educational institution wishes to seek USDA assurance of religious exemption from Title IX provisions, where should that written request be sent?**

   All written requests for assurance of a religious exemption should be sent <u>by mail</u> to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, Center for Civil Rights Operations, 1400 Independence Avenue, SW, Stop 9407, Washington, DC 20250; or <u>by email</u> to: CR-INFO@usda.gov.

August 12, 2022

**EXHIBIT "G"**



THE NATIONAL CENTER
FOR LAW & POLICY

October 4, 2022

*Via Email and U.S. Mail*

California Department of Social Services
744 P Street
Sacramento, CA 95814
Email: CACFPAppeals@dss.ca.gov

**RE:  CHURCH OF COMPASSION DAYSPRING CHRISTIAN LEARNING CENTER V.
CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, NOTICE OF <u>APPEAL</u> AND
PENDING FEDERAL CIVIL RIGHTS LITIGATION (Written Review Requested).**

To Whom it May Concern,

Thank you for your prompt attention to the urgent and important matters addressed in this legal demand letter and appeal. Please be advised that the National Center for Law & Policy (NCLP) is a non-profit organization providing legal assistance to individuals and organizations whose civil rights have been threatened or infringed by the government and its various agents.

Because of the NCLP's significant experience successfully representing churches and religious organizations facing religious discrimination by government actors, I have been retained by the Church of Compassion Dayspring Christian Learning Center to represent this organization regarding the State's recent egregiously unconstitutional actions targeting the Church.  Attorneys with Advocates for Faith and Freedom serve as co-counsel and should be copied on all responses.[1]

A written review is requested.  Please do not contact my clients, but refer all communications regarding the important legal matters discussed herein to my attention only.

---

[1] The constitutional attorneys of the National Center for Law and Policy and Advocates for Faith and Freedom, have extensive experience successfully advocating against government entities on behalf of religious organizations whose civil rights have been infringed.  Our legal victories include successfully advocating against the State of California and various counties to re-open churches during the pandemic (*See, i.e., Cross Culture Christian Center v. Newsom*) and prevailing against California's unconstitutional AB 775 at the U.S. Supreme Court (See *NIFLA v. Becerra*).

1

The purpose of this letter is both to appeal the California Department of Social Services' (CDSS) recent adverse determination against my clients (discussed below) and to notify the CDSS that, if a prompt resolution cannot be obtained, a federal civil rights lawsuit will be filed seeking declaratory and injunctive relief regarding the many constitutional and statutory violations committed by CDSS, as discussed herein.

The claims, legal arguments and description of facts embodied herein are not necessarily intended to be exhaustive and I hereby reserve the right to supplement or modify the legal theories and damages as further investigation and discovery dictate. Please understand that this letter has been sent to you for the sole purpose of exploring prelitigation settlement discussions. Its contents and all future communications are confidential and privileged pursuant to California Evidence Code §1152 and §1154.

Additionally, this letter is also written to remind you of CDSS' duty to preserve evidence pertaining to the following subject matters: Compassion Church and Dayspring Christian Learning Center's applications for funding and funding grants, both by CDSS and the DOE.  This includes any and all documents, including correspondence and items maintained in my client's file. Because electronic data may be an irreplaceable source of discovery should this matter proceed to litigation, it is your duty to preserve all potentially relevant electronic data. Consistent with that duty, I request that your data be preserved and maintained in a readily accessible format, and in native format with metadata intact, regarding the above subject matters, including electronic data (electronic mail, databases, computer system logs, word processing files, excel files, video conferencing recordings, company online data storage), physical data (personal files, physical documents, CDs, DVDs, USB drives, etc.), data storage devices, cell phone data (text messages, phone call logs, etc.), personal computer data, and any other evidence.

## I.     Statement of Facts

The Church of Compassion (hereinafter "Church") is a non-denominational Christian church which maintains biblically orthodox religious beliefs and practices regarding human sexuality, as Christian churches have faithfully maintained for the past two thousand years. The Church operates a daycare program in its facilities called the Dayspring Christian Learning

Center (hereinafter "Dayspring").  Dayspring is licensed to serve up to 112 children in the community. The State of California Department of Social Services (CDSS) is on notice and is aware that the Church and Dayspring are a faith-based non-profit agency, under its program guidelines.  It is important to note here that Dayspring does not discriminate against children based on the sexual orientation or gender identity of student family members.

The Church and Dayspring have participated in Child and Adult Food Care Food Program ("CACFP") through the California Department of Education (DOE) for approximately nearly twenty years.  As a result, the Church of Compassion receives state taxpayer funds, approximately $3,500 to $4,500 a month, to cover food-related costs for students in its daycare program. The Church's Vendor Number is V6020Z.

The CDSS, after assuming responsibility from the DOE for the CACFP program, issued new compliance language in the "Assurance of Civil Rights Compliance," Permanent Single Agreement (PSA) form dated April 2022.  The new language purports to require the Church to certify that CACFP will be "operated in compliance with all applicable civil rights laws and will implement all applicable non-discrimination regulation.  Unless otherwise made inapplicable by law, the program operator agrees to comply with…Title VII…USDA non-discrimination regulations…to the effect that no person shall be discriminated against on the basis of…sex" [including gender identity and sexual orientation] …." (hereinafter "Sex Rules").  Because of Church's biblical beliefs regarding human sexuality, it was unable to agree to comply with the government Sex Rules when it submitted its application for the 2022-2023 year.

Jessie Rosales, Chief of the Child and Adult Care Food Program at the California Department of Social Services (CDSS) submitted a letter to the Church dated October 20, 2022 with the subject:   NOTICE OF DENIAL OF APPLICATION AND DETERMINATION OF SERIOUS DEFICIENCY (hereinafter "CDSS Notice").  The CDSS Notice explained that the Church's application for participation in the CACFP was denied because the Church refused to agree to comply with the Sex Rules.

Rosales' demanding and threatening letter states, "While the Legislature strongly supports religious freedom, it has also explicitly stated that religious freedom should not be a justification for discrimination. To that end, the Legislature enacted California Government Code sections 11135 and 11139.8, which prohibit discrimination based on sexual orientation and

3

gender identity in any program or activity that is operated or administered by the State, is funded by the State, or receives State financial assistance."

The CDSS Notice proceeds to note two specific "violations."  First, that the Church's application requested a modification of the PSA's non-discrimination clause related to sexual orientation and gender identity.  Second, that the Church "requires all employees to read and abide by a staff handbook that specifically disallows "lesbians, gay, bisexual, and transgender lifestyles. Rosales concludes, "These actions show intent to discriminate against individuals based on sexual orientation and gender identity in violation of State law."  The CDSS Notice concluded that the Churches employment practices "violate Title VII of the Civil Rights Act of 1964 and "constitute one or more serious deficiencies in its operation of CACFP under 7 CFR section 226.6(c)(2)(ii)."

The CDSS Notice opined that the Church, in order to continue receiving state funding, could take corrective action within 15 days of receipt of the CDSS notice by signing the PSA agreeing to comply with the Sex Rules without modification; attest to compliance with all State and Federal laws implicating the Sex Rules; stop requiring Church employees to sign or abide by its handbook or any other policy not in compliance with the Sex Rules; and provide an updated copy of the Church handbook to CDSS.

However, if the Church refused to comply with these demands, Rosales ominously threatened that failure to comply will result in the termination of the Church's operation of the CACFP, disqualification of the Church from future CACFP participation and placement on the National Disqualification List.  Furthermore, Dayspring notes that CDSS has locked it out of access to the CNITS website.

## II.     Legal Analysis

Simply put, the government may not impose its politically correct sexual orthodoxy on religious institutions, especially churches, even when state funds are involved. The CDSS Sex Rules have, in fact, been made inapplicable by law, specifically the First Amendment to the U.S. Constitution.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism,

religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943)

The CDSS's Notice seeks to impose unconstitutional conditions on the Church which are in blatant violation of the First Amendment to the U.S. Constitution and well-established statutory law.  First, the Free Exercise Clause prohibits the State from denying a generally available public benefit to the Church based on the the organization's religious beliefs and status. Second, the State violates the Church's Freedom of Speech, by attempting not coercively compel the alteration of its employee handbook. Furthermore, the State completely ignores the judicially recognized "ministerial exception" as well as the two statutory exemptions provided to religious organizations under Title VII of the Civil Rights Acts of 1964 ("Title VII").  Therefore, for the following reasons, we hereby demand that the CDSS immediately cease and desist violating the Church's constitutional rights and immediately restore the CACFP funding.

**A. Free Exercise Clause expressly prohibits California from denying a generally available public benefits from a religious organization based on its religious beliefs or status.**

The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988). The Supreme Court has repeatedly held that a state violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits. *See Sherbert v. Verner*, 374 U.S. 398, 404, (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); *see also Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 16, (1947) (a State "cannot exclude" individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation").

The Supreme Court recently applied these principles in the context of two state efforts to withhold otherwise available public benefits from religious organizations. In *Trinity Lutheran*

*Church of Columbia, Inc. v. Comer*, the court considered a Missouri program that offered grants to qualifying nonprofit organizations to provide installed cushioning playground surfaces made from recycled rubber tires, but expressly denied such grants to any applicant owned or controlled by a church or other religious entity. 582 U. S. ——, 137 S.Ct. 2012 (2017). The Trinity Lutheran Church Child Learning Center applied for a grant to resurface its gravel playground, but the Department denied funding on the grounds that the Center was religiously affiliated. *Id.*

In *Trinity Lutheran*, the Court reaffirmed the established legal principle that "[t]he Free Exercise Clause *did* guard against the government's imposition of "special disabilities on the basis of religious views or religious status." *Id*. at 2021 (citing *Lyng,* 494 U.S., at 877, 110 S.Ct. 1595.).[2] Furthermore, the court deemed it "unremarkable in light of our prior decisions" to conclude that the Free Exercise Clause did not permit Missouri to "expressly discriminate[ ] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id*. Similarly to as noted in *Trinity Lutheran*, California is here attempting to interfere with an internal church decision that affects the faith and mission of the church itself—its deeply held religious views on human sexuality as applied to its personnel decisions. *Id*. f.n. 3. While it was true that Trinity Lutheran remained "free to continue operating as a church," it could enjoy that freedom only at the cost of "absolute exclusion from the benefits of a public program for which the Center [was] otherwise fully qualified." *Id*. at 2022 (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality opinion)). Such discrimination is "odious to [the] Constitution" and cannot not stand. *Trinity Lutheran*, 137 S.Ct. at 2025.

In *Espinoza v. Montana Dep't of Revenue*, 207 L. 140 S.Ct. 2246 (2020), the U.S. Supreme Court addressed a Montana program that prohibited the use of state scholarship funds

---

[2] "This is not to say that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause. Recently, in *Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), this Court held that the Religion Clauses required a ministerial exception to the neutral prohibition on employment retaliation contained in the Americans with Disabilities Act. Distinguishing *Smith,* we explained that while that case concerned government regulation of physical acts, "[t]he present case, in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself." 565 U.S., at 190, 132 S.Ct. 694." *Id*. f.n. 3.

to support sectarian schools. The court again held that the Free Exercise Clause forbade the State's action. *Id.* The application of the Montana Constitution's no-aid to religion provision required strict scrutiny because it "bar[red] religious schools from public benefits… because of the religious character of the schools." *Id*. at 2255. "A State need not subsidize private education, [b]ut once a State decides to do so, it cannot disqualify some private schools because they are religious." *Id.* at 2261.

Here, the "unremarkable" principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case. California offers its schools a benefit: nutrition assistance payments to help feed students. Just like the wide range of nonprofit organizations eligible to receive playground resurfacing grants in *Trinity Lutheran*, a wide range of private and public schools are eligible to receive California's nutrition assistance payments here. And like the daycare center in *Trinity Lutheran*, Dayspring Christian Learning Center and the Church of Compassion are disqualified from this generally available benefit precisely because of CDSS' imposition of "special disabilities on the basis of religious views or religious status," specifically in this case, the Church's Christian orthodox religious views and practices regarding marriage, gender, and sexuality. *Trinity Lutheran*, 137 S.Ct. at 2021. By "condition[ing] the availability of benefits" in this manner, California's nutrition assistance program—like the program in *Trinity Lutheran*— "effectively penalizes the free exercise" of religion. *Id*.; *California Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019 (9th Cir. 2020) (implementing the reasoning of *Trinity Lutheran* to state that "the exclusion of religious institutions from beneficial programs amount[s] to a financial penalty."). Furthermore, CDSS mandates to the Church "concerns government interference with an internal church decision that affects the faith and mission of the church itself," here fundamental religious beliefs and religious hiring practices involving human sexuality. *Trinity Lutheran*, 137 S.Ct. 2012, 2021, f.n. 3 (quoting *Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC,* 565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012)).

In *Espinoza,* the court considered a state benefit program under which public funds flowed to support tuition payments at private schools and which specifically carved out private religious schools from those eligible to receive such funds. *Espinoza*, 207 L. 140 S.Ct. 2246. While the exact parameters of the benefit programs in *Espinoza* and the present case differ slightly, their effect is the same: to "disqualify some private schools" from funding "because they are religious" or adhere to biblically based views regarding sexuality. *Id.* at 2261. As held in *Espinoza*, a program that operates in that manner must be subjected to "the strictest scrutiny." *Id.* at 2257. To satisfy strict scrutiny, government action "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546, (1993). "A law that targets religious conduct for distinctive treatment ... will survive strict scrutiny only in rare cases." *Id.*

This case is not one of them. An interest in upholding antidiscrimination laws "cannot qualify as compelling in the face of the infringement of free exercise." *Espinoza*, 591 140 S.Ct. at 2260 (quoting *Trinity Lutheran*, 137 S.Ct. at 2024). There is nothing neutral about California's program. Under the nutrition program's new standards, the State grants funding to certain private schools – so long as the schools do not adhere to orthodox religiously based beliefs and practices regarding gender and sexuality, which are not in perfect alignment with the State's new sexual orthodoxy as embodied in its new Sex Rules. That is per se discrimination against religion. A State's antidiscrimination interest does not justify "enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson as next friend of O. C. v. Makin*, 142 S.Ct. 1987, 1996–98 (2022). Accordingly, the State of California cannot deny Church and Dayspring nutrition assistance funding, for which the they haves otherwise been eligible, for over 20 years, based upon their religious beliefs.

**B. CDSS Seeks to control the content of the Church's religious speech in violation of the First Amendment**

It is a basic First Amendment principle that "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61, (2006). Content-based regulations "target speech based on its communicative content." *National Institute of Family Life v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert,* 576 U.S. ——, ——, 135 S. Ct. 2218, 2226, 192 L.Ed.2d 236 (2015)). As a general matter, such laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

Here, the CDSS mandate that the Church immediately bring all of its policies and procedures, including its written handbook, in alignment with the State's new sexual orthodoxy represents a transparent attempt by the government to tell the Church what to say (and what to believe). In fact, the CDSS aggressively seeks to regulate the Church's religious speech based on its communicative content (i.e. affirming sexual orientation and gender identity). And similarly, to California misguided attempt to regulate the content of the speech of pro-life pregnancy centers in *NIFLA v. Becerra*, the CDSS' attempt to coerce the content of the Church's speech is will not survive strict scrutiny because it is not narrowly tailored to serve a compelling government interest.

Furthermore, the Government "'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.'" *Forum for Academic and Institutional Rights*, 547 U.S. at 59 (quoting *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 210 (2003)). A funding condition can result in an unconstitutional burden on free speech rights. *See Forum for Academic and Institutional Rights*, 547 U.S. at 59 (the First Amendment supplies a limit on the "ability to place conditions on the receipt of funds"); *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 547 (2001) (A state "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.").

Relying on these principles, the Supreme Court held in *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, that requiring organizations to expressly oppose prostitution in order to

receive government funding compelled as a condition of government funding the affirmation of a belief that by its nature could not be confined within the scope of the government program and thus violated First Amendment free speech protections. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).

Similarly, CDSS attempts to force recipients of funding in the Child and Adult Food Care Program explicitly to agree and comply with all civil rights laws, including provisions directly affirming sexual orientation and gender identity—which has nothing to do with feeding children. Thus, the California improperly seeks to "leverage funding to regulate [religious] speech outside the contours of the program itself." *Id.* at 214–15. CACFP explicitly and only concerns with itself with feeding students and the elderly. Nevertheless, the state has only recently conditioned participation in CACFP on the affirmation of the government's beliefs regarding sexual orientation and gender identity. This condition, by its very nature, affects protected religious speech outside the scope of the state funded program in violation of the First Amendment. *Id.* Well-established constitutional protections for religious speech require California to stay in its lane here and do not permit the State to coercively force its new sexual ideology on churches and other religious institutions via funding mechanisms.

## C.  California cannot impose unconstitutional conditions on the Church to force it to forfeit its First Amendment rights

The unconstitutional condition's doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *San Diego County Water* Authority v. Metropolitan Water Dist. of Southern California (2017) 12 Cal.App.5th 1124, 1159; citing *Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 604. Under the unconstitutional condition's doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Management Dist.* (2013) 133 S.Ct. 2586, 2594 (internal quotation and citation omitted). The doctrine "limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *See United States v. Scott* (9th Cir. 2006) 450 F.3d 863, 866; *Keyishian v. Board of Regents of Univ. of State of N.Y.* (1967) 385 U.S. 589 (teaching position conditioned upon non-membership in "subversive" organizations was unconstitutional condition); *O'Hare Truck Service, Inc. v. City of Northlake* (1996) 518 U.S. 712,

10

721 (government may not coerce political support by conditioning continuance of tow truck contract on support for mayor's reelection campaign).

Here, the State brazenly demands that, within 15 days, the Church must, in order to continue to receive CACFP benefits, sign the PSA agreeing to comply with the new Sex Rules without modification; attest to compliance with all State and Federal laws implicating the Sex Rules; stop requiring Church employees to sign or abide by its handbook or any other policy not in compliance with the Sex Rules, and; provide an updated copy of the Church handbook to CDSS. In other words, to continue to receive the benefits widely, available to secular organizations, the Church must yield to the State's coercive demands and forfeit, waive and surrender its constitutional right to the Free Exercise of Religion and Freedom of Speech. But California may not deny a benefit to a Church because it exercises its constitutional rights— which is precisely what is occurring here. In so doing, CDSS attempts to coercively impose unconstitutional conditions on the Church. This must not stand.

### D. The Church has three separate exemptions from the prohibitions of discrimination "because of sex" under Title VII.

Title VII of the Civil Rights Act of 1964 prohibits discrimination because of "sex." 42 U.S.C. § 2000e-2(a)(1) (2012). In *Bostock v. Clayton County*, the Supreme Court extended the term "sex" to include sexual orientation and gender identity, meaning that Title VII now protects employees from discrimination based on their LGBTQ+ status. *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). However, churches and religious organizations have well-established three exemptions from the terms of Title VII, including the ministerial exception and two statutory exemptions within Title VII, which the State cannot force the Church to surrender through an "Assurance of Civil Rights Compliance."

Regarding the ministerial exception, the Supreme Court has unequivocally concluded that there is a "ministerial exception grounded in the religion clauses of the First Amendment." *Id.*; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012). Under the ministerial exception, churches and religious institutions have discretion over whom

they employ as "ministers," unconstrained by the federal or state civil rights law that would generally govern the employer-employee relationship. *Id.*

The ministerial exception doctrine is based on the notion that a church's appointment of its clergy is an inherently religious function because clergy are such an integral part of a church's functioning as a religious institution. *Roman Catholic Archbishop of Los Angeles v. Superior Court*, 131 Cal. App. 4th 417, 433 (2005). Therefore, "secular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy…The preservation of the free exercise of religion is deemed so important a principle as to overshadow the inequities which may result from its liberal application. In our society, jealous as it is of separation of church and state, one who enters the clergy forfeits the protection of the civil authorities in terms of job rights." *Higgins v. Maher*, 210 Cal. App. 3d 1168, 1175 (1989).

The ministerial exception is not limited strictly to churches, per se, but extends to "church-related institutions which have a substantial religious character," including church-affiliated schools. *Schmoll v. Chapman University*, 70 Cal. App. 4th 1434, 1436-39 (1999). Neither is the ministerial exception limited only to members of the clergy, but may include teachers and staff at religious schools, so long as they are performing "religious functions". *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063-64 (2020) (holding that teachers at Catholic school were covered by the ministerial exception where the school's mission was religious in nature and the teachers and staff engaged in religious activities with the students); *Henry v. Red Hill Evangelical Lutheran Church of Tustin*, 201 Cal. App. 4th 1041 (holding that teacher was a "spiritual leader" for purposes of the ministerial exception to enforcement of Title VII).

Regarding Title VII's statutory exemptions, Title VII also expressly contains two religious exemptions in §702(a) and §703(e)(2), which shield religious institutions from liability under Title VII. The first provision, § 702(a), exempts "a religious corporation, association, educational institution, or society" from employment discrimination claims, including hiring and firing claims,

based on religion, regardless of whether or not the employee's duties are religious. 42 U.S.C. § 2000e-1 (2012).

§ 703(e)(2) protects the right of religious educational institutions to "hire and employ employees of a particular religion." *Id.* An educational institution qualifies if it is "in whole or in substantial part, owned, supported, controlled, or managed by a particular religion" or if the curriculum is "directed toward the propagation of a particular religion." *Id.* Congress passed § 703(e)(2) as a subsequent amendment to Title VII out of concern that § 702(a) would not include educational institutions aligned with a particular religion, but not fully owned or supported by that religion. *LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 236-37 (3rd Cir. 2007). While § 702(a) requires a close nexus between the entity and religion, § 703(e)(2) requires a lesser degree of association. *Id.* at 237.

Notably, the ministerial exception and statutory exemptions to Title VII are affirmative defenses to claims of employment discrimination. However, these exceptions animate the principle that the State may not compel churches and religious organizations to violate their religious beliefs in the course of hiring and employment practices. Nor can the State mandate that a religious organization surrender or waive the legal protections judicially and statutorily afforded to them to receive a generally available public benefit.

Here, the Church and Dayspring clearly qualify for all three available Title VII exemptions from the State's Sex Rules. The judicially recognized ministerial exception applies here because both Church and Dayspring staff perform religious functions by inculcating religious instruction to the students and because Dayspring is a church-related institution which has a substantial religious character. The statutory "religious institution" exemption applies because both the Church and Dayspring are, without question, religious institutions. Finally, the "religious educational" exception applies here because Dayspring is a religious school which is directly connected to the Church.   Beyond blatantly violating its constitutional rights, as discussed above, signing, affirming and complying with the PSA's State Sex Rules would

effectively force the Church and Dayspring to surrender or waive the legal protections judicially and statutorily afforded to them in order to receive a generally available public benefit.

### III.    Conclusion

The CDSS has presented a draconian Hobson's choice to the Church in the form of ultimatum – either completely surrender its sincerely religious belief and practices regarding human sexuality by unconditionally agreeing to complying with the new PSA's State Sex Rules in order to continue receiving generally available funds to feed needy children, or maintain the Church's deeply and sincerely held religious beliefs regarding human sexuality and forfeit state funding—as a penalty.   Fortunately, the U.S. Constitution stands squarely is CDSS's way, protecting the Church from such naked tyranny. The Church cannot thusly be egregiously coerced by the state to compromise and sell its proverbial soul in order to continue to receive state funds to students in their community, including low-income children. California may not abuse sexual orientation and gender identity ideological orthodoxy as a cover discriminate against religious institutions.

Be advised that if this dispute is not promptly resolved with the result that CDSS continues to fund the Church and Dayspring in due course under CACFP, our clients have authorized us to file a federal civil rights lawsuit seeking declaratory and injunctive relief, attorney's fees and any other available legal remedies.   Also, please immediately restore Dayspring's access to the CNIT's website. Thank you for your prompt attention to this matter and your professional courtesy and cooperation in this regard.

Sincerely,

Dean R. Broyles, Esq.
President & Chief Counsel
**The National Center for Law & Policy**

cc. Church of Compassion
     Advocates for Faith & Freedom

14

State of California – Health and Human Services Agency          California Department of Social Services

# NUTRITION SERVICES DIVISION / PROGRAM INTEGRITY UNIT APPEAL REQUEST

I.  Agency Information:

    A.  Legal Name of Agency: Church of Compassion Dayspring Christian Learning Center

    B.  Mailing Address: 1150 Greenfield Drive

        City, State, Zip: El Cajon, CA 92021-3314

    C.  CNIPS ID or Vendor Number: V6020Z

II.  Statement of Purpose:

    A.  Type of appeal requested: (Check one box)

        ☑ Written Review

        ☐ Oral Hearing

        ☐ Written Review with Oral Argument

    B.  Specifically, what is the finding (or findings) being appealed?

    Notice of Denial of Application for Participation in the Child and Adult Food Care Food Program and Determination of Serious Deficiency, CDSS letter dated October 20, 2022. Coercive impostion of sexual orientation and gender identity provisions on the Church (See attached legal demand letter/appeal).

    C.  What is the basis (reason) for the appeal?

    CDSS infringment of civil rights guaranteed by the Free Exercise Clause and Freedom of Speech Clause of the First Amendment, the imposition of unconstitutional conditions, refusal to recognize exceptions to Title VII's exceptions, including the ministerial exception. (See attached legal demand letter/appeal)

State of California – Health and Human Services Agency          California Department of Social Services

III.    Background Information:

(Explain the events that led up to your decision to appeal the action taken against you.)

CDSS' blatant infringment of the Church of Compassion's constitutional and staturorily protected right to the free exercise of religion and the freedom of speech by attempting to coercively impose the State's sexual orthodoxy (beliefs and practices regarding human sexuality) on the Church in order for the Church to continue to receive state funding to feed the poor (See attached legal demand letter/appeal).

IV.    Oral Hearing Only or Written Appeal with Oral Argument

If an **oral hearing** or **a written appeal with oral argument** is requested, please complete the following:

A.    Representative
(Name of person who will be officially representing the agency at the hearing):

Name:_____ Title:_____

Mailing Address:_____

City, State, Zip:_____

Phone:_____Fax:_____

Email:_____

Does this representative have a legal background?  ☐ Yes ☐   No

If yes, please describe:

State of California – Health and Human Services Agency                    California Department of Social Services

V.  Contact

Person to contact for information regarding this appeal:

Name: Dean R. Broyles, Esq.                    Title: Constitutional Attorney

Mailing Address: 539 West Grand Avenue

City, State, Zip: Escondido, CA

Phone: 760-747-4529                    Fax: 760-747-4505

Email: dbroyles@nclplaw.org

VI.  Evidence:

You may submit written documents/evidence to the hearing officer by attaching it to this appeal request or by sending it under separate cover. (Note: If sent separately, you must adhere to the deadline for submittal and send to the Office of Administrative Hearings as noted in the Appeal Procedures.)

VII.  Signature of Authorized Representative

Signed: _Dean R Broy_                    Date: November 4, 2022

Name of Authorized Representative: Dean R. Broyles, Esq.

**Email the completed Appeal Request to:**  CACFPappeals@dss.ca.gov

# EXHIBIT "H"

# BEFORE THE
# OFFICE OF ADMINISTRATIVE HEARINGS
# STATE OF CALIFORNIA

## In the Matter of:

## CHURCH OF COMPASSION DAYSPRING CHRISTIAN

## LEARNING CENTER, Appellant

## vs.

## CALIFORNIA DEPARTMENT OF SOCIAL SERVICES,

## Respondent

## OAH No. 2022110456

## DECISION

**The Department's Basis for Denial**

**Appellant's Legal Argument**

**Analysis**

**CALIFORNIA LAW PROHIBITS THE DEPARTMENT FROM CONTRACTING WITH APPELLANT**

**SERIOUS DEFICIENCIES ARE NOT SUBJECT TO ADMINISTRATIVE REVIEW**

**LEGAL CONCLUSION**

**ORDER**

# NOTICE OF FINAL DECISION

Sean Gavin (Dec 28, 2022 16:35 PST)

# EXHIBIT "I"

STATE OF CALIFORNIA—HEALTH AND HUMAN SERVICES AGENCY
# DEPARTMENT OF SOCIAL SERVICES
744 P Street • Sacramento, CA 95814 • www.cdss.ca.gov



**KIM JOHNSON**
DIRECTOR

**GAVIN NEWSOM**
GOVERNOR

January 30, 2023

**Sent by U.S. mail and electronically via Adobe Sign**

Dean R. Broyles, Attorney
539 West Grand Avenue
Escondido, CA 92025

SUBJECT: 2022–23 APPLICATION DENIAL APPEAL DECISION LETTER FOR CNIPS
ID 4897-CACFP-37-NP-IC

Dear Dean R. Broyles:

This letter is in reference to the decision rendered by the Office of Administrative
Hearings (OAH) on December 28, 2022, in Case No. 2022110456, regarding the
2022–23 application denial for the Church of Compassion Dayspring Christian Learning
Center's (Church of Compassion) Child and Adult Care Food Program (CACFP). In
accordance with the OAH's decision, the California Department of Social Services'
(CDSS) original application denial determination has been upheld. As a result, pursuant
to 7 CFR section 226.6(c)(2)(iii)(D), the Church of Compassion's agreement with CDSS
to operate CACFP has been terminated, and the Church of Compassion and its
responsible principals and responsible individuals have been disqualified from
participation in CACFP. A copy of the October 20, 2022 notice of action and the
December 28, 2022 OAH decision are enclosed.

CDSS will pay all properly payable claims for reimbursement for meals served up to and
including December 29, 2022, the date Church of Compassion was served a copy of the
OAH decision., Church of Compassion may be eligible to receive reimbursement for
costs associated with ceasing its CACFP participation. These funds are available only
to reimburse costs that cannot be reasonably avoided and that specifically result from
closing out CACFP operations. Close-out costs must be approved by the CDSS before
the costs are incurred and included in a close-out budget. Any costs not pre-approved
by CDSS are not eligible for reimbursement. Please contact the CDSS for additional
details regarding the close-out process.

Consistent with the request in Church of Compassion's Notice of Appeal and Demand
Letter, CDSS is not sending this letter to the Church of Compassion directly and
requests that you provide this information to your client. If you have any questions
regarding this subject, please contact me by phone at 916-654-2696 or by email
at Jessie.Rosales@dss.ca.gov.

Sincerely,

Sean Hardin Acting

Digitally signed by Sean Hardin
Acting
Date: 2023.01.30 11:04:02 -08'00'

Jessie Rosales
Chief, Child and Adult Care Food Programs Branch
California Department of Social Services

Enclosure

# EXHIBIT "J"

**Julianne Fleischer**

| | |
|---|---|
| **From:** | Rosales, Jessie@DSS <Jessie.Rosales@DSS.ca.gov> |
| **Sent:** | Tuesday, February 21, 2023 8:29 AM |
| **To:** | Dean Broyles |
| **Cc:** | Airada, Brandi@DSS; Mariah Gondeiro |
| **Subject:** | RE: Please sign CACFP OAH Appeal Decision Letter for Church of Compassion |

Dear Dean R. Broyles,

As you are aware, on December 28, 2022, the Office of Administrative Hearings (OAH) issued a final order denying and dismissing the Church of Compassion's appeal. The impact of the OAH order is that the California Department of Social Services' (CDSS) decision to deny the Church of Compassion's Child and Adult Care Food Program (CACFP) application remains in effect and the Church of Compassion is no longer eligible to participate in the CACFP.

Regarding the attachment of the U.S. Department of Agriculture's (USDA) nondiscrimination statement to CDSS' January 30, 2023 letter, CDSS' practice is to include the nondiscrimination statement with all CACFP correspondence exceeding a certain length. CDSS is in the process of updating the USDA nondiscrimination statement attached to CACFP correspondence to be consistent with existing law and USDA policy, namely, to include reference to sexual orientation and gender identity. The inclusion of the USDA non-discrimination statement is automated and was not indicative of any change in the terms of CDSS' agreements with CACFP site operators. I apologize for the confusion this caused given the substance of the basis for termination of the Church of Compassion's participation in the CACFP program.

## Jessie Rosales

Chief, Child and Adult Care Food Programs Branch
California Department of Social Services
Jessie.Rosales@dss.ca.gov
(916) 459-6683 (Cell)

---

**From:** Dean Broyles <dbroyles@nclplaw.org>
**Sent:** Thursday, February 2, 2023 11:30 AM
**To:** Rosales, Jessie@DSS <Jessie.Rosales@DSS.ca.gov>
**Cc:** Airada, Brandi@DSS <Brandi.Airada@dss.ca.gov>; 'Mariah Gondeiro' <mgondeiro@tylerbursch.com>
**Subject:** Please sign CACFP OAH Appeal Decision Letter for Church of Compassion
**Importance:** High

Ms. Rosales,

I am in receipt of your attached letter dated January 30, 2023 wherein you confirm that the CDSS has terminated its agreement with the Church of Compassion, effective December 29, 2022.  The Church of Compassion strongly disputes your self-serving conclusion that the OAH's decision in any way affirmed or approved the CDSS' unconstitutional choice to unilaterally terminate your longstanding agreement with the church and decision to withhold neutrally available taxpayer funds used to feed indigent children because of the church's sincerely religious beliefs and practices regarding human sexuality—which they are certainly not willing to compromise.  The OAH's ruling merely held that it did not have jurisdiction to decide the serious constitutional issues involved nor the power to decide your allegations of substantial non-compliance.  I signed an acknowledgement of receipt of your letter *only* (see attached).

Your correspondence included but did not address or discuss, as its last attachment, a divergent USDA "Non-discrimination statement", which you have inexplicably asked us to sign on our client's behalf.  Please explain precisely why, post-termination, you have attached this different USDA statement and why you have requested our signature on our client's behalf.  At this point, this makes no sense.  For the record, I note here that the USDA's statement is *very different* that which was previously provided to my client—specifically, it does not list "sexual orientation" and "gender identity" as protected categories, but only sex.   Please explain why?  If there has been a policy change, please let us know whether this is the only non-discrimination agreement you need our client to sign to comply with your program requirements.  Otherwise, we will assume that you sent it in error or merely to notify my client of its rights vis-à-vis the USDA.

That being said, my client would probably not have any issue signing this USDA statement (if this is the operative agreement now) because it does include sexual orientation or gender identity—which are at issue here.  However, I did not complete the online form you sent (i.e., the second signature) because we are not prepared to sign the USDA statement until we have more information from you as to precisely why it was attached.  Please explain your reasons in detail for attaching it and also specifically whether the church can continue to participate in the CDSS program if they sign it.

Furthermore, I note that the divergent USDA non-discrimination statement, with which the CDSS is explicitly obligated to comply, does not include "religion" as a protected category.  That is a glaring omission indeed.  Why is that word missing?  It is your understanding that the Federal government and states are somehow now free to religiously discriminate against religious institutions and persons by trying to financially coercively force them to change their deeply held religious beliefs and practices, as the CDSS is currently doing here?  If so, I strongly counsel you to remember that we still have a U.S. Constitution and that California remains obligated to honor our client's civil rights guaranteed therein.  Even if California often wishes that it did not, the U.S. Supreme Court has not forgotten these important principles.

As we clearly explained in our November 4, 2022 demand letter, the unilateral CDSS' termination of the Church of Compassion's longstanding  agreement with the CDSS is in flagrant violation of the church's First Amendment rights, specifically the free exercise of religion and freedom of speech, as well as being violative of Title VII's religious exemptions.  Unfortunately, at this point, a federal judge may have to explain that to you and your organization, if your legal counsel has not.

Time is of the essence.  Thank you in advance for your prompt response to this correspondence.

Sincerely,


Dean R. Broyles, Esq.
President & Chief Counsel
**THE NATIONAL CENTER FOR LAW & POLICY**
539 West Grand Avenue
Escondido, California 92025
Tel:  (760) 747-4529
Fax:  (760) 747-4505
E-mail:  dbroyles@nclplaw.org
Web:  www.nclplaw.org