David A. Cortman, GA Bar No. 188810*
dcortman@adflegal.org
Ryan J. Tucker, AZ Bar No. 034382*
rtucker@adflegal.org
Jeremiah J. Galus, AZ Bar No. 030469*
jgalus@adflegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020o

Julie Blake, DC Bar No. 998723*
jblake@adflegal.org
Andrea Dill, DC Bar No. 1719500*
adill@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

Dean R. Broyles, Esq., CA Bar No. 179535
dbroyles@nclplaw.org
NATIONAL CENTER FOR LAW & POLICY
539 West Grand Ave.
Escondido, CA 92025
(760) 747-4529

Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
Julianne Fleischer, Esq. CA Bar No. 337006
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
(951) 600-2733

*Admitted Pro Hac Vice
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHURCH OF COMPASSION**, a California Non-Profit Corporation, **DAYSPRING CHRISTIAN LEARNING CENTER**, a subsidiary of the CHURCH OF COMPASSION;<br><br>Plaintiffs,<br><br>vs. | Case No.:  3:23-cv-00470-AGS-WVG<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

i

1
2
3
4
5
6
7
8
9

**KIM JOHNSON**, in her official capacity as the Director of the California Department of Social Services; **JESSIE ROSALES**, in his official capacity as the Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services; **SEAN HARDIN**, in his official capacity as the Acting Chief of the Child and Adult Care Food Programs, a division of the California Department of Social Services; **THOMAS VILSACK**, in his official capacity as Secretary of the U.S. Department of Agriculture; and **UNITED STATES DEPARTMENT OF AGRICULTURE**.

Defendants.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iv

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND .............................................................................................2

    A. Plaintiffs' Religious Mission and Beliefs ........................................................2

    B. The Child and Adult Food Care Program ........................................................4

    C. Title IX of the Education Amendments of 1972 ...............................................4

    D. Defendants' SOGI Rules .................................................................................5

    E. CDSS Excludes Plaintiffs from the Food Program ..........................................7

LEGAL STANDARD .......................................................................................................9

ARGUMENT ..................................................................................................................9

    I. Plaintiffs are likely to succeed on the merits.....................................................9

    A. USDA's SOGI Rule violates the APA. ............................................................9

        1. It is a legislative rule subject to the APA's rulemaking procedures. ..........10

        2. USDA ignored the APA's notice and comment procedures.......................11

        3. USDA did not engage in reasoned decision making..................................12

        4. USDA exceeded its statutory authority.....................................................12

    B. The SOGI Rules violate Plaintiffs' statutory and constitutional rights. ...........14

        1. The Rules violate the Free Exercise Clause. ............................................14

            a. The Rules interfere with Plaintiffs' ministerial hiring decisions and prevents them from hiring coreligionists. ...........................14

            b. The Rules withhold an otherwise available public benefit because of Plaintiffs' religious character, beliefs, and exercise.......................17

            c. The Rules are not neutral or generally applicable, and they fail strict scrutiny. ...............................................................18

        2. The Rules violate Plaintiffs' freedom of speech. ......................................21

        3. USDA's Rule conflicts with Title IX's religious exemption and RFRA.......................................................................................22

        4. CDSS's Rules cannot be an independent basis for exclusion. ...................23

    II. The remaining preliminary injunction factors support Plaintiffs. ......................24

CONCLUSION .............................................................................................................25

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

*Alabama Association  of Realtors v. Department*
  *of Health and Human Services*,
  141 S. Ct. 2485 (2021) ............................................................. 14

*American Beverage Association v. City & County of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ...................................................... 9, 24

*Azar v. Allina Health Services*,
  139 S. Ct. 1804 (2019) ............................................................. 10

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................... 10

*Board of Education of Hendrick Hudson Central School District,*
  *Westchester City v. Rowley*,
  458 U.S. 176 (1982) ............................................................... 14

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................. 13, 14

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ........................................................... 6, 13

*Bryce v. Episcopal Church in the Diocese of Colorado*,
  289 F.3d 648 (10th Cir. 2002) ...................................................... 15

*Carson v. Makin*,
  142 S. Ct. 1987 (2022) ...................................................... 14, 17, 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ....................................................... 14, 18, 19

*Department of Homeland Security v. Regents*
  *of the University of California*,
  140 S. Ct. 1891 (2020) ............................................................. 12

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................... 24

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) ...................................................... 18, 19, 20, 23

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ............................................................... 14

iv

*Hosanna-Tabor Evangelical Lutheran Church & School v.*
  *Equal Employment Opportunity Commission,*
  565 U.S. 171 (2012) ................................................................ 14, 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
  515 U.S. 557 (1995) ..................................................................... 22

*Jean v. Nelson,*
  711 F.2d 1455 (11th Cir. 1983)..................................................... 11

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*
  *in North America,*
  344 U.S. 94 (1952) ....................................................................... 15

*Kennedy v. Warren,*
  66 F.4th 1199 (9th Cir. 2023)......................................................... 9

*Keyishian v. Board of Regents of University of State of New York,*
  385 U.S. 589 (1967) ..................................................................... 22

*LeBoon v. Lancaster Jewish Community Center Association,*
  503 F.3d 217 (3d Cir. 2007).......................................................... 16

*Little Sisters of the Poor v. Pennsylvania,*
  140 S. Ct. 2367 (2020) .................................................................. 12

*Lyng v. Northwest Indian Cemetery Protective Association,*
  485 U.S. 439 (1988) ..................................................................... 17

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
  138 S. Ct. 1719 (2018) ............................................................ 19, 20

*Maxon v. Fuller Theological Seminary,*
  549 F. Supp. 3d 1116 (C.D. Cal. 2020)......................................... 23

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021)..................................................... 13, 22

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm*
  *Mutual Automobile Insurance Company,*
  463 U.S. 29 (1983) ....................................................................... 12

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) ..................................................................... 21

*Pennhurst State School & Hospital v. Halderman,*
  451 U.S. 1 (1981) ......................................................................... 13

*Perez v. Mortgage Bankers Association,*
  575 U.S. 92 (2015) ....................................................................... 11

v

*Providence Yakima Medical Center v. Sebelius*,
  611 F.3d 1181 (9th Cir. 2010) ....................................................................... 10

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................................... 21, 22

Sandifer v. United States Steel Corp.,
  571 U.S. 220 (2014) .................................................................................... 4

*Slattery v. Hochul*,
  61 F.4th 278 (2d Cir. 2023) ....................................................................... 16

*Spencer v. World Vision, Inc.*,
  633 F.3d 723 (9th Cir. 2011) ..................................................................... 15

*Telescope Media Group v. Lucero*,
  936 F.3d 740 (8th Cir. 2019) ..................................................................... 22

*Tenn. Hospital Association v. Azar*,
  908 F.3d 1029 (6th Cir. 2018) ................................................................... 11

*Tennessee v. United States Department of Education*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ................................................... 11

*Texas v. Equal Employment Opportunity Commission*,
  933 F.3d 433 (5th Cir. 2019) ..................................................................... 10

*Texas v. United States*,
  201 F. Supp. 3d 810 (N.D. Tex. 2016) .............................................. 11, 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) .................................................................................. 17

*Watson v. Jones*,
  80 U.S. 679 (1871) .................................................................................... 15

*West Virginia v. Environmental Protection Agency*,
  142 S. Ct. 2587 (2022) .............................................................................. 13

**Statutes**

5 U.S.C. § 551 ................................................................................................ 10

5 U.S.C. § 553 ................................................................................................ 11

5 U.S.C. § 705 ................................................................................................ 25

5 U.S.C. § 706 .......................................................................................... 9, 12

20 U.S.C. § 1681 .................................................................................... passim

20 U.S.C. § 1686 ............................................................................................ 12

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION

20 U.S.C. § 1687 ..................................................................................... 5

42 U.S.C. § 1766 ................................................................................. 1, 25

42 U.S.C. § 2000bb-1 .............................................................................. 23

42 U.S.C. § 2000e ............................................................................ 13, 19

Cal. Gov't Code § 11135 ............................................................ 7, 16, 21, 24

Cal. Gov't Code § 11139.8 ................................................................. 7, 21

**Regulations**

7 C.F.R. § 15 ..................................................................................... 6, 23

7 C.F.R. § 226.25 .................................................................. 7, 19, 21, 23

7 C.F.R. § 226.6 ...................................................................................... 6

34 C.F.R. § 106.33 ................................................................................ 12

34 C.F.R. § 106.41 ................................................................................ 13

**INTRODUCTION**

The Biden administration and California state officials are taking away lunch money from low-income children simply because they attend a Christian school. This case challenges the government's exclusion of a church preschool and daycare from a federal food program. Under the First Amendment and other federal laws, the church is free to hire coreligionists and align its internal policies on restroom usage, dress codes, and pronouns with its religious beliefs about human sexuality. But because the government is not respecting these rights—and has excluded the church's children from a public meal program—the Court should grant this motion and require the officials to reinstate the school's meal agreement.

Plaintiff Church of Compassion has a preschool and daycare called Dayspring Christian Learning Center. For nearly twenty years, the Church and Dayspring have participated in the Child and Adult Care Food Program, a federal program administered nationally by the U.S. Department of Agriculture (USDA) and locally by the California Department of Social Services (CDSS). Through the Food Program, Dayspring was reimbursed approximately $3,500 to $4,500 a month for the nutritious meals it provided to children every day. The partnership was successful. The Church and Dayspring faithfully served its community, welcoming all families and children (including LGBTQ families), while fulfilling the Food Program's stated purpose of providing "nutritious foods that contribute to the wellness healthy growth, and development of young children." 42 U.S.C. § 1766(a)(1)(A)(ii).

That all changed when Defendants enforced new sexual orientation and gender identity nondiscrimination provisions ("SOGI Rules") against Plaintiffs. It was no longer enough that the Church and Dayspring welcomed all families and children and would never turn away a hungry child. With their new SOGI Rules, Defendants demanded that the Church and Dayspring stop requiring employees to share and live out their religious beliefs, including their beliefs about human sexuality. They also

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

insisted that Dayspring bring *all* school operations, not just the lunch line, into alignment with the new mandates. That includes restrooms, dress codes, and daily conversations—it even requires using pronouns contrary to a student's sex. When the Church and Dayspring declined, Defendants kicked them out of the Food Program.

This is wrong for many reasons. To start, USDA bases its mandate on Title IX, which prohibits only "sex" discrimination and says nothing about "sexual orientation" or "gender identity." Expanding the law in this way, without public notice or comment, violates the Administrative Procedure Act. And enforcing any SOGI Rule (whether USDA's or CDSS's) against the Church and Dayspring violates their statutory and First Amendment rights. A preliminary injunction is thus needed to protect Plaintiffs' rights and to immediately restore funding for the meals they provide to hungry children.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Religious Mission and Beliefs

The Church of Compassion is a non-denominational Christian church that operates a preschool and daycare program called Dayspring Christian Learning Center. Decl. of Ronald Wade in Supp. of Mot. for Prelim. Inj. (Wade Decl.) ¶¶ 3–5. For over twenty years, the Church and Dayspring have served their local community in El Cajon, California. Many community members are immigrants—coming from Syria, Iraq, Mexico, and other nations—and about 40% of Dayspring's students qualify for free meals under the federal Child and Adult Care Food Program. *Id.* ¶¶ 26–27, 33. Given the needs of their community, the Church and Dayspring participated in the Food Program for nearly 20 years and was reimbursed approximately $3,500 to $4,500 a month for the nutritious meals it served children daily. *Id.* ¶¶ 34–36.

The Church and Dayspring believe and follow Christian teachings. *Id.* ¶¶ 8–13. This includes the belief that the Bible is the infallible, inerrant word of God; that God created men and women in His image, male and female; that human sexuality is defined and determined by God; and that the Bible commands the Church and

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Dayspring to love their neighbors as themselves. *Id*. The Church and Dayspring have followed these beliefs while faithfully meeting the needs of their community. Their Christian beliefs teach and compel them to welcome all families and children and to never turn away a hungry child. *Id*. ¶ 13. Dayspring serves families and children from all backgrounds, including several LGBTQ families. *Id*. ¶¶ 14–15.

But Dayspring is clear about its religious nature and purpose. For example, its parent handbook includes Dayspring's statement of faith and mission statement. *Id*. ¶¶ 19–20. Parents that choose Dayspring know their children will be taught that:

> The Bible is the Sovereign Word of God. Jesus Christ is the Son of God, born of the virgin Mary. Jesus died to atone for our sins. Jesus rose on the third day, lives today, and is coming again to receive those that believe and wait for His return. Salvation is obtained by grace alone through faith. The Holy Trinity includes the Father, the Son, and the Holy Spirit.

*Id*. ¶ 24. Dayspring teachers must subscribe to a similar statement of faith, and they have religious teaching responsibilities, including reading and explaining Bible stories to students. *Id*. ¶ 21. During chapel services at Dayspring, teachers lead students in Christian songs worshipping God and pray with the students. *Id*. ¶ 22.

In all ways, the Church and Dayspring follow their religious beliefs in interactions with students and employees. This includes their beliefs about human sexuality. *Id*. ¶ 16. And their religious beliefs inform all aspects of their internal operations, including hiring, restroom usage, dress codes, curricula, activities, and daily conversations. *Id*. Dayspring thus maintains sex-separated bathrooms and dress codes for boys and girls based on their biological differences and cannot agree to use any child or employee's "preferred" pronouns that do not correspond to biological sex. *Id*. ¶ 17. The Church and Dayspring also expect employees to share and live out these religious beliefs. *Id*. ¶ 18.

### B.      The Child and Adult Food Care Program

The Child and Adult Care Food Program ("Food Program") is a federal program that provides reimbursements for nutritious meals and snacks to eligible children and adults who are enrolled for care at participating child care centers, day care homes, and adult day care centers. Wade Decl. ¶ 29. The Food Program also provides reimbursements for meals served to children and youth participating in afterschool care programs, children residing in emergency shelters, and adults over the age of 60 or living with a disability and enrolled in day care facilities. *Id.*

The USDA administers the Food Program nationwide, providing funding to California and other states. *Id.* ¶ 30. For years, the California Department of Education administered the Food Program in California, and now the program is administered by CDSS. *Id.*; *see also* Verified First Am. Compl. ("FAC") ¶ 34. To participate, the Church and Dayspring certified compliance with certain civil rights laws each year. Wade Decl. ¶ 37. That was no problem; the Church and Dayspring complied with those laws and always signed the agreement. *Id.* ¶ 38-40. But things changed in 2022. That year government officials added "sexual orientation" and "gender identity" to non-discrimination provisions and tried using the Food Program as a hook for regulating the Church and Dayspring's employment practices. *Id.* ¶¶ 39–42.

### C.      Title IX of the Education Amendments of 1972

In 1972, Congress enacted Title IX of the Education Amendments, 20 U.S.C. § 1681, to forbid education programs or activities receiving federal financial assistance from discriminating against persons based on their sex. FAC ¶ 42. At the time, "sex" meant "one of the two divisions of organic esp. human beings respectively designated male or female."[1] That meaning controls—or at least should control—Title IX. *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (when a term is not defined it should be given its "ordinary, contemporary, common meaning").

---

[1] Webster's New International Dictionary 2081 (3d ed. 1966).

Participation in the Food Program qualifies as "Federal financial assistance." So participating subjects a school in all aspects to Title IX, including all school operations such as hiring, restrooms, dress codes, admissions, curricula, activities, athletics, and daily conversations. Title IX applies institution-wide to "all of the operations" of the school—not just the lunch line. 20 U.S.C. § 1687. However, Title IX includes a religious exemption, which applies automatically by operation of statute. 20 U.S.C. § 1681(a)(3). Title IX does not apply to covered entities "controlled by a religious organization if the application of [Title IX] would not be consistent with the religious tenets of such organizations." *Id.*

### D.    Defendants' SOGI Rules

USDA's SOGI Rule. USDA operates school meal programs, including the Food Program. FAC ¶ 49. It also administers, interprets, and enforces Title IX, and it investigates complaints and brings enforcement actions against program participants for Title IX violations. *Id.* ¶ 50. It administers its own program of reviewing religious exemptions to Title IX. *Id.*

In 2021, with no prior notice or public comment, USDA posted on its website a "departmental regulation" redefining sex in Title IX to mean "Sex (including sexual orientation and gender identity)." Issued under its Title IX enforcement authority, USDA said the "regulation applies to all programs and activities receiving Federal financial assistance from USDA Mission Areas and agencies." FAC, Ex. C.

Then, in May 2022, USDA's Food and Nutrition Service (FNS) sent a "Policy Update" to all state directors of USDA's food and nutrition service programs, including the Food Program. The update "clarifie[d] that prohibitions against discrimination based on sex in all FNS programs found in Title IX . . . prohibit discrimination on the basis of gender identity and sexual orientation." FAC, Ex. D at 1. USDA justified this new interpretation by citing the Supreme Court's decision in *Bostock v. Clayton*

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

*County*, 140 S. Ct. 1731 (2020), as well as President Biden's Executive Order 13988, which claims *Bostock*'s reasoning applies to Title IX. FAC, Ex. D at 2.

USDA's "Policy Update" instructed all state agencies and program operators to "expeditiously review their program discrimination complaint procedures and make any changes necessary to ensure complaints alleging discrimination on the basis of gender identity and sexual orientation are processed and evaluated as complaints of discrimination on the basis of sex." FAC, Ex. D at 3. USDA also directed state officials to distribute the policy update "to local agencies, Program Operators and Sponsors, and all other subrecipients of Federal financial assistance." *Id*. It then instructed program participants to "direct questions concerning this memorandum to their State agency," not to USDA. *Id*.

The "Policy Update" included a cover letter addressed to state agencies, as well as a Q&A document. The cover letter repeated many of the same points about immediate compliance by program participants. FAC, Ex. E. The Q&A document said that religious exemptions were not automatic and that schools had to "request a religious exemption" under 7 C.F.R. § 15a.205 "by submitting a written declaration to the Secretary of Agriculture identifying the provisions that conflict with a specific tenet of the religious organization." FAC, Ex. F at 3. According to these documents, schools would have to post new "And Justice for All" posters and adopt new nondiscrimination statements that included sexual orientation and gender identity within the meaning of "sex." FAC, Ex. F at 2.

While USDA has since clarified that religious exemptions should be granted automatically without the need for any written request, *see* FAC, Ex. K, Defendants have not followed that guidance when it comes to Plaintiffs.

<u>CDSS's SOGI Rules.</u> Under Director Johnson, CDSS administers the Food Program at the state level. Federal regulations require the agency to assure compliance with Title IX at the application or award stage. *E.g.*, 7 C.F.R. § 226.6(b)(4)(ii) (state

agency must require approved institutions to sign a "Program agreement" stating that they will, among other things, "comply with all requirements of . . . title IX of the Education Amendments of 1972 . . .").

Although CDSS imposes additional state requirements for participation in the Food Program, USDA regulations clarify that such requirements must track federal requirements and "may not deny the Program to an eligible institution." 7 C.F.R. § 226.25(b). USDA guidance further explains that "[s]tate agencies may not deny an application, . . . declare a sponsor seriously deficient, or terminate a sponsor based solely on the violation of an additional State agency requirement." FAC, Ex. G at 2. State agencies therefore must receive written approval from USDA before imposing any additional state requirements, and they must provide "an assurance that the proposed additional requirement will not deny access to eligible institutions and participants." FAC, Ex. G at 1.

In 2022, CDSS added state SOGI Rules as a condition to participating in the federal Food Program. CDSS now requires compliance with California Government Code §§ 11135 and 11139.8, which generally prohibit discrimination based on sexual orientation and gender identity. Yet by their plain terms, the California legislature intended neither statute to apply to the federal Food Program. California Government Code § 11135 concerns only programs funded exclusively by state dollars, not federally funded ones. And California Government Code § 11139.8 limits the ability of state officials to travel to states that, in California's opinion, do not adequately protect against SOGI discrimination. It says nothing about the Food Program and places no obligations whatsoever on private entities like Plaintiffs.

### E.    CDSS Excludes Plaintiffs from the Food Program

Last year, CDSS revised the Food Program Agreement's "Assurance of Civil Rights Compliance." FAC, Ex. H. The revised language required the Church and Dayspring to certify compliance with certain federal laws and regulations—including

Title IX, USDA nondiscrimination regulations, and "the USDA Food and Nutrition Service (FNS) directives and guidelines"—"to the effect that no person shall be discriminated against on the basis of . . . sex (including sexual orientation and gender identity) . . . ." FAC, Ex. H.

Because of their religious beliefs about human sexuality, and because the nondiscrimination requirement would extend even to their internal policies and employment decisions, the Church and Dayspring signed the agreement but asked for a modification removing the words "sexual orientation" and "gender identity." *See* FAC, Ex. I at 32.

In response, Defendant Jessie Rosales sent a "Notice of Denial" letter, denying the Church and Dayspring's Food Program application. FAC, Ex. J. The letter refused the requested accommodation, saying that "religious freedom should not be a justification for discrimination," and asserted that California Government Code sections 11135 and 11139.8 forbid their religious employment practices. *Id*. at 1. Defendant Rosales similarly claimed that the Church and Dayspring's employment practices violated Title VII, *id*. at 2, even though they qualify for that law's religious exemption and no federal rule or regulation conditions Food Program participation on compliance with Title VII. The letter said that "the Church's operation of [the Food Program] is in violation of State law and constitutes one or more serious deficiencies as specified in Section 226.6(c)(2)(ii) of Title 7 of the Code of Federal Regulations." *Id*.

Finally, Defendant Rosales' letter demanded that the Church and Dayspring agree to these conditions: (1) comply with the new SOGI Rules; (2) attest to compliance with all state and federal laws "including, but not limited to, Government Code sections 11135 and 11139.8 and Title VII of the Civil Rights Act of 1964"; (3) stop asking employees to sign or abide by its handbook or any other policy not in compliance with the SOGI Rules; and (4) provide CDSS with an updated copy of the Church employee handbook. *Id*.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Unable to comply with these demands, the Church and Dayspring were excluded from the Food Program. Although Plaintiffs timely appealed the decision, and federal law required continued funding during an administrative appeal, CDSS cut off their Food Program funding right away. Wade Decl. ¶ 58. CDSS then waited more than three weeks before correcting its error. *Id*. After an unsuccessful administrative appeal, Defendant Sean Hardin sent a "Decision Letter" to Plaintiffs affirming the decision to exclude them from the Food Program, effective December 22, 2022. FAC, Ex. N. Funding has been cut off again ever since.

## LEGAL STANDARD

Plaintiffs satisfy the four factors for a preliminary injunction (1) a likelihood of success on the merits; (2) that they will suffer irreparable harm in the absence of a preliminary injunction; (3) that their harm outweighs any harm to defendants; and (4) that the injunction is in the public interest. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019). Plaintiffs also can obtain a preliminary injunction if they show "serious questions" going to the merits and the balance of hardships "tips sharply" towards them. *Kennedy v. Warren*, 66 F.4th 1199, 1206 (9th Cir. 2023).

## ARGUMENT

I.     **Plaintiffs are likely to succeed on the merits.**

A.     **USDA's SOGI Rule violates the APA.**

Under the APA, final agency action must be "set aside" when it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). USDA's SOGI Rule violates the APA for several of these reasons, so it must be "set aside."

**1.  It is a legislative rule subject to the APA's rulemaking procedures.**

Under the APA's pragmatic approach, agency action is final and subject to federal court jurisdiction if the action is (1) the "consummation' of the agency's decisionmaking process"; and (2) "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Agency action is final if it "has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019).

Here, USDA's SOGI Rule is final agency action subject to APA review. USDA's publication of its SOGI Rule—through a departmental regulation, the policy update, the cover letter, and the Q&A—issued an obligation in final form. FAC ¶¶ 54–62. USDA delineated obligations and rights for federal officials, state agencies, program participants, and the public because USDA required everyone to act as if Title IX covered new bases. And the enforcing state agency has demanded compliance.

For the same reasons, USDA's SOGI Rule is a legislative rule subject to rulemaking procedures. Under the APA's two categories for agency action, an agency either issues an order by adjudication or a rule by rulemaking. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1188 (9th Cir. 2010). A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551. If an agency "established or changed a 'substantive legal standard,'" the agency sought to make a legislative rule—and it cannot evade notice and comment procedures. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810, 1817 (2019).

The SOGI Rule is a legislative rule imposing substantive duties. USDA removed discretion by announcing a new view of Title IX binding every agency official, State, and program participant. Now, officials need only determine *if* each school's

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION

nondiscrimination policies include sexual orientation or gender identity; officials need no longer decide *whether* Title IX addresses sexual orientation or gender identity. USDA even called its mandate a "departmental regulation." FAC, Ex. C. And the APA's rulemaking procedures apply even when the government thinks "the statute explicitly mandates" the new standard and believes "it is doing nothing more than implementing the express language of the statute." *Jean v. Nelson*, 711 F.2d 1455, 1476 (11th Cir. 1983). Of course, here, the government is wrong about Title IX, *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 833, 838 (E.D. Tenn. 2022), so the SOGI Rule seeks to "create[ ] new law, *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018).

### 2. USDA ignored the APA's notice and comment procedures.

The APA imposes three-fold rulemaking procedures on legislative rules. *First*, an agency must publish a general notice of proposed rulemaking in the Federal Register, including "a statement of the time, place, and nature of public rule making proceedings" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved," or else find good cause on the record to omit these procedures. 5 U.S.C. § 553(b). *Second*, an "agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). And *third*, the "agency must consider and respond to significant comments." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

But USDA did none of this; it just published its SOGI Rule on its website, without warning or comment. FAC ¶ 54. The federal government's unilateral attempt to rewrite Title IX was enjoined for lack of notice and comment when the Department of Education tried to do so in 2016, *Texas v. United States*, 201 F. Supp. 3d 810, 828–31 (N.D. Tex. 2016), and again when it tried in 2021, *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022). The same should happen here.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### 3. USDA did not engage in reasoned decision making.

The SOGI Rule also must be "set aside" because it is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). An agency must address important aspects of the issue. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). This includes a duty to explain the impact on reliance interests and to consider alternatives. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910–13 (2020).

Because USDA skipped rulemaking procedures entirely, it never addressed the issues required for reasoned decision making. It did not consider the rule's impact on private religious schools and the students who attend them. It did not address the disruption its rule would create for children and schools that have reliance interests in continuing school meal programs. It did not consider any reliance interests that might exist in maintaining sex-specific restrooms, dress codes, or athletics. And it did not consider interests in freedom of religion, speech, and association, such as in hiring practices or using pronouns that correspond with biological sex. Nor did USDA consider any alternative policies that respect the interests of religious schools and their students. FAC ¶ 192.

The government's failure to "overtly consider" these privacy and religious freedom reliance interests renders it fatally flawed. *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020). Considering these policy concerns "was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

### 4. USDA exceeded its statutory authority.

USDA's SOGI Rule is flawed for another reason: it exceeds Title IX's statutory authority. Title IX's text, structure, legislative history, regulations, and historical interpretation confirm that "sex" means biological sex—not sexual orientation or gender identity. Indeed, when Title IX was passed over 50 years ago, Congress understood "sex" as a biological binary. *E.g.*, 20 U.S.C. §§ 1681(a)(2), 1681(a)(8), 1686; 34 C.F.R. § 106.33. Title IX required equal opportunities and practical

accommodations according to biological sex, so of course it didn't adopt a sex-blindness theory. That is why Title IX regulations require athletic opportunities to "effectively accommodate the interests and abilities" of girls. 34 C.F.R. § 106.41(c).

When the federal government sought to expand Title IX in this way through the Department of Education, it was enjoined for acting contrary to the statute's text. *Texas*, 201 F. Supp. 3d at 829–34.

In *Bostock v. Clayton County*, the Supreme Court held that firing an employee "for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII, 42 U.S.C. § 2000e-2, which governs employment. 140 S. Ct. 1731, 1737–38 (2020). But just because a federal law addresses sex discrimination does not mean it is identical to Title VII. To the contrary, the texts of Title VII and Title IX are materially different. *Compare* 42 U.S.C. § 2000e-2(a) with 20 U.S.C. § 1681(a); *see also Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects . . . . Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."). That is why the Supreme Court rejected any assertion that its "decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." 140 S. Ct. at 1753. In fact, even under Title VII, the Court assumed "sex" "refer[s] only to biological distinctions between male and female." *Id.* at 1739. And it did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 1737–38, 1753.

Nor did *Bostock* consider the effect of Title IX on the major questions doctrine, *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–09 (2022), and the clear-notice canon, which limit agencies from broadly interpreting statutes that, like Title IX, preempt core state police-power regulations, *Bond v. United States*, 572 U.S. 844, 858 (2014), abrogate sovereign immunity, or impose grant conditions, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24 (1981). Congress must use "exceedingly clear language . . . to significantly alter the balance between federal and state power." *Ala.*

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

*Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The statute must be "unmistakably clear," *Gregory v. Ashcroft*, 501 U.S. 452, 460, 464 (1991), and not use "expansive language," *Bond II*, 572 U.S. at 857–58, 860, to impose "a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 190 n.11 (1982). But Congress did not unmistakably address sexual orientation or gender identity in Title IX in 1972. Title IX's plain text, the major questions doctrine, and the clear-notice canon thus compel a narrow reading. *See, e.g.*, *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811–17 (11th Cir. 2022).

**B.  The SOGI Rules violate Plaintiffs' statutory and constitutional rights.**

**1.  The Rules violate the Free Exercise Clause.**

Defendants' enforcement of the SOGI Rules, both USDA's and CDSS's, should also be enjoined because they violate the Free Exercise Clause in at least three ways.

First, the SOGI Rules seek to limit the Church and Dayspring's ability to select their ministers and to hire employees who agree with and live out their religious beliefs. Such a serious intrusion into their religious freedom is per se unconstitutional. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196 (2012). Second, the SOGI Rules exclude the Church and Dayspring from the Food Program because they will not forfeit their religious character and beliefs. This too is unconstitutional. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022). Third, Defendants' enforcement of the SOGI Rules burden the Church and Dayspring's religious exercise, but the rules are neither neutral nor generally applicable and cannot satisfy strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

**a.  The Rules interfere with Plaintiffs' ministerial hiring decisions and prevents them from hiring coreligionists.**

The SOGI Rules interfere with the Church and Dayspring's constitutionally protected employment decisions. CDSS claimed they violated the SOGI Rules simply

14

by "requir[ing] all employees to read and abide by a staff handbook" that expects them to share and live out the Church's religious beliefs. FAC, Ex. J at 1–2. But the First Amendment affords churches and religious organizations that right, and Defendants cannot force them to surrender it to participate in the Food Program.

The First Amendment protects the autonomy of churches and religious organizations—the "independence . . . to decide for themselves, free from state interference, matters of [internal] government." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This includes a "ministerial exception" from nondiscrimination rules, which "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194–95 (quoting *Kedroff*, 344 U.S. at 119). It also includes the freedom to hire coreligionists—those who agree with and live out the church's religious beliefs and teachings, including "the standard of morals required of them." *Watson v. Jones*, 80 U.S. 679, 733 (1871).

Although the ministerial exception and freedom to hire coreligionists are different, they work together to keep the government out of the internal affairs of churches and religious organizations. The ministerial exception prevents interference with a religious institution's decision to hire or fire one of its "ministers," whatever the reason given for the decision. The freedom to prefer coreligionists, on the other hand, extends to all positions (not just ministers) but is limited in that it "does not apply to purely secular decisions." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002). In other words, the right to hire coreligionists does not confer a right to fire non-ministerial employees for any reason. But when the employment decision is rooted in religious belief, practice, or adherence, the First Amendment forbids the government from usurping or second guessing it. *Id.*; *see also Spencer v. World Vision, Inc.*, 633 F.3d 723, 742 (9th Cir. 2011) (Kleinfield, J., concurring) ("If the government coerced staffing of religious institutions by persons

who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions.").

Defendants' SOGI Rules seek to strip Plaintiffs of both freedoms: the ministerial exception and the right to hire coreligionists. To feed needy children through the Food Program, Defendants insist the Church and Dayspring must hire not just those who reject their beliefs about human sexuality but also those who reject Christianity *entirely*. *See* Cal. Gov't Code § 11135 (prohibiting discrimination "on the basis of . . . religion"). But no court has ever allowed the government to go so far; and the First Amendment would be meaningless if the government could. In deciding whether an organization qualifies as religious under the First Amendment (or a religious exemption), courts ask if the organization's "membership is made up by coreligionists." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007). To tell Plaintiffs they cannot limit employment to coreligionists is really no different than telling them they can't be religious.

The results would be devastating. The Church and Dayspring's overarching goal is "to introduce each child to a lasting relationship with Jesus Christ." Wade Decl. ¶ 11. But this goal cannot be achieved without employees who wholeheartedly agree with and live out the Church and Dayspring's beliefs and who desire to transform lives through Jesus Christ. The Church and Dayspring depends on their employees to put faith into action and to aid others in their spiritual growth. Employees, especially teachers, who reject, disagree, or live a life contrary to that faith cannot credibly demonstrate it to Dayspring's students. Instead, they would actively undermine it.

Because the SOGI Rules would force the Church and Dayspring to hire people who reject their religious beliefs, they violate the First Amendment.[2]

---

[2] The SOGI Rules violate Plaintiffs' right to expressive association for the same reasons. *See Slattery v. Hochul*, 61 F.4th 278, 288 (2d Cir. 2023) ("The right to

### b.  The Rules withhold an otherwise available public benefit because of Plaintiffs' religious character, beliefs, and exercise.

Defendants have further violated the Free Exercise Clause by disqualifying the Church and Dayspring from public funding because of their religious character, beliefs, and exercise.

The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). It also forbids the government from "exclud[ing] religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996. So government officials cannot "discriminate[ ]" against otherwise eligible religious schools "by disqualifying them . . . solely because of their religious character." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). Nor may they "identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S. Ct. at 2002.

Yet Defendants have done just that. Their enforcement of the SOGI Rules has excluded the Church and Dayspring from a public benefit solely because they hire coreligionists and follow their religious beliefs about human sexuality. A wide range of private and public schools with government-approved views on human sexuality may continue to participate in the Food Program, but the Church and Dayspring have been shunned because of theirs. This imposes "special disabilities on the basis of religious views or religious status"; it is "odious to our Constitution" and "cannot stand." *Trinity Lutheran*, 582 U.S. at 460–61, 467.

---

expressive association allows [an organization] to determine that its message will be effectively conveyed only by employees who sincerely share its views.").

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### c. The Rules are not neutral or generally applicable, and they fail strict scrutiny.

Finally, the SOGI Rules violate the Free Exercise Clause for a third reason: they are neither neutral nor generally applicable and cannot survive strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876–77 (2021).

<u>Neutrality & General Applicability</u>. "Neutrality and general applicability are interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877. "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id*.

In *Fulton*, the City of Philadelphia refused to contract with Catholic Social Services (CSS) for foster care services unless the religious ministry agreed to certify same-sex couples as foster parents in violation of its beliefs. *Id.* at 1875–76. The city invoked the contract's nondiscrimination provision, claiming that it prohibited CSS from declining to certify same-sex couples based on its religious beliefs. *Id.* at 1875. But exceptions from the nondiscrimination provision were available at the city's "sole discretion." *Id.* at 1878. That discretion, the Court held, created "a system of individual exemptions," making the nondiscrimination provision not generally applicable. *Id.* And it did not matter if the city had ever granted an individualized exemption; the mere "*creation* of a formal mechanism for granting exceptions renders a policy not generally applicably, regardless whether any exceptions have been given." *Id.* at 1879 (emphasis added).

Similarly, here, Defendants' SOGI Rules are not generally applicable because the laws on which they are based allow for exemptions. *See* 20 U.S.C. § 1681(a)(3) (Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of [Title IX] would not be consistent with the religious

18

tenets of such organization"); 42 U.S.C. § 2000e-1 (Title VII "shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities").[3] Defendants could have granted Plaintiffs an exemption, but they refused to do so. This triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1877.

The SOGI Rules also trigger strict scrutiny because Defendants showed hostility towards Plaintiffs' religious beliefs when enforcing the rules against them. A government policy will not qualify as neutral if it is "specifically directed at . . . religious practice." *Smith*, 494 U.S. at 878. A policy can fail this test, even if it does not "discriminate[s] on its face," if a religious exercise is otherwise its "object." *Lukumi*, 508 U.S. at 533. "The government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).

The religious hostility here was like the hostility on display in *Masterpiece Cakeshop*. There, Jack Phillips refused to create a custom wedding cake in celebration of a same-sex wedding. *Id.* at 1724. The Colorado Civil Rights Commission asserted that his religious views "[could] not legitimately be carried into the public sphere or commercial domain." *Id.* at 1729. And one commissioner later commented that "[f]reedom of religion ha[d] been used to justify all kinds of discrimination throughout history." *Id.* The Supreme Court determined that these comments were "inappropriate

---

[3] To the extent that the State Defendants argue their SOGI Rule is based on state statutes that do not allow for exemptions, federal law requires those statutes to be enforced consistently with federal requirements and prohibits the State from relying on those statutes as an independent basis for denial. 7 C.F.R. § 226.25(b); *see also* Section I.B.4.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

and dismissive," *id.*, and held that "the Commission's treatment of Phillips' case violated the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint," *id.* at 1731.

So too here. The State Defendants, entrusted by USDA to administer the Food Program, summarily rejected Plaintiffs' request for a religious exemption. FAC ¶¶ 79–81. And they disparaged the Church and Dayspring's religious beliefs along the way, accusing them of using "religious freedom" as "a justification for discrimination." FAC, Ex. J at 1. Nothing could be further from the truth; Plaintiffs welcome and serve all families and children. Wade Decl. ¶¶ 14–15. They just wanted to make sure they could continue aligning their internal policies and employment decisions with their religious beliefs—just as they had for decades before and is their constitutional right. What's more, the State Defendants' prematurely cut off Dayspring's funding in violation of rules requiring it to continue funds during an administrative appeal. Wade Decl. ¶ 58. Taken together, these facts show that Plaintiffs' religious objections were "not considered with the neutrality that the Free Exercise Clause requires." *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

Strict Scrutiny. Defendants' actions cannot survive strict scrutiny. The government cannot rely on a "broadly formulated" interest in "equal treatment" or in "enforcing its non-discrimination policies generally," but must establish a compelling interest of the highest order "in denying an exception" to the Church and Dayspring. *Fulton*, 141 S. Ct. at 1882. But here, federal law already exempts many schools from the SOGI Rules. 20 U.S.C. § 1681(a)(3). This "creation of a system of exceptions . . . undermines the [government's] contention that its nondiscrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882.

Nor can the State Defendants assert a compelling interest in enforcing their own SOGI Rules in this context. As noted, federal law prohibits state agencies administering the Food Program from imposing additional state requirements to deny otherwise

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

eligible institutions. 7 C.F.R. § 226.25(b). And the two state statutes that CDSS invoked for its own SOGI Rule—Cal. Gov't Code §§ 11135 and 11139.8—were not even intended by the California legislature to apply to the federal Food Program. California Government Code § 11135 is concerned with exclusively state-funded programs, not federal ones. And California Government Code § 11139.8 merely limits the ability of state officials to travel to states that, in California's opinion, do not adequately protect against sexual orientation and gender identity discrimination. That law says nothing about the Food Program and places no obligations at all on private entities like Plaintiffs.

### 2. The Rules violate Plaintiffs' freedom of speech.

Defendants' SOGI Rules also violate the First Amendment's Free Speech Clause. They do so by censoring and compelling speech based on content and viewpoint and by attaching unconstitutional conditions. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-164 (2015).

The Church and Dayspring share their views on human sexuality in appropriate ways with both their students and employees, including the belief that "God created and designed men and women in His image, male and female, and that human sexuality is defined and determined by God—not emotions or feelings." Wade Decl. ¶ 10. This is protected speech. *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 679–80 (2015) ("The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths."). But under Defendants' SOGI Rules, officials would treat Plaintiffs' speech as discrimination or harassment. The SOGI Rules require Plaintiffs to speak in ways contrary to biological sex, including pronouns, and they prohibit speech taking a different view. The rules also force the Church and Dayspring to adopt government policies that violate their religious beliefs, and post these policies publicly,

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

and requires them to file assurances of compliance, pledging to avoid speech that the government disfavors. FAC ¶ 62.

Worse, the SOGI Rules regulate Plaintiffs' speech based on "the idea or message expressed." *Reed*, 576 U.S. at 163. Under the rules, the Church and Dayspring must print and post statements saying they hire people of all sexual orientations and gender identities, but they cannot publish statements saying they hire only those who share their religious beliefs about human sexuality. So a statement is only prohibited based on the message it contains. The SOGI Rules unconstitutionally shut off an entire category of speech. *Id.* at 169 ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

But "regulating speech because it is discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019). The government lacks any legitimate objective "to produce speakers free" from purported bias. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995). And any such claimed interest is particularly "weak" in the context of education and pronouns. *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021); *see also Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("academic freedom" is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"). In contrast, "the First Amendment interests are especially strong here because [the Church and Dayspring's] speech also relates to [their] core religious and philosophical beliefs." *Meriwether*, 992 F.3d at 509.

### 3.  USDA's Rule conflicts with Title IX's religious exemption and RFRA.

Title IX does not apply to schools "controlled by a religious organization if the application of [Title IX] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Because this exemption applies *automatically*

22

by operation of statute, *Maxon v. Fuller Theological Seminary*, 549 F. Supp. 3d 1116, 1125 (C.D. Cal. 2020), neither USDA nor CDSS was free to ignore it, either on their own initiative or on the theory that USDA regulations require schools to correspond in writing to USDA to "claim" an exemption. 7 C.F.R. § 15a.205.

Enforcing USDA's SOGI Rule against the Church and Dayspring also conflicts with the Religious Freedom Restoration Act (RFRA). RFRA prohibits Defendants from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless Defendants prove the burden "is in furtherance of a compelling interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Defendants cannot meet this rigorous standard. The SOGI Rules force the Church and Dayspring to choose between their religious character and exercise and being excluded from the Food Program. This qualifies as a substantial burden. *Carson*, 142 S. Ct. at 1996–97. And Defendants' enforcement actions against Plaintiffs cannot survive strict scrutiny given that the government already exempts many schools. *See Fulton*, 141 S. Ct. at 1882.

### 4.  CDSS's Rules cannot be an independent basis for exclusion.

With USDA's SOGI Rule being unlawful under the APA, and the Church and Dayspring qualifying for a religious exemption under Title IX and the Constitution, there is no room for CDSS's SOGI Rules. Not only do they conflict with federal rights, but federal law also prohibits state agencies administering the Food Program from imposing additional state requirements to deny otherwise eligible institutions. 7 C.F.R. § 226.25(b). USDA regulations declare that any additional State agency requirements for participation in the Food Program may not be "inconsistent" with federal requirements and "may not deny the Program to an eligible institution." 7 C.F.R. § 226.25(b). USDA guidance further explains that "State agencies may not deny an application, . . . declare a sponsor seriously deficient, or terminate a sponsor based solely on the violation of an additional State agency requirement." FAC, Ex. G at 2.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Yet that is precisely what happened here. The State Defendants invoked their own SOGI Rules as an *independent* basis for kicking the Church and Dayspring out of the Food Program. Because such actions conflict with federal laws, the Court should grant the motion and enjoin the State Defendants from enforcing independent state requirements—such as Cal. Gov't Code §§ 11135 and 11139.8—to exclude Plaintiffs from the Food Program. *See* U.S. Const., Art. VI, para. 2 (Supremacy Clause).

## II.   The remaining preliminary injunction factors support Plaintiffs.

In First Amendment cases, the preliminary injunction analysis essentially reduces to a single question: whether the plaintiff is likely to succeed on the merits. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). That is because a likely First Amendment violation "compels a finding that the balance of hardships tips sharply in Plaintiff's favor" and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up and citations omitted). The loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Church and Dayspring have suffered and continue to suffer irreparable harm because of Defendants' enforcement of the SOGI Rules. As explained, Defendants' SOGI Rules violate the Church and Dayspring's free exercise of religion and freedom of speech and association by forcing them to surrender their religious beliefs and practices, including their right to hire coreligionists, to keep feeding hungry children through the Food Program. A preliminary injunction is warranted for this reason alone.

The requested injunction is also appropriate because the harm to Plaintiffs and their schoolchildren far outweighs any purported harm to the government. In fact, a preliminary injunction would not harm the government at all, as it would merely be required to do a good thing—continue to feed children in need. Any argument to the contrary is belied by the fact that Title IX provides automatic exemptions and

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

accommodations for religious institutions whose beliefs and practices conflict with SOGI Rules. What's more, the Church and Dayspring have successfully participated in the Food Program for nearly 20 years, admirably fulfilling the purpose of the program by providing nutritious, healthy meals to children every day. And they have done so precisely *because of* their religious beliefs, which teach them to love and care for every child. Wade Decl. ¶ 31. Kicking them out of the program because some government officials do not like their religious beliefs does nothing to advance the government's only real interest here: providing "nutritious foods that contribute to the wellness healthy growth, and development of young children." 42 U.S.C. § 1766(a)(1)(A)(ii).

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction and issue an injunction without bond (1) ordering Defendants to reinstate Plaintiffs' Food Program Agreement effective December 29, 2022, (2) delaying the effective date of USDA's SOGI Rule under 5 U.S.C. § 705, and (3) prohibiting enforcement or implementation of both USDA's and CDSS's SOGI Rules against Plaintiffs during the pendency of this action.

Dated June 2, 2023                    Respectfully submitted,

/s/Jeremiah J. Galus
David A. Cortman, GA Bar No. 188810*
dcortman@adflegal.org
Ryan J. Tucker, AZ Bar No. 034382*
rtucker@adflegal.org
Jeremiah J. Galus, AZ Bar No. 030469*
jgalus@adflegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

Julie Blake, DC Bar No. 998723*
jblake@adflegal.org
Andrea Dill, DC Bar No. 1719500*
adill@adflegal.org
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Dean R. Broyles, Esq., CA Bar No. 179535
dbroyles@nclplaw.org
NATIONAL CENTER FOR LAW & POLICY
539 West Grand Ave.
Escondido, CA 92025
(760) 747-4529

Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
Julianne Fleischer, Esq. CA Bar No. 337006
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
(951) 600-2733

*Admitted Pro Hac Vice
Attorneys for Plaintiff

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION